# EXHIBIT A

# PART 1

**MILLER NASH LLP**
Bernard J. Kornberg, Bar No. 252006
bernie.kornberg@millernash.com
Nicole M. McLaughlin, Bar No. 272019
nicole.mclaughlin@millernash.com
340 Golden Shore, Suite 450
Long Beach, California 90802
Telephone: (562) 435-8002
Facsimile: (562) 435-7967

Attorneys for Plaintiff Conterra Agricultural Capital, LLC

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

CONTERRA AGRICULTURAL CAPITAL, LLC, an Iowa limited liability company,

Plaintiff,

v.

DLP FUNDING, LLC, a New York limited liability company,

Defendant.

Case No.

**COMPLAINT FOR**

**(1) Conversion;**
**(2) Intentional Interference with Contract; and**
**(3) Unfair Business Practices (Calif. Bus. & Prof. Code §17200, Et. Seq.)**

Plaintiff Conterra Agricultural Capital, LLC ("Conterra" or "Plaintiff") alleges the following:

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction based upon 28 U.S.C. § 1332. Complete diversity of citizenship is present because plaintiff Conterra is a citizen of Iowa, while defendant DLP Funding, LLC ("DLP") is a citizen of New York. As described below, Conterra alleges damages of at least $6,000,000 which exceeds the

$75,000.00 threshold for diversity jurisdiction cases.

2. The Court has personal jurisdiction over DLP, which availed itself of the laws of the State of California by providing lending services to businesses within the State and by taking the assignment of accounts owed within the state to businesses within the State.

3. This Court is the appropriate venue for this action pursuant to 28 U.S.C. § 1391 because a substantial part of the acts and omissions giving rise to the claims occurred and continue to occur in this judicial district.

**PARTIES**

4. Conterra is a limited liability company formed under the laws and protections of the State of Iowa with its principal place of business located in the State of Iowa. Conterra is engaged in the business of lending to agricultural businesses throughout the United States, including the State of California, County of Kern.

5. On information and belief, DLP is a limited liability company formed under the laws and protections of the State of New York with its principal place of business located in the State of New York, doing business in the State of California and in this District by, among other things providing lending services to businesses in the State of California, County of Kern.

**FACTUAL ALLEGATIONS**

**A. The First-Position Conterra Loan Agreement**

6. Conterra Agricultural Capital, LLC is a leading lending institution that focuses exclusively on agricultural lending throughout the United States, including businesses in California's Central Valley.

7. Non-parties Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, the "Conterra Borrowers") are affiliated entities that own and/or operate a family-owned

business commonly referred to as "Hronis Farms," headquartered in the City of Delano, County of Kern, California. Hronis Farms grows, packs, and ships grapes and other produce to its customers, which include big box retailers like Costco and Walmart.

8. Conterra is the lender on a loan given on October 29, 2024 to the Conterra Borrowers (the "Loan") in which Conterra agreed to provide an operating line of credit to the Conterra Borrowers in the amount of $55,000,000 (which was later extended to $85,850,000 due to the financial distress of the Conterra Borrowers). A true and correct copy of the Loan and Security Agreement dated October 29, 2024 (the "Conterra Loan Agreement") is attached hereto as **Exhibit 1**.

9. Pursuant to section 1.1 of the Conterra Loan Agreement, an "account" is generally defined to include "all present and future right to payment of a monetary obligation, whether or not earned by performance."

10. Pursuant to section 1.1 of the Conterra Loan Agreement, a "general intangible" includes "deposit accounts, customer deposit accounts, deposits, rights related to prepaid expenses, Farm Service Agency payments, USDA payments, negotiable or non-negotiable instruments or securities, chattel paper, causes of action and all other intangible personal property of every kind and nature."

11. Pursuant to section 1.1 of the Conterra Loan Agreement, an "account debtor" is generally defined to include the "party which is obligated on or under an Account or a General Intangible."

12. Pursuant to Section 5.1 of the Conterra Loan Agreement, the Conterra Borrowers granted Conterra a security interest in substantially all personal property assets, including the accounts and general intangibles, of the Conterra Borrowers (the "Personal Property Collateral").

13. A UCC-1 Financing Statement (the "Financing Statement") providing notice of this security interest was recorded with the California Secretary of State on October 29, 2024 as filing number U240083964841. A true and correct copy of the

Financing Statement is attached hereto as **Exhibit 2**.

14. Pursuant to Section 5.6 of the Conterra Loan Agreement, the Conterra Borrowers are required to require all account debtors to deposit all payments into U.S. Bank National Association Bank Account, last four #1093 (the "U.S. Bank Account"). The U.S. Bank Account is controlled by Conterra under a Deposit Account Control Agreement (the "DACA"). These payments were to be used for payment of the Conterra Loan Agreement.

15. Pursuant to Section 5.14 of the Conterra Loan Agreement, the Conterra Borrowers "shall not sell, lease, transfer or otherwise dispose of any Collateral unless the purchase price for the full value of the Collateral is paid to the Lender."

16. Shortly after giving the loan, Conterra learned that Borrowers' representations regarding their financial condition that were provided during underwriting was materially incorrect. These financial misstatements led to an immediate default on the Loan and a request by the Conterra Borrowers to increase the funds available to complete the 2025 harvest.

17. Conterra and the Conterra Borrowers then entered into several workout agreements, the last of which is a letter agreement dated June 27, 2025 (the "June Letter Agreement"). A copy of the June Letter Agreement is attached to this complaint as **Exhibit 3**.

18. Relevant to this action, in the June Letter Agreement, the Conterra Borrowers agreed to hire a Chief Restructuring Officer (the "CRO").

19. Further, the Conterra Borrowers agreed that "[t]he CRO will have full and sole responsibility regarding borrowing of funds by Borrowers."

20. Further, in the June Letter Agreement, the Conterra Borrowers agreed that "Borrowers shall not enter into any transaction outside the ordinary course of business without (i) receiving prior approval of the CRO for the transaction; and (ii) notifying Lender no earlier than three business days before the transaction."

21. Relying on these and other promises in the June Letter Agreement,

Conterra agreed to increase the amount available to the Conterra Borrowers under the Loan to $85,850,000.

**B. <u>The DLP Merchant and Security Agreement</u>**

22. DLP, on the one hand, and Hronis Fruit Company, Hronis Ranch, LLC, Hronis Citrus, LLC, California Grape Growers Cooperative, International Fruit Company, Inc., Central California Orange Growers Cooperative, Shamrock Transport, LLC, Hronis, Inc., and the Peter Hronis Company, LLC (collectively, the "DLP Borrowers"), on the other hand, entered into a Merchant and Security Agreement, dated November 14, 2025 (the "MSA"). A true and correct copy of the MSA is attached hereto as **Exhibit 4**.

23. Under the MSA, DLP agreed to fund a total of $13,453,570.20 to the DLP Borrowers, to be paid out under the schedule set forth in the MSA.

24. In exchange for these funds, the DLP Borrowers agreed to sell, assign, and transfer to DLP 19.25% of all of the DLP Borrowers' future receipts, contract rights, and rights to payment from the DLP Borrowers' customers and/or third party payors. Further, in the event of a default, the DLP Borrowers agreed that 100% of future receipts would transfer to DLP.

25. Pursuant to the MSA, the term "Future Receipts" is defined as "all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchant Account(s)."

26. In connection with the MSA, the DLP Borrowers granted DLP a security interest in all of the DLP Borrowers' accounts.

27. Three of the DLP Borrowers are also Conterra Borrowers: Hronis Ranch, LLC, Hronis Citrus, LLC, and Hronis, Inc. (collectively, the "Overlap Borrowers").

28. Under the June Letter Agreement, the Overlap Borrowers were prohibited from entering into the MSA without the authorization of the CRO and notice to Conterra. This authorization was not sought or granted. Instead, the Overlap

Borrowers hid the existence of the MSA from the CRO and Conterra.

29. The CRO only discovered the existence of the MSA in December of 2025. By that time, at least $2,452,229.00 had been advanced by DLP under the MSA.

**C. <u>DLP's Fraudulent Notices to the Conterra Borrowers' Account Debtors</u>**

30. Conterra is informed that, shortly after these funds were advanced, the DLP Borrowers defaulted on their obligations under the MSA.

31. Conterra is informed and thereon alleges that DLP served notices (the "DLP Payover Notices") on certain account debtors of the Conterra Borrowers, including Costco Wholesale ("Costco") and Walmart, Inc. ("Walmart"). These notices assert that DLP is the assignee of the accounts of the DLP Borrowers and that, under sections 9406 and/or 9607 of the California Commercial Code, all payments on accounts owed to the DLP Borrowers must be paid directly to DLP.

32. DLP had no right to send the DLP Payover Notices. All payments owed by Costco and Walmart were owed to the Overlap Borrowers. Thus Conterra's first in time lien in the accounts of the Overlap Borrowers took priority over any interest of DLP in those accounts.

33. Further, as the Financing Statement was recorded October 29, 2024, DLP had, at a minimum, constructive notice of the existence of Conterra's lien in the accounts of the Conterra Borrowers. DLP's acts to redirect those accounts to DLP were intentionally wrongful.

34. Prior to the mailing of the DLP Payover Notices, Costco and Walmart tendered all payments owed to the Conterra Borrowers directly to the US Bank Account controlled by Conterra.

35. Upon receipt of the DLP Payover Notices, Costco and Walmart have refused to release the funds owed to the Conterra Borrowers to the US Bank Account.

36. On January 2, 2026, Conterra served its own notices on Costco and Walmart setting forth the superiority of its lien and requiring payment of all owed to

the Conterra Borrowers directly to Conterra (either directly or through the US Bank Account). A copy of each notice is attached as **Exhibit 5** and **Exhibit 6** to this complaint.

37. In response, Costco and Walmart have informed counsel for Hronis Farms and Conterra that all funds will be held pending resolution of the dispute regarding payment.

38. Conterra is informed that Costco is holding $1,175,692.01 in funds owed to the Conterra Borrowers (the "Costco Withheld Funds").

39. Conterra is informed that Walmart is holding approximately $4,700,000.00 of funds owed to the Conterra Borrowers (the "Walmart Withheld Funds").

40. The Costco Withheld Funds and Walmart Withheld Funds were, pursuant to the Conterra Loan Agreement, scheduled to be paid to the U.S. Bank Account controlled by Conterra, and if made would have resulted in payment on the Conterra Loan Agreement.

41. DLP's false notices have therefore directly interfered with Conterra's first position rights in the accounts of the Conterra Borrowers. DLP knew or should have known that its notices would interfere with Conterra's collection on the Conterra Loan and constitute conversion of Conterra's collateral.

42. On January 5, 2026, Conterra sent DLP a cease and desist letter demanding that DLP release all liens and provide an accounting of all funds collected under the MSA. A copy of this letter is attached as **Exhibit 7** to this complaint.

43. After receipt of this letter, counsel for Conterra and DLP held a call to discuss the matter. Since that call, DLP has not yet provided a full accounting. Further, DLP has refused to release the accounts and, further, refused to provide assurances it will not further seek to collect on the accounts of the Conterra Borrowers.

44. To date, there is an outstanding balance owed to Conterra under the

Conterra Loan Agreement in the amount of $68,921,599.97.

45. Due to the Conterra Borrowers' continued breach of their obligations under the Conterra Loan Agreement, including the entering into the MSA in violation of the June Letter Agreement, on December 4, 2025, Conterra brought suit in the Superior Court of California, County of Kern against the Hronis Borrowers and others to collect on its debt (the "Collection Action"). A copy of the initiating complaint in that action is attached as **Exhibit 8** to this complaint.

**FIRST CLAIM FOR RELIEF: CONVERSION**

**(Against DLP)**

46. Conterra re-alleges each and every allegation as set forth above.

47. Pursuant to the Conterra Loan Agreement, Conterra has first position rights in the accounts of the Conterra Borrowers, including the U.S. Bank Account.

48. At all relevant times, Conterra's security interest was in first priority due to the Conterra Loan Agreement and the UCC-1 Financing Statement being first recorded in October 2024.

49. At all relevant times, DLP's security interest was second in priority to Conterra's security interest, as the Conterra Loan Agreement has not been paid in full.

50. DLP intentionally and substantially interfered with Conterra's security interest in the Conterra Borrowers' accounts by serving notices falsely advising certain account debtors, including Costco and Walmart, to pay over all accounts directly to DLP.

51. As a result of DLP's conduct, Costco and Walmart have withheld funds owed to the Conterra Borrowers which were scheduled to be paid to a depository account controlled by Conterra, and if made would have resulted in payment on the Conterra Loan Agreement. Further, other account debtors of the Conterra Borrowers are, on information and belief, also withholding funds from Conterra.

52. Conterra did not consent to DLP sending the notices to the account

debtors or to DLP advising the account debtors to pay over all accounts directly to DLP.

53. DLP's conduct was a substantial factor in causing Conterra's harm.

54. As a result of DLP's conduct, Conterra has been damaged in an amount not less than $6,000,000, constituting the withheld and/or misdirected funds that were scheduled to be used for payment on the Conterra Loan Agreement, and from its loss of the use of funds.

55. Conterra is further entitled to its attorneys' fees and costs under the tort of another doctrine.

**SECOND CLAIM FOR RELIEF: INTENTIONAL INTERFERENCE WITH CONTRACT**

**(Against DLP)**

56. Conterra re-alleges each and every allegation as set forth above.

57. Conterra has, and at all relevant times herein mentioned had, valid and existing contractual relationships with the Conterra Borrowers via the Conterra Loan Agreement.

58. At all relevant times, Conterra's security interest was in first position and first in priority due to the Conterra Loan Agreement and the Financing Statement. DLP is aware, and at all relevant times herein mentioned has been aware, of the contractual relationships between Conterra and the Conterra Borrowers.

59. DLP is aware, and at all relevant times herein mentioned has been aware, that DLP's security interest was second in priority to Conterra's security interest, as the Conterra Loan Agreement was not paid in full.

60. DLP is aware, or should have been aware through due diligence, that the Conterra Loan Agreement prohibited the Conterra Borrowers from further encumbering or selling the accounts.

61. DLP is aware, or should have been aware through due diligence, that the June Letter Agreement prohibited the Overlap Borrowers from entering into the MSA

without the authorization of the CRO and notice to Conterra.

62. By engaging in the wrongful acts hereinabove alleged, specifically by taking liens in the accounts of the Overlap Borrowers and providing notices falsely demanding that the Overlap Borrowers' account debtors, including Costco and Walmart, pay over all accounts directly to DLP, DLP engaged in intentional acts designed to disrupt Conterra's contractual relationships by intentionally interfering with and obstructing the Conterra Borrowers' collection of accounts to satisfy the first position Conterra Loan Agreement. DLP intended to interfere in order to divert the funds to itself for its sole benefit. By engaging in the conduct alleged herein, DLP knew that Conterra would suffer harm from the disruption of its contractual relationships with the Conterra Borrowers.

63. As a direct and proximate result of DLP's intentional acts herein alleged, the contractual relationships of Conterra have been, and continue to be actually disrupted. Costco and Walmart have withheld funds owed to the Conterra Borrowers which would have resulted in payment on the Conterra Loan Agreement. DLP's conduct has caused, and will continue to cause, irreparable harm to Conterra's business interests, and has significantly damaged Conterra's contractual relationships described herein.

64. As a result of DLP's conduct, Conterra has been damaged in an amount not less than $6,000,000, constituting the withheld and/or misdirected funds that were scheduled to be used for payment on the Conterra Loan Agreement, and from its loss of the use of funds.

65. Conterra is further entitled to its attorneys' fees and costs under the tort of another doctrine.

**THIRD CLAIM FOR RELIEF: UNFAIR BUSINESS PRACTICES**

**(CALIF. BUS. & PROF. CODE §17200, ET. SEQ.)**

**(Against DLP)**

66. Conterra re-alleges each and every allegation as set forth above.

67. California Business & Professions Code section 17200 provides that unfair competition means and includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

68. DLP's acts as described above constitute unlawful, unfair, and fraudulent or deceptive business practices in violation of California Business & Professions Code section 17200. DLP's unlawful, unfair, and fraudulent or deceptive business practices specifically include providing false notices advising the Conterra Borrowers' account debtors to pay over all accounts directly to DLP, when DLP knew that Conterra's security interest in the Conterra Borrowers' accounts precedes that of DLP and has first priority. By engaging in the conduct alleged herein, DLP directly interfered with Conterra's first position rights in the accounts of the Conterra Borrowers and interfered with Conterra's collection on the Conterra Loan Agreement.

69. As a direct and proximate result of DLP's unfair competition, Conterra has been, and will continue to be, seriously and irreparably damaged unless DLP is enjoined from committing acts of unfair competition. In addition, by reason of DLP's actions, it has unlawfully profited, and Conterra has been damaged, in amounts which have not yet been fully determined.

70. Conterra is further entitled to its attorneys' fees and costs under the tort of another doctrine and under Code of Civil Procedure section 1021.5.

71. Conterra is further entitled to an injunction against DLP from further purchasing fully encumbered accounts in violation of the California Commercial Code and other law.

## PRAYER FOR RELIEF

WHEREFORE, Conterra prays that judgment be entered in its favor in this action as follows:

1. For damages in the amount of no less than $6,000,000, plus pre-judgment interest and post-judgment interest at the maximum rate permitted by

law;

2. For a finding that DLP has violated Cal. Bus. & Prof. Code § 17200 et seq.;

3. For preliminary and permanent injunctive relief ordering DLP to cease its unfair competition, as well as disgorgement of all of DLP's profits associated with this unlawful competition;

4. For preliminary and permanent injunctive relief (i) requiring DLP to account to Conterra as to all account debtors to whom DLP has made demand for payment on the MSA; (ii) requiring DLP to send notices to each of those account debtors, including Costco and Walmart, in which DLP states that it makes no claim to the accounts; (iii) prohibiting DLP from providing further false notices to any account debtors of the Conterra Borrowers and (iv) requiring DLP to account for and return to Conterra all payments made on the MSA;

5. For Punitive and other exemplary damages as allowed by law;

6. For an order compelling DLP to provide an accounting of any profits improperly made as a result of its unlawful conduct as herein alleged, and imposing a constructive trust on any such profits in favor of Conterra, as well as compelling DLP to disgorge all profits accrued as a result of its unlawful conduct as herein alleged in an amount to be determined at trial according to proof;

7. For reasonable attorneys' fees;

8. For costs of suit herein incurred; and

9. For such other and further relief as the Court may deem just and proper.

Dated: January 8, 2026 MILLER NASH LLP

By: *_/s/ Nicole M. McLaughlin_*
Bernie J. Kornberg
Nicole M. McLaughlin
Attorneys for Plaintiff Conterra Agricultural Capital, LLC

# EXHIBIT 1

# LOAN AND SECURITY AGREEMENT

| | |
|---|---|
| BORROWERS: | Hronis Capital Assets, LP<br>Hronis Capital Management, LLC<br>Hronis Citrus, LLC<br>Hronis Farming, LP<br>Hronis Fruit Company LLC<br>Hronis, Inc.<br>Hronis Land Company<br>Hronis Ranch, LLC<br>Hronis Resource Management, LLC<br>The Hronis Family Limited Partnership |
| LENDER: | Conterra Agricultural Capital, LLC, Its Successors And Or Assigns As Their Interest May Appear |
| ARANTORS: | Peter John Hronis<br>Kosta James Hronis<br>Demetrius Albert Hronis<br>The Kosta Hronis Living Trust Dated February 12, 2014<br>The Peter John Hronis Living Trust Dated February 28, 2006<br>Kosta Hronis and Peter J. Hronis, Trustees of the Sophia Hronis Irrevocable Trust One Dated December 27, 2012 |
| DATE: | October 29, 2024 |
| LOAN AMO NT: | 55,000,000 |

Table of Contents

Page

1. DEFINITIONS ..... 2
1.1 eneral Definitions ..... 2
1.2 Accounting Terms ..... 13
1.3 Others Defined in California niform Commercial Code ..... 13
1.4 Interpretation ..... 13
1.5 Other Defined Terms ..... 13
2. LOAN, LOAN AD ANCES, FEES AND S BORDINATIONS ..... 13
2.1 Loan ..... 13
2.2 Default Rate ..... 14
2.3 Prepayment ..... 14
2.4 Purposes ..... 14
2.5 Loan Fees ..... 14
2.6 Loan Account ..... 15
2.7 Statements ..... 15
2.8 Termination of Agreement ..... 15
2.9 Subordination by Borrower ..... 14
2.10 Lease Subordinations ..... 15
3.POSITION REPORT ..... 18
3.1 Eligible Accounts ..... 18
3.2 Eligible rowing Crops ..... 18
3.3 Delivery of Position Report Certificates ..... 18
4. CONDITIONS TO AD ANCES ..... 19
4.1 The Lender's Execution of Funding Documents ..... 19
4.2 Approval of the Lender's Counsel ..... 19
4.3 Compliance ..... 19
4.4 Documentation ..... 19
4.5 Other Conditions Precedent ..... 19
4.6 Line of Credit Position Report ..... 19
4.8 First Lien ..... 19
4.9 Inspections ..... 19

4.10 Permits ..... 19
4.11 oning..... 19
4.12 Collateral ..... 19
5. SEC RIT ..... 20
5.1 Security Interests and Liens ..... 20
5.2 Endorsement by the Lender ..... 21
5.3 Delivery of Warehouse Receipts ..... 21
5.4 Preservation of Collateral and Perfection of Security Interests Therein..... 21
5.5 Loss of alue of Collateral ..... 24
5.6 Collection of Accounts ..... 24
5.7 Account Covenants ..... 24
5.8 Account Records and erification Rights ..... 24
5.9 Notice to Account Debtors..... 25
5.10 Records And Reporting..... 25
5.11 Special Collateral ..... 25
5.12 Remittance of Proceeds to the Lender ..... 25
5.13 Safekeeping of Collateral..... 25
5.14 Sales and se of Collateral ..... 25
5.15 Real Property Collateral..... 24
5.16 Title Insurance ..... 24
5.17 .S. Bank Account ..... 26
6. WARRANTIES ..... 27
6.1 Binding Effect..... 27
6.2 Correctness of Financial Statements..... 27
6.3 Employee Controversies ..... 27
6.4 Compliance with Laws and Regulations..... 27
6.5 Collateral..... 27
6.6 Account Warranties ..... 28
6.7 Location of Assets..... 28
6.8 Inventory and Farm Product Warranties..... 28
6.9 Solvency..... 28
6.10 Tax Liabilities ..... 28

6.11 Pension Reform Act ........ 28
6.12 Indebtedness and Producer Payables ........ 29
6.13 Margin Security ........ 29
6.14 Other Corporate or Fictitious Names ........ 29
6.15 Affiliates ........ 29
6.16 Survival of Warranties ........ 29
6.17 Related Party Transactions ........ 29
6.18 ERISA Plans and Contracts ........ 29
6.19 Compliance: Licenses, Permits ........ 30
6.20 Ha ardous Substances ........ 31
6.21 Affiliate Transactions ........ 31
6.22 Compliance with Laws and Regulations ........ 32
6.23 SA Patriot Act Notification ........ 32
6.24 Borrower Existence and Equity Interests Properly Issued ........ 32
6.25 Borrower Authority ........ 35
6.26 Management and Equity Interests ........ 36
6.27 Litigation and Proceedings ........ 39
6.28 Certification ........ 39
6.29 Borrower's Non Reliance pon Lender ........ 39
6.30 Environmental uestionnaire ........ 39
6.31 Borrower Lists ........ 40
6.32 Financial Statements ........ 40
7. AFFIRMATI E CO ENANTS ........ 40
7.1 Financial Statements ........ 40
7.2 Conduct of Business ........ 41
7.3 Maintenance of Properties ........ 42
7.4 Notice of Suit, Adverse Change in Business, or Event of Default ........ 42
7.5 se of Proceeds ........ 42
7.6 Borrower's Property Insurance ........ 42
7.7 Pension Plans ........ 43
7.8 Further Actions ........ 43
7.9 Deposit Accounts ........ 43

7.10 Workers' Compensation Coverage ........ 43
7.11 Fidelity and Employee Dishonesty Bond ........ 44
7.12 The Lender's Right of Entry and Inspection ........ 44
7.13 Actions ........ 44
7.14 Collateral Located Only At Approved Locations ........ 44
7.15 Indemnity ........ 44
7.16 Regulation ........ 44
7.17 The Lender's Right of Entry and Inspection ........ 44
7.18 Borrower's Collateral Sales ........ 45
7.19 Further Action ........ 45
7.20 No Commitment for New Loans ........ 45
7.21 Consent to Loan Participation, Sale or Transfer ........ 45
7.22 Deposit Accounts ........ 45
7.23 Actions ........ 42
7.24 Title Insurance ........ 42
7.25 Financial Covenants ........ 45
8. NE ATI E CO ENANTS ........ 46
8.1 Encumbrances ........ 46
8.2 Consolidations, Mergers or Acquisitions, Subsidiaries, Public Offering ........ 47
8.3 Deposits, Investments, Advances or Loans ........ 47
8.4 Indebtedness ........ 47
8.5 uaranties and Other Contingent Obligations ........ 47
8.6 Disposition of Property ........ 47
8.7 Capital Investment Limitations ........ 48
8.8 Loans to Affiliates or Others ........ 48
8.9 Continuity of Management ........ 48
8.10 Environmental Laws ........ 48
8.11 Loans, Acquisitions, uaranties, Other Businesses ........ 48
8.12 Payables and Payment of Debt ........ 48
8.13 Split Financing ........ 48
8.14 Managerial Fees, Compensation of Officers or Managers ........ 48
8.15 Dividends, Redemptions, Debt ........ 48

8.16 Issuance of Membership Interests ........ 49
8.17 Amendment of Corporate overning Documents........ 49
8.18 se of Corporate or Fictitious Names ........ 49
8.19 Continuity of Consent of Management........ 49
8.20 Environmental Laws ........ 49
8.21 Loans, Acquisitions, uaranties, Other Businesses........ 49
9. DEFA LT, RI HTS AND REMEDIES OF THE LENDER ........ 49
9.1 Liabilities ........ 49
9.2 Rights and Remedies enerally........ 49
9.3 Entry pon Premises ........ 50
9.4 Sale of Other Disposition of Collateral by the Lender ........ 50
9.5 Waiver of Demand........ 50
9.6 Waiver of Notice........ 51
10. MISCELLANEO S ........ 51
10.1 Timing of Payments........ 51
10.2 Attorneys' Fees and Costs ........ 51
10.3 Expenditures by the Lender ........ 51
10.4 The Lender's Costs and Expenses as Additional Liabilities........ 52
10.5 Claims and Taxes........ 52
10.6 Custody and Preservation of Collateral ........ 52
10.7 Inspection........ 52
10.8 Examination of Banking Records ........ 53
10.9 overnmental Reports ........ 53
10.10 Reliance by the Lender ........ 53
10.11 Parties........ 53
10.12 Applicable Law Severability........ 53
10.13 Judicial Reference........ 53
10.14 Application of Payments Waiver ........ 53
10.15 Marshalling: Payments Set Aside........ 54
10.16 Section Titles ........ 54
10.17 Continuing Effect........ 54
10.18 No Waiver........ 54

10.19 Notices ........................................................................................................ 55
10.20 Maximum Interest ............................................................................................. 57
10.21 Additional Advances ........................................................................................ 57
10.22 Right of Setoff ................................................................................................... 57
10.23 No Partnership .................................................................................................. 57
10.24 Authority to File Notices ................................................................................... 58
10.25 Exhibits and Schedules ..................................................................................... 58
10.26 Counterparts ...................................................................................................... 58
10.27 Release .............................................................................................................. 58
10.28 No Reliance ....................................................................................................... 54
10.29 Agreement to overn and Control .................................................................... 58

# <u>LOAN AND SECURITY AGREEMENT</u>

## I. <u>PARTIES</u>

This Loan And Security Agreement (as may be amended, supplemented, restated, or otherwise modified from time to time, this Agreement ) is made and entered into as of the 29th day of October, 2024, by and among Hronis Capital Assets, LP ( Hronis Capital Assets ), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Capital Management, LLC ( Hronis Capital Management ), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Citrus, LLC ( Hronis Citrus ), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Farming, LP ( Hronis Farming ), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Fruit Company LLC ( Hronis Fruit Company ), whose address is 10443 Hronis Road, Delano California 93215, Hronis, Inc. ( Hronis ), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Land Company ( Hronis Land Company ), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Ranch, LLC ( Hronis Ranch ), whose address is 10443 Hronis Road, Delano, California 93215, Hronis Resource Management, LLC ( Hronis Resource Management ), whose address is 10443 Hronis Road, Delano, California 93215, The Hronis Family Limited Partnership ( The Hronis Family Limited Partnership ), whose address is 10443 Hronis Road, Delano, California 93215 (hereafter, Hronis Capital Assets, Hronis Capital Management, Hronis Citrus, Hronis Farming, Hronis Fruit Company, Hronis, Hronis Land Company, and The Hronis Family Limited Partnership are each a Borrower and sometimes collectively referred to as the Borrower ), Peter John Hronis ( PJHronis ), whose address is 10443 Hronis Road, Delano, California 93215, Kosta James Hronis ( KJHronis ), whose address is 10443 Hronis Road, Delano, California 93215, Demetrius Albert Hronis ( DAHronis ), whose address is 10443 Hronis Road, Delano, California 93215, The Kosta Hronis Living Trust dated February 12, 2014 ( The Kosta Hronis Living Trust ), whose address is 10443 Hronis Road, Delano, California 93215, The Peter John Hronis Living Trust dated February 28, 2006 ( The Peter John Hronis Living Trust ), whose address is 10443 Hronis Road, Delano, California 93215, Kosta Hronis and Peter J. Hronis, Trustees of the Sohpia Hronis Irrevocable Trust One dated December 27, 2012 ( The Sophia Hronis Irrevocable Trust One ), whose address is 10443 Hronis Road, Delano, California 93215 (hereafter, PJHronis, KJHronis, DAHronis, The Kosta Hronis Living Trust, The Peter John Hronis Living Trust, and The Sophia Hronis Irrevocable Trust One are each a uarantor and sometimes collectively referred to as uarantor ), and Conterra Agricultural Capital, LLC, its successors and or assigns as their interest may appear (the Lender ), whose address is 5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266 (hereafter, Borrower, uarantor, and Lender are each a Party and sometimes collectively referred to as the Parties ).

## II. <u>EFFECTI E DATE</u>

Although this Agreement is dated as of the 29th day of October, 2024, this Agreement will be effective only upon the execution by all Parties and not upon execution by fewer than all Parties (the Effective Date ).

## III. <u>RECITALS</u>

A. Borrower and uarantor have requested, and Lender has agreed to make that certain and financial accommodations on the terms and conditions set forth in this Agreement.

I . A REEMENTS

NOW, THEREFORE, in consideration of the mutual promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. DEFINITIONS

1.1 eneral Definitions. When used herein, the following terms shall have the meanings indicated:

Accounts shall mean all present and future right to payment of a monetary obligation, whether or not earned by performance: (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of; (b) for services rendered or to be rendered; (c) for a policy of insurance issued or to be issued, (d) for a secondary obligation incurred or to be incurred; (e) for energy provided or to be provided, (f) for the use or hire of a vessel under a charter or other contract; (g) arising out of the use of a credit or charge card or information contained on or for use with the card; or (h) as winnings in a lottery or other game of chance operated or sponsored by a State, governmental unit of a State, or person licensed or authori ed to operate the game by a State of governmental unit of a State. Accounts shall include the broadest definition permitted under the Code.

Account Control Agreement shall collectively mean the Deposit Account Control Agreements in forms and substance satisfactory to Lender and signed by the applicable depository institution qualifying as an Approved Local Bank, the applicable depositor, and the Lender.

Account Debtor shall mean the party which is obligated on or under an Account or a eneral Intangible.

Affiliate shall mean any Person: (a) the spouse, parent, child, grandchild, or sibling of any individual person, or any relative who lives in the same house with, or who is a dependent of (under the Internal Revenue Code), such Person; (b) any general or limited partnership or limited liability company in which such Person or any individual identified in clause (a) or entity identified in clauses (c) or (d) or (e) is a partner or member or in which any such Person, individual, or entity owns, beneficially or of record, more than 5 of the outstanding membership interest of Borrower; (c) any corporation in which such Person or any individual identified in clause (a) is a director or officer, or which any such Person, or any individual or entity identified in clause (a) is a director or officer, or in which such Person, or any individual or identity identified in clauses (a), (b), (d), or

(e) is the owner, beneficially or of record, of 5 or more of the outstanding voting stock; (d) any trust of which any such Person, or any individual or entity identified in clauses (a), (b), (c), or (e) is a trustee or co-trustee or is the holder, beneficially or of record, of a beneficial interest of 5 or more; or (e) any corporation, partnership, limited liability company, trust, or limited partnership or general or other entity controlled by, controlling under, or under common control with, either directly or indirectly, such Person or of the individuals or entities identified in clauses (a) through (d) above.

AgAmerica shall mean Ag REIT Two, LLC, a Florida limited liability company, and its successors and assigns, whose address is 4030 South Pipkin Road, Lakeland, Florida 33811.

AgAmerica Intercreditor Agreement shall mean the Intercreditor Agreement of even date herewith between AgAmerica and Lender and consented to by Borrower.

Agreement has the meaning set forth in the introductory paragraph of this document.

Approved Local Bank shall mean .S. Bank and any other depository bank approved by Lender and which has delivered to Lender a fully executed Account Control Agreement in form and substance acceptable to Lender, and it shall mean .S. Bank (or such other depository institution designated by Lender from time to time) with respect to the .S. Bank Account.

Borrower shall have the meaning set forth in the introductory paragraph of this Agreement.

Borrower Lease shall mean any lease or other document or agreement, written or oral, now or hereafter in existence, permitting any Borrower to use or occupy any part of the Real Property Collateral.

Borrower Tenant shall mean any Borrower now or hereafter using or occupying any part of the Real Property Collateral pursuant to a Borrower Lease.

Business Day means any day other than: (a) a Saturday, Sunday or legal holiday or a day on which banks located in Iowa are required or authori ed by law to be closed: or (b) a day on which the New ork Stock Exchange is closed.

Chattel Paper means a record or records that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, a security interest in specific goods and license of software used in the goods, a lease of specific goods, or a lease of specific goods and license of software used in the goods. In this paragraph, monetary obligation means a monetary obligation secured by the goods or owed under a lease of the goods and includes a monetary obligation with respect to software used in the goods. The term does not include: (a) charters or other contracts involving the use or hire of a vessel; or (b) records that

evidence a right to payment arising out of the use of a credit or charge card or information contained on or for use with the card. If a transaction is evidenced by records that include an instrument or series of instruments, the group of records taken together constitutes Chattel Paper. The term shall have the broadest meaning under the Code.

Code shall mean the niform Commercial Code as adopted in the State of California.

Collateral shall mean the Real Property Collateral and any and all assets in which the Lender may now or hereafter have a lien or security interest under or pursuant to Section 5.1 of this Agreement, under other Financing Agreements or otherwise to secure the Liabilities.

Current Ratio shall mean, as of any particular date, the ratio of Borrower's consolidated current assets, adjusted by deducting prepaid assets, to Borrower's consolidated current liabilities which shall include current portion of long-term debt, treating all amounts currently owing to Affiliates as current liabilities, and giving no value as current assets to any amounts currently owing from Affiliates, all of which asset values may be adjusted by the Lender in its reasonable discretion. In determining Current Ratio Intangible Assets shall be treated as having no value. Except as stated herein, Current Ratio shall be determined in accordance with AAP.

DAHronis uaranty shall mean the guaranty of even date herewith given by DAHronis to and for the benefit of Lender, and any modification, amendment or supplement thereto.

Debt shall mean all of the Liabilities, plus all other debts of Borrower.

Deed of Trust No. 1 shall mean the Deed of Trust, Security Agreement and Assignment of Rents of even date herewith given by Hronis Ranch, The Hronis Family Limited Partnership, Hronis Land Company, Hronis Capital Assets, PJHronis, and KJHronis for the benefit of Lender concerning the Real Property Collateral No. 1, as such Deed of Trust may be amended, modified, extended or partially re-conveyed from time to time.

Deed of Trust No. 2 shall mean the Deed of Trust, Security Agreement and Assignment of Rents of even date herewith given by Hronis Ranch, The Hronis Family Limited Partnership, Hronis Land Company, Hronis Capital Assets, PJHronis, and KJHronis for the benefit of Lender concerning the Real Property Collateral No. 2, as such Deed of Trust may be amended, modified, extended or partially re-conveyed from time to time.

Deeds of Trust shall collectively mean the Deed of Trust No. 1 and the Deed of Trust No. 2.

Default shall mean the occurrence or existence of any one or more of the following events:

(a) any Borrower fails to pay any principal or interest pursuant to the Note or any other Financing Agreements when such principal or interest becomes due or is declared due;

(b) any Borrower fails to pay any of the Liabilities within ten (10) days of the date when such Liabilities become due or are declared due;

(c) any Borrower or uarantor fails or neglects to perform, keep or observe any of the covenants, conditions, representations, promises or agreements contained in this Agreement including but not limited to Section 3, Section 4, Section 5, Section 6, Section 7, Section 8, Section 9, or Section 10 of this Agreement;

(d) any Borrower or uarantor fails or neglects to perform, keep or observe any of the covenants, conditions, promises or agreements contained in any of the other Financing Agreements;

(e) the amount outstanding under the Note is at any time in excess of the Current Position stated in any Position Report Certificate; provided, however, that Borrower shall have twenty (20) days to cure such Default, and Lender shall have no obligation to make any Line of Credit Advance while such Default remains uncured;

(f) any warranty or representation now or hereafter made by or on behalf of any Borrower or uarantor in connection with this Agreement or any of the other Financing Agreements is untrue or incorrect in any material respect, or any schedule, certificate, statement, report, financial data, notice, or writing furnished at any time by or on behalf of any Borrower to the Lender is untrue or incorrect;

(g) a judgment in excess of 10,000 is rendered against any Borrower or uarantor and not satisfied or stayed pending appeal no later than fifteen (15) days after its entry;

(h) all or any part of any Borrower's or any uarantor's assets come within the possession of any receiver, trustee, custodian or assignee for the benefit of creditors of any Borrower or uarantor;

(i) a proceeding under any bankruptcy, reorgani ation, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed against any Borrower or uarantor or a proceeding under any bankruptcy, reorgani ation, arrangement of debt, insolvency, readjustment of debt or

receivership law or statute is filed by any Borrower or uarantor, or any Borrower or uarantor makes an assignment for the benefit of creditors;

(j) any Borrower or uarantor is enjoined, restrained, or in any way prevented by the order of any court or any administrative or regulatory agency or by the termination or expiration of any permit or license, from conducting all or any material part of any Borrower's or uarantor's business affairs;

(k) any Borrower or uarantor is declared to be or is in default on any other obligation for borrowed money;

(l) the Lender makes an expenditure under Section 10.3 of this Agreement which is not repaid by Borrower within five (5) Business Days of demand therefore; or

(m) the Lender in good faith deems itself insecure or that the prospect for repayment of the Liabilities or Borrower's obligations under the Financing Agreements is impaired.

Documents shall mean any and all warehouse receipts, bills of lading or similar documents of title relating to goods in which Borrower at any time has an interest, whether now or at any time or times hereafter issued to Borrower or the Lender by any Person, and whether covering Borrower's Inventory or otherwise and shall also mean any Documents as that term is used or defined in the Code.

Eligible Accounts shall have the meaning set forth in Section 3.3 of this Agreement.

Eligible rowing Crops shall have the meaning set for in Section 3.4 of this Agreement.

Environmental Claim means any investigation, notice, violation, demand, allegation, action, suit, injunction, judgment, order, consent decree, penalty, fine, lien, proceeding, or claim (whether administrative, judicial, or private in nature) arising:

(a) pursuant to, or in connection with, an actual or alleged violation of, any Environmental Law;

(b) in connection with any Ha ardous Material or actual or alleged Ha ardous Material Activity;

(c) from any abatement, removal, remedial, corrective, or other response action in connection with a Ha ardous Material, Environmental Law, or other order by any governmental authority; or

(d) from any actual or alleged damage, injury, threat, or harm to health, safety, natural resources, and or the environment.

Environmental Indemnity Agreement means the Environmental Indemnity Agreement of even date herewith by and among Borrower, uarantor, and Lender.

Environmental Law means any applicable federal, state or local law, statute, regulation or other requirement of any governmental authority pertaining to:

(a) the protection of health, safety, and the indoor or outdoor environment;

(b) the conservation, management, or use of natural resources and wildlife;

(c) the protection or use of surface water and groundwater;

(d) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation or handling of, or exposure to, any Ha ardous Material; or

(e) pollution (including any Release to air, land, surface water, and groundwater).

Environmental Law also includes, without limitation, any requirement or provision contained in the following federal laws: the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) of 1980, as amended by the Superfund Amendments and Reauthori ation Act of 1986, 42 SC 9601 *et seq.*, Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Ha ardous and Solid Waste Amendments of 1984, 42 SC 6901 *et seq.*, Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 SC 1251 *et seq.*, Clean Air Act of 1966, as amended, 42 SC 7401 *et seq.*, Toxic Substances Control Act of 1976, 15 SC 2601 *et seq.*, Ha ardous Materials Transportation Act, 49 SC App. 1801 *et seq.*, Occupational Safety and Health Act of 1970, as amended, 29 SC 651 *et seq.*, Oil Pollution Act of 19909, 33 SC 2701 *et seq.*, Emergency Planning and Community Right-to-Know Act of 1986, 42 SC 11001 *et seq.*, National Environmental Policy Act of 1969, 42 SC 4321 *et seq.*, Safe Drinking Water Act of 1974, as amended 42 SC 300(f) *et seq.*, the Federal Insecticide, Fungicide and Rodenticide Act, 7 .S.C. §§ 136 to 136y, the provisions of California State Law, and any similar, equivalent, implementing or successor federal, state, tribal, or local law, and any amendment, rule, regulation, order, or directive issued thereunder.

Environmental Permits shall mean all permits and licenses required by or pursuant to all applicable Environmental Laws.

Environmental uestionnaire shall mean the Environmental uestionnaire in the form provided by Lender and completed and signed by Borrower.

Equipment shall mean any and all goods, other than Inventory (including, without limitation, equipment, machinery, motor vehicles, implements, tools, parts and accessories) which are now or hereafter owned or acquired by Borrower, together with any and all accessions, parts and appurtenances thereto, and all Equipment as that term is used or defined in the Code.

Event of Default shall mean the occurrence or existence of a Default, or the occurrence of a default or event of default under any of the Financing Agreements of Borrower or uarantor in existence or hereafter entered into between Borrower, a uarantor or an Affiliate and the Lender.

Farm Products shall mean all personal property of Borrower used or for use in farming operations, now or hereafter owned by Borrower or now or hereafter purchased by or for the benefit of Borrower. Farm Products shall also include, but shall not be limited to, any other Farm Products as that term is used or defined in the Code.

Financing Agreements shall mean all agreements, instruments and documents, including, without limitation, this Agreement and all security agreements, loan agreements, promissory notes, letter of credit applications, guaranties, mortgages, deeds of trust, subordination agreements, pledges, powers of attorney, consents, assignments, contracts, notices, leases, financing statements, cash management agreements, deposit account agreements, collateral assignments of insurance policies, assignments of indemnities, and all other written matter whether heretofore, now, or hereafter executed by or on behalf of any Borrower and delivered to the Lender, together with all amendments thereof and all agreements and documents referred to therein or contemplated thereby specifically including but not limited to those documents set forth in Section 5.4.

AAP shall mean enerally Accepted Accounting Principles as consistently applied.

eneral Intangibles shall mean eneral Intangibles as that term is used or defined in the Code and all of Borrower's right, title and interest in and to any deposit accounts, customer deposit accounts, deposits, rights related to prepaid expenses, Farm Service Agency payments, SDA payments, negotiable or non-negotiable instruments or securities, chattel paper, causes of action and all other intangible personal property of every kind and nature whether presently owned or hereafter acquired or arising, including, without limitation, corporate or other business records, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, goodwill, registrations, copyrights, licenses, franchises, customer lists, tax refunds, tax refund

claims, customs claims, guarantee claims, co-op memberships or patronage benefits, rights to any government subsidy, set aside, diversion, deficiency or disaster payment or payment in kind, water rights which are not or may not be real property (including, without limitation, water stock, ditch rights, well permits, water permits, applications and the like), storage agreements or contracts, leasehold interests in real and personal property, and any security interests or other security held by or granted to Borrower to secure payment by any Account Debtor of any of the Accounts and all contracts and contract rights.

uaranties shall collectively mean the PJHronis uaranty, the KJHronis uaranty, the DAHronis uaranty, The Kosta Hronis Living Trust uaranty, The Peter John Hronis Living Trust uaranty, and The Sophia Hronis Irrevocable Trust One uaranty.

uarantor shall have the meaning set forth in the introductory paragraph of this Agreement.

Ha ardous Material Activity means any activity, event, or occurrence involving a Ha ardous Material, including, without limitation, the manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, Release, threatened Release, abatement, removal, remediation, handling of or corrective or response action to any Ha ardous Material.

Ha ardous Material shall mean any substance, chemical, compound, product, solid, gas, liquid, waste, byproduct, pollutant, contaminant, or material which is ha ardous, toxic, or subject to regulation under any Environmental Law, all ha ardous substances, materials and wastes as defined under any Environmental Law, and includes, without limitation, nitrates, asbestos, polychlorinated biphenyls, flammable explosives, radioactive materials, urea formaldehyde, PCB's, and petroleum products or byproducts.

Ha ardous Waste shall mean ha ardous substance, disposal, release, and threatened release, as used in this Agreement, shall have the same meanings as set forth in the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 .S.C. § 9601, et seq., ( CERCLA ), the Superfund Amendments and Reauthori ation Act of 1986, Pub. L. No. 99-499 ( SARA ), the Ha ardous Materials Transportation Act, 49 .S.C. § 1801, et seq., the Resource Conservation and Recovery Act, 49 .S.C. § 6901, et seq., and the environmental laws or other applicable state or federal laws, rules, or regulations adopted pursuant to any of the foregoing.

Improvements shall mean and include without limitation all existing and future buildings, structures, facilities, fixtures, additions, and similar construction on the Real Property Collateral.

Instrument shall mean a negotiable instrument or any other writing that evidences a right to the payment of a monetary obligation, is not itself a security agreement or lease,

and is of a type that in ordinary course of business is transferred delivery with any necessary indorsement or assignment. The term does not include: (i) investment property; (ii) letters of credit; or (iii) writings that evidence a right payment arising out of the use of a credit or charge card or information contained on or for use with the care.

Intangible Assets shall mean goodwill, business records, inventions, designs, patents, patent applications, trademarks, trade names, trade secrets, registrations, copyrights, licenses, franchises, customer lists, co-op memberships, guaranty claims, organi ation costs, loan costs, tax refunds, tax refund, claims, customs claims, brands, leasehold interests and easements contract rights, and similar intangible assets which have no material reali able value.

Inventory shall mean Inventory as that term is used or defined in the Code including, without limitation, goods in transit, wheresoever located, whether now owned or hereafter acquired by Borrower, which from time to time are held for sale or lease, furnished under any contract of service or held as raw materials, work in process or supplies, and all packaging or handling materials (including, without limitation, all pallets, containers, bags, cartons, boxes, wrappers and the like) used or consumed in Borrower’s business, and shall include all goods which are the subject of Documents, including warehouse receipts.

Investment Property shall mean all certificated or uncertificated securities, security entitlements, security accounts, commodity accounts, or commodity contracts.

KJHronis uaranty shall mean the guaranty of even date herewith given by KJHronis to and for the benefit of Lender, and any modification, amendment or supplement thereto.

Leased Premises shall mean any portion of the Real Property Collateral occupied by a Borrower Tenant pursuant to a Borrower Lease.

Lender shall have the meaning set forth in the introductory paragraph of this Agreement.

Liabilities shall mean any and all liabilities, obligations and indebtedness of Borrower to the Lender of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable and howsoever evidenced, created, incurred, acquired or owing, whether primary, secondary, direct, contingent, fixed or otherwise (including obligations of performance) and whether arising or existing under this Agreement or any of the other Financing Agreements, or by operation of law.

Line of Credit shall mean the Lender’s line of credit to Borrower in the original principal amount not to exceed 55,000,000 evidenced by the Note as limited by the requirements of this Agreement and the Financing Agreements.

Line of Credit Advances shall mean advances on the Note.

Loan Account shall have the meaning set forth in Section 2.6 of this Agreement.

Loan shall mean the loan evidenced by the Note.

Loan-to- alue Ratio shall mean the percentage relationship of (a) the unpaid principal balance of all of Borrower's Debt, to (b) the most recent appraised value of the Real Property Collateral satisfactory to Lender.

Monetary Default shall mean an occurrence or existence of any one or more of (a), (b), (e), (h), (i) or (k) in the definition of Default .

New Owner shall have the meaning stated in Section 2.10.

Note means Borrower's promissory note of even date herewith payable to Lender in the original principal amount not to exceed 55,000,000, as it may be modified, amended, restated and extended from time to time.

Person shall mean any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organi ation, association, corporation, institution, entity, party or government (whether national, federal, state, provincial, county, city, municipal or otherwise, including, without limitation, any instrumentality, division, agency, body or department thereof).

PJHronis uaranty shall mean the guaranty of even date herewith given by PJHronis to and for the benefit of Lender, and any modification, amendment or supplement thereto.

Position Report shall mean reports in forms satisfactory to the Lender listing all forward sale or purchase contracts and all futures contracts by type, amount and price for all of Borrower's commodities. All values submitted by Borrower on the Position Report Certificate are subject to Lender's adjustments in its sole discretion and Lender's adjustments shall control for purposes of the Position Report.

Position Report Certificate shall mean a certificate in the form attached hereto as Exhibit A and made a part hereof, signed as indicated thereon, setting forth the Borrower's Position Report. The Position Report Certificate form shall use values established by Lender or which are in accordance with industry standards, as approved by Lender in its sole discretion. Lender may, in its sole discretion and from time to time, amend the Position Report Certificate or may change the value contained therein. After notice thereof, Borrower must use such amended Position Report Certificate form for the following reporting period.

Producer Payables shall mean all amounts now or hereafter payable by Borrower for the purchase of Inventory or Farm Products.

Real Property Collateral No. 1 shall mean the following described real property legally described as follows and all improvements thereon and all privileges and appurtenances: See Schedule 1.1(a) attached hereto and incorporated herein by this reference.

Real Property Collateral No. 2 shall mean the following described real property legally described as follows and all improvements thereon and all privileges and appurtenances: See Schedule 1.1(b) attached hereto and incorporated herein by this reference.

Real Property Collateral shall collectively mean the Real Property No. 1 Collateral and the Real Property No. 2 Collateral.

Release means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the indoor or outdoor environment.

Subordinated Obligations shall have the meaning stated in Section 2.9 of this Agreement.

Subordination Termination shall have the meaning stated in Section 2.9 of this Agreement.

Supporting Obligations shall mean a letter-of-credit right or secondary obligation that supports the payment or performance of an account, chattel paper, a document, a general intangible, an instrument, or investment property. Supporting Obligations shall include the broadest definition stated in the Code.

The Kosta Hronis Living Trust uaranty shall mean the guaranty of even date herewith given by The Kosta Hronis Living Trust to and for the benefit of Lender, and any modification, amendment or supplement thereto.

The Peter John Hronis Living Trust uaranty shall mean the guaranty of even date herewith given by The Peter John Hronis Living Trust to and for the benefit of Lender, and any modification, amendment or supplement thereto.

The Sophia Hronis Irrevocable Trust One uaranty shall mean the guaranty of even date herewith given by The Sophia Hronis Irrevocable Trust One to and for the benefit of Lender, and any modification, amendment or supplement thereto.

Total Assets shall mean, as of a particular date, Borrower's consolidated total assets as they would normally be shown on the balance sheet of Borrower, adjusted by deducting (a) all values attributable to Intangible Assets, except: Lender deposit accounts; government subsidies; set aside, diversion; deficiency or disaster payments receivable which are properly assigned to the Lender; and storage agreements or contract receivables which are properly assigned to the Lender; and by deducting

(b) accounts due from Affiliates if the Lender in its sole discretion determines the collection of such accounts to be doubtful or impaired, and by deducting (c) all accumulated depreciation and amorti ation on Borrower's assets.

.S. Bank shall mean .S. Bank National Association and its successors and assigns.

.S. Bank Account shall mean the deposit account number 158200181093 maintained for the benefit of Lender with .S. Bank, or such other account designated by Lender from time to time.

1.2 Accounting Terms. Any accounting terms used in this Agreement which are not specifically defined in this Agreement shall have the meanings customarily given them in accordance with generally accepted accounting principles, as consistently applied as of the date of this Agreement.

1.3 Others Defined in California niform Commercial Code. All other terms contained in this Agreement (which are not specifically defined in this Agreement) shall have the meanings set forth in the Code to the extent the same are used or defined therein.

1.4 Interpretation. nless the context indicates otherwise, words importing the singular include the plural number, and vice versa. Words of any gender include the correlative words of the other genders, unless the sense indicates otherwise.

1.5 Other Defined Terms. Other capitali ed terms shall have the meanings stated in the Recitals in this Agreement.

2. LOAN, LOAN AD ANCES, FEES AND S BORDINATIONS

2.1 Loan. Subject to all of the terms and conditions contained in this Agreement, the Lender hereby agrees to make the following loan for the benefit of Borrower:

2.1.1 Line of Credit. Line of Credit Advances to Borrower from time to time from and after the date of this Agreement, through and including October 29, 2027 (the Termination Date ), unless extended or renewed, in amounts up to the lesser of: (a) Fifty-Five Million Dollars ( 55,000,000); or (b) the cumulative Current Position stated in the then current Position Report Certificate and for only the purpose stated in Section 2.4; provided, however, that Lender shall have no obligation to make any Line of Credit Advance in an amount less than 1,000,000. The Line of Credit Advances shall be evidenced by and repayable in accordance with the terms of the Note, all terms of which are incorporated herein by this reference. The Line of Credit is a revolving credit facility and the Lender shall deposit all proceeds of the Loan exclusively in the .S. Bank Account. Subject to the terms and conditions of this Agreement, Borrowers may obtain Line of Credit Advances, prepay Line of Credit Advances, and reborrow Line of Credit Advances.

The Lender shall also have the option, in its sole discretion and without any obligation to do so, to extend the Termination Date for the making of Line of Credit Advances. Notwithstanding any other provision of this Agreement, nothing in this Agreement shall be interpreted as a promise by Lender to make any Line of Credit Advances. Lender may refuse to make a requested Line of Credit Advance at any time and for any reason, whether arising before, on, or after the date of this Agreement, whether or not Borrower is in compliance with the covenants contained in this Agreement, and whether or not an Event of Default has occurred, or for no reason at all. Lender may in its sole discretion elect to make any requested Line of Credit Advances, whether in the requested amount or a lower amount, may reject such request in its entirety, or may condition its willingness to make such requested Line of Credit Advances on one or more conditions, including but not limited to such amendments to this Agreement and the other Financing Agreements, as Lender, in its sole discretion, deems appropriate.

2.2 Default Rate. pon and after an Event of Default, and until such Event of Default is cured, Lender may require Borrower to pay, in lieu of the interest rate set forth in the Notes, interest from the date of the Event of Default at a per annum rate which is equal to eighteen percent (18 ) per annum (the Default Rate ) calculated on the outstanding principal balance of the Liabilities until either all of the Liabilities are repaid in full or until the date such Event of Default is cured. The triggering of a Default rate shall not cure the Default.

2.3 Prepayment. Borrower may, at any time and from time to time, prepay all or any portion or the entire balance of the Liabilities; provided, however, that any prepayment of all or any portion of the principal balance of the Liabilities shall be accompanied by interest from the date on which interest was last paid to the date on which such prepayment is received by the Lender.

2.4 Purpose. The purpose of the Line of Credit is to provide working capital for the Borrower's commercial farming operations. Borrower will use all Line of Credit Advances solely in accordance with this stated purpose.

2.5 Loan Fees. Borrower agrees to pay the Lender a loan origination fee equal to 275,000, which such loan origination fee shall be fully earned and is due on the date of this Agreement. Borrower also shall pay Lender a loan exit fee equal to 275,000 upon the earlier to occur of: (a) the Termination Date; (b) the date on which any acceleration of the Loan occurs, including in connection with the filing for bankruptcy, receivership, assignment for the benefit of creditors or any similar restructuring or reorgani ation proceeding or undertaking (the Acceleration Date ); and (c) the date on which the Liabilities are paid in full (the Satisfaction Date ), which such exit fee shall be fully earned on the date of this Agreement and shall be due on the earlier to occur of the Termination Date, the Acceleration Date, and the Satisfaction Date, as the case may be. In addition, Borrower shall be responsible for paying all of the Lender's out-of-pocket expenses incurred in connection with the Note and Financing Agreements specifically including, but not limited to: (a) recording fees and costs; and (b) all other reasonable and necessary loan closing fees and costs including attorneys' fees. The Lender may elect to pay all loan fees and reimbursables by Line of Credit Advances. Borrower has previously paid a

nonrefundable deposit of 50,000 to Lender for due diligence costs and other expenses incurred by Lender in connection with the transactions contemplated by this Agreement.

2.6 Loan Account. The Lender shall maintain a loan account (the Loan Account ) on its books in which shall be recorded: (a) all Line of Credit Advances made by the Lender to Borrower pursuant to this Agreement; (b) all payments made by Borrower on all such Line of Credit Advances; and (c) all other appropriate debits and credits as provided in this Agreement, including, without limitation, all fees, charges, expenses and interest. All entries in the Loan Account shall be made in accordance with the Lender's customary accounting practices as in effect from time to time. Borrower promises to pay the amount reflected as owing by and under the Loan Account and all other obligations hereunder as such amounts become due or are declared due pursuant to the terms of this Agreement.

2.7 Statements. All Line of Credit Advances to Borrower, and all other debits and credits provided for in this Agreement, shall be evidenced by entries made by the Lender in its internal data control systems showing the date, amount and reason for each such debit or credit. ntil such time as the Lender shall have rendered to Borrower written statements of account as provided herein, the balance in the Loan Account, as set forth on the Lender's most recent printout, shall be rebuttable presumptive evidence of the amounts due and owing the Lender by Borrower. After the last day of each calendar month, the Lender may, at the Lender's option, mail or electronically deliver to Borrower a statement setting forth the balance of the Loan Account. Each such statement shall be subject to subsequent adjustment by the Lender but shall, absent manifest errors or omissions, be presumed correct and binding upon Borrower and shall constitute an account stated unless, within sixty (60) days after receipt of any statement from the Lender Borrower shall have delivered to the Lender a notice of written objection thereto specifying the error or errors, if any, contained in such statement.

2.8 Termination of Agreement. The Lender shall have the right to terminate any obligation to make Line of Credit Advances under this Agreement immediately upon an Event of Default constituting a Monetary Default, subject to: (a) any applicable grace or cure period; (b) the cure of any such Monetary Default(s) within any such applicable grace periods; or (b) the payment in full of all of the Liabilities. In addition, all of the Liabilities shall be due and payable on the Termination Date if the Lender elects not to extend the Termination Date of the Line of Credit. Notwithstanding the foregoing, in the event that a proceeding under any bankruptcy, reorgani ation, arrangement of debt, insolvency, readjustment of debt or receivership law or statute is filed by or against any Borrower, or any Borrower makes an assignment for the benefit of creditors, the Lender shall have no obligation to make Line of Credit Advances, and all the Liabilities shall be due and payable.

2.9 Subordination By Borrower. Each Borrower and uarantor hereby agrees and acknowledges that any and all indebtedness, intercompany indebtedness (including any intercompany management fees, premiums or distributions, promissory notes, accounts payable, liabilities or other obligations owed to such Borrower or uarantor by any other Borrower or uarantor (regardless of the date of creation the granting of any security interests or any other circumstance) (collectively, the Subordinated Obligations ), is and shall continue to be expressly subordinate to Liabilities owed to the Lender, whether under this Agreement, any other Financing

Agreement or otherwise, until the indefeasible payment in full of all of the Liabilities and any other obligation of a Borrower to the Lender (the Subordination Termination ). Each Borrower further agrees not to accept any payments from any other Borrower with respect to any Subordination Obligations prior to Subordination Termination and each agrees that if any other Borrower does make a payment with respect to a Subordinated Obligation, to immediately transfer such amount to the Lender and to otherwise hold any such amounts in trust for the Lender until such transfer is complete. The subordination set forth in this Section 2.9 is a subordination of payment and performance, and the Borrower hereby agrees that prior to the Subordination Termination no Borrower shall seek to enforce any rights or remedies it may have against another Borrower.

2.10 Lease Subordinations. Each Borrower hereby agrees as follows:

2.10.1 Each Borrower Tenant's interest in each Borrower Lease, including any option in favor of any Borrower Tenant to renew any Borrower Lease or to purchase the Real Property Collateral, or any portion of either, shall be subject and subordinate to the Deeds of Trust in all respects.

2.10.2 Notwithstanding any provision in any Borrower Lease to the contrary, upon the occurrence of an Event of Default, Lender may, in its sole discretion, elect to cause any Borrower Lease to be terminated for any reason whatsoever, whether or not the respective Borrower Tenant is in default under its Borrower Lease, by giving written notice of its election to the Borrower Tenant of that Borrower Lease, whereupon that Borrower Lease shall be deemed to be terminated on the date such notice is given, and the Borrower Tenant of that Borrower Lease shall immediately surrender its Leased Premises. If Lender does not exercise its right to terminate a particular Borrower Lease, then after the receipt by the Borrower Tenant of that Borrower Lease of notice that Lender or any other person, party or entity has become the owner of the Leased Premises or the Real Property Collateral (each a New Owner, which term shall include such entity's successors and assigns) as a result of a foreclosure sale under any Deed of Trust or a conveyance in lieu of foreclosure, that Borrower Tenant will attorn to and recogni e Lender, its successors and assigns, or any purchaser at the foreclosure sale, as its substitute lessor under its Borrower Lease, and, having thus attorned, that Borrower Tenant's possession shall not thereafter be disturbed by Lender during the term of that Borrower Lease, as long as that Borrower Tenant shall continue to pay the rental and otherwise observe and perform the covenants, terms and conditions of that Borrower Lease to be observed and performed by that Borrower Tenant thereunder. In that case, Lender and that Borrower Tenant shall execute and deliver, upon request, appropriate agreements of attornment and recognition, but these agreements shall be deemed to be self-operative, and no such separate agreements shall be required to effectuate the foregoing attornment and recognition.

2.10.3 (a) No Borrower Tenant shall have any claim against any New Owner resulting from, and no New Owner shall be liable for, any act, omission and or breach of a Borrower Lease by any prior or subsequent landlord under that Borrower Lease, including but not limited to any Borrower; (b) no rights of any New Owner in and to the Leased Premises and in, to and under any Borrower Lease shall be subject to any right of setoff or defense which any Borrower Tenant may have against any prior landlord under any Borrower Lease; (c) no New Owner shall be bound by (i) any rent or additional rent or other charges which any Borrower

Tenant may have paid for more than one month in advance, or (ii) any amendment or modification of any Borrower Lease made without Lender's written consent, or (iii) any provision of any Borrower Lease relating to the application of insurance or condemnation proceeds or the restoration of the Leased Premises by the landlord in the event of a casualty loss thereto or a taking thereof, or restrictions on the use of other properties owned by the landlord for purposes which compete with a Borrower Tenant; and (d) no New Owner shall be liable for any security deposit that any Borrower Tenant might have paid to any prior landlord, except to the extent such New Owner has actually received said security deposit. A New Owner shall use any insurance or condemnation proceeds received by it in accordance with the Deeds of Trust. pon any sale or other transfer by a New Owner of its interest in the Leased Premises or the Real Property Collateral after acquiring title to the same, said New Owner shall thereupon automatically be released and discharged from all liability thereafter accruing under the applicable Borrower Lease.

2.10.4 No Borrower Tenant shall, without the written consent of Lender: (a) amend any Borrower Lease; (b) pay the rent or any other sums due under any Borrower Lease more than one month in advance; (c) voluntarily surrender any Leased Premises or terminate any Borrower Lease; (d) accept any Borrower's waiver of or release from the performance of any obligations of any Borrower Tenant under that Borrower Tenant's Borrower Lease; or (e) sublease any Leased Premises or any part thereof, or assign, pledge or encumber any Borrower Tenant's interest under any Borrower Lease or in any Leased Premises or any part thereof.

2.10.5 No Borrower shall permit any Borrower Lease to become subordinate to the lien of any mortgage, deed of trust, or other security instrument, other than the Deeds of Trust and any deed of trust for the benefit of AgAmerica existing as of the date hereof.

2.10.6 Borrower agrees to notify Lender in writing of any default under any Borrower Lease. Lender shall have the right, but not the obligation, to cure any such default.

2.10.7 Borrower, with the understanding that Lender will rely upon the statements and representations made regarding the Borrower Leases in entering into this Agreement, hereby certify, represent, warrant and confirm to Lender, that, as of the date hereof, and except as has been disclosed to Lender in this Agreement:

2.10.8 There are no other written or oral agreements or understandings between any Borrower with respect to the Leased Premises or the Real Property Collateral; no Borrower Tenant has subleased any portion of the Real Property Collateral, and no Borrower has assigned, whether outright or by collateral assignment, all or any portion of its rights under any Borrower Lease; each Borrower Lease is in full force and effect in accordance with its terms; and a complete copy of each written Borrower Lease and all amendments and supplements thereto has been provided by the Borrower to Lender;

2.10.9 To the best of each Borrower's knowledge, no default by any Borrower in the performance of any Borrower Lease to be by them respectively performed exists on the date hereof, and no event has occurred which, after the passage of time or expiration of any notice, grace or right to cure period, would constitute a default under the Borrower Lease;

2.10.10 To the best of each Borrower's knowledge, no Borrower Tenant now has any claim against any other Borrower which might be setoff against past or future rents due under the Borrower Lease or which might be used as a defense to enforcement of the Borrower Lease; a

2.10.11 No rents have been prepaid under the Borrower Lease, except for the normal prepayment thereof for no more than one month in advance;

2.10.12 Lender is entitled to specific performance of the covenants, agreements and rights contained in this Section 2.10. All remedies provided at law or in equity, including the right to specific performance as herein provided, shall be cumulative; and

2.10.13 Each Borrower agrees to execute and deliver to Lender at Lender's request therefor (an in any case within five Business Days) a memorandum or memoranda summari ing the contents of this Section 2.10 in recordable form sufficient to enable Lender to obtain a title policy of insurance showing each Borrower Lease as subordinate to the Deeds of Trust, and otherwise in form and substance acceptable to Lender.

3. POSITION REPORT

3.1 Eligible Accounts. The Lender shall have the right, in the exercise of the Lender's commercially reasonable discretion, to determine whether Accounts are eligible for inclusion in the Position Report at any particular time (such accounts being hereinafter referred to as Eligible Accounts ). In the event that Accounts previously included in the Position Report Certificate cease to be Eligible Accounts, Lender may, in its sole discretion, require Borrower to promptly pay to the Lender an amount sufficient to ensure that the cumulative Current Position stated in the then current Position Report Certificate is positive.

3.2 Eligible rowing Crops. The Lender shall have the right, in the exercise of the Lender's commercially reasonable discretion, to determine whether crops are eligible for inclusion in the Position Report at any particular time (such eligible crops being hereinafter referred to as Eligible rowing Crops ) and to determine the value of the Eligible rowing Crops for purposes of the Position Report Certificate. In the event that crops previously included in the Position Report Certificate cease to be Eligible rowing Crops, Borrower shall promptly pay to the Lender an amount sufficient to ensure that the cumulative Current Position stated in the Position Report Certificate is positive. The value of Eligible rowing Crops shall be the actual costs of inputs as determined by the Lender in its sole discretion on a commercially reasonable basis.

3.3 Delivery of Position Report Certificates. Borrower shall execute and deliver to the Lender pursuant to the terms set forth in Section 7.1.3 of this Agreement, and all Line of Credit Advances on the Note shall be limited to the cumulative Current Position stated in the then current Position Report Certificate unless the Lender in its sole discretion elects to over-advance. If the amount outstanding under the Line of Credit exceeds the Position Report set forth in the corresponding Position Report Certificate, Borrower shall immediately (on the day of such Position Report Certificate) notify Lender and within twenty (20) days of Borrower's notice to Lender, Lender may, in its sole discretion, require Borrower to repay the amount drawn under the Line of Credit to an amount equal to or less than the Current Position .

4. CONDITIONS TO AD ANCES

Notwithstanding any other provisions to the contrary contained in this Agreement, the making of any Line of Credit Advances provided for in this Agreement shall be conditioned upon the following:

4.1 The Lender's Execution of Funding Documents. The Lender shall have executed all necessary documents related to the Lender's funding of the Note.

4.2 Approval of the Lender's Counsel. Legal matters, if any, relating to the Line of Credit Advances shall be satisfactory to counsel for the Lender.

4.3 Compliance. All representations and warranties contained in this Agreement shall be true on and as of the date of the making of such Line of Credit Advances as if such representations and warranties had been made on and as of such date, and no Event of Default shall have occurred or shall exist.

4.4 Documentation. Borrower shall have executed and or delivered to the Lender all of the documents listed in Section 5.4 and the Position Report Certificate, setting forth the Current Position as of the date of this Agreement.

4.5 Other Conditions Precedent. Borrower shall have satisfied the terms and conditions set forth in Section 2 and Section 4 of this Agreement, which require, among other things, compliance with the Current Position .

4.6 Line of Credit Position Report. Funding under the Line of Credit is subject to, and the extent of, there being a positive cumulative Current Position stated in the current Position Report Certificate.

4.7 First Lien. No Line of Credit Advances will be made unless the Lender has a first perfected lien on the Collateral, except for the existing permitted liens securing the debt set forth in Schedule 4.7 attached hereto (the Permitted Liens ).

4.8 Inspections. The Lender shall have access to the Collateral with or without notice and from time to time to conduct inspections of the Collateral. The Lender may, but is under no obligation to make periodic, regular, random, and unannounced Collateral inspections.

4.9 Permits. The Lender shall have received and accepted copies of all permits and requisite approvals of any governmental body necessary for the use of the Real Property Collateral.

4.10 oning. Borrower shall have furnished evidence satisfactory to the Lender that land on which the Real Property Collateral is located is duly and validly oned for the operations located thereon.

4.11 Collateral. Borrower shall own all of the Collateral free and clear of all liens and encumbrances except for the Permitted Liens.

4.12 Requests for Line of Credit Advances.

4.12.1 Borrower shall have delivered to Lender, not later than 12:00 p.m. local time in Des Moines, Iowa, on the tenth (10th) Business Day prior to the date of the requested Line of Credit Advance, in form and substance satisfactory to Lender, a written request specifying the amount and date of the requested Line of Credit Advance and the expected use of such Line of Credit Advance.

4.12.2 Borrower shall not request more than one (1) Line of Credit Advance per week.

4.12.3 No request for a Line of Credit Advance shall be for an amount equal to or greater than 5,000,000, and no request for a Line of Credit Advance shall be or an amount less than 1,000,000.

5. SEC RIT

5.1 Security Interests and Liens. To secure the payment and performance of the Liabilities, Borrower hereby grants to the Lender a continuing security interest in and to the following property and interests in property of Borrower, whether now owned or existing or hereafter acquired or arising and wheresoever located:

> All Borrower's Accounts, Inventory, Equipment, Farm Products, Fixtures, oods, eneral Intangibles, Payment Intangibles, Commercial Tort Claims, Deposit Accounts, Commodity Accounts, Commodity Contracts, Investment Property, Instruments, Letters of Credit Rights, Documents, Chattel Paper, Electronic Chattel Paper, Tangible Chattel Paper, all accessions to, substitutions for, and all replacements, products, proceeds, and proceeds of proceeds of the foregoing (including, without limitation, proceeds of insurance policies insuring any of the foregoing and any other kind of proceeds coming from Borrower's crop), all rights under and payments due or to become due under any federal or state laws, rules, regulations, or programs pertaining to any of the foregoing, all books and records pertaining to any of the foregoing (including, without limitation, customer lists, credit files, computer programs, printouts and other computer materials and records), and all insurance policies insuring any of the foregoing. The Collateral includes all Real Property Collateral and all fixtures on Real Property Collateral.
>
> All of the Real Property Collateral, together with all licenses and permits
>
> Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, crops, timber, all diversion payments or third party payments made to crop producers, all water and riparian rights, wells, ditches, reservoirs and water stock and all existing and future Improvements, structures, fixtures, and

replacements that may now, or at any time in the future, be part of the Real Property Collateral.

All water and water rights and water shares, whether surface or underground, tributary, non-tributary, not non-tributary, wells, well permits, ditches, ditch rights, reservoir and storage rights, water district taps, accounts and allocations appurtenant to and used in connection with the Real Property Collateral.

Together with all substitutions and replacements for and products of any of the foregoing property and together with proceeds of all of the foregoing property and, in the case of all tangible Collateral, together with all accessions and together with all accessories, attachments, parts, equipment and repairs now or hereinafter attached or affixed to or used in connection with any such goods

5.2 Endorsement by the Lender. Borrower hereby authori es the Lender to endorse, in Borrower's name, any item, however received by the Lender, representing payment on or other proceeds of any of the Collateral, specifically including, but not limited to all items deposited in the .S. Bank Account and in any other deposit or sweep account with .S. Bank.

5.3 Delivery of Warehouse Receipts. In the event that any Inventory or Farm Products become the subject of a negotiable or non-negotiable warehouse receipt, said warehouse receipt shall be promptly delivered to the Lender with such endorsements and assignments as are necessary to vest title and possession in the Lender.

5.4 Preservation of Collateral and Perfection of Security Interests Therein. Borrower shall execute and deliver to the Lender, concurrently with the execution of this Agreement, and at any time or times hereafter, all financing statements (including but not limited to financing statements describing the Collateral as all assets or all personal property ) or other documents (and pay the cost of filing or recording the same in all public offices deemed necessary by the Lender), as the Lender may request, in a form satisfactory to the Lender, to perfect and keep perfected the Lender's security interest in the Collateral granted by Borrower to the Lender and otherwise to protect and preserve the Collateral and the Lender's security interests therein, specifically including but not limited to the documents described below. Should Borrower fail to do so, the Lender is authori ed to sign or file any such financing statements. Borrower further agrees that a carbon, photographic, photostatic or other reproduction of this Agreement or of a financing statement is sufficient as a financing statement. To perfect the Lender's security interest in any Equipment covered by certificates of title, Borrower shall ensure that all such certificates of title are properly noted or endorsed by the appropriate state officials wherever such notation or endorsement is, in the Lender's sole determination, either permitted or required as a condition to perfection. The Financing Agreements delivered to the Lender at closing shall include but not be limited to the following Financing Agreements:

5.4.1 This Agreement;

5.4.2 Note;

5.4.3 Deeds of Trust;

5.4.4 uaranties:

(a) KJHronis uaranty

(b) PJHronis uaranty

(c) DAHronis uaranty;

(d) The Kosta Hronis Living Trust uaranty;

(e) The Peter John Hronis Living Trust uaranty;

(f) The Sophia Hronis Irrevocable Trust One uaranty;

5.4.5 Environmental Indemnity Agreement;

5.4.6 Position Report Certificate of even date herewith;

5.4.7 Financing Statement;

5.4.8 Effective Financing Statement;

5.4.9 Assignment of Indemnity;

5.4.10 Assignment of Payment;

5.4.11 .S. Bank Deposit and Sweep Account Documentation;

5.4.12 AgAmerica Intercreditor Agreement;

5.4.13 Opinion Letter of Borrower's Counsel;

5.4.14 Officer's Certificates attaching Company Consents, Incumbencies, certified certificates of formation or incorporation, bylaws, limited liability company agreements or similar operating agreements, and certificates of good standing from the Secretary of State or similar authority from the state of formation or incorporation of each Company :

(a) Hronis Capital Assets;

(b) Hronis Capital Management;

(c) Hronis Citrus;

(d) Hronis Farming;

(e) Hronis Fruit Company

(f) Hronis;

(g) Hronis Land Company;

(h) Hronis Ranch

(i) Hronis Resource Management

(j) The Hronis Family Limited Partnership;

5.4.15 Perfection Certificates:

(a) Hronis Capital Assets;

(b) Hronis Capital Management;

(c) Hronis Citrus;

(d) Hronis Farming;

(e) Hronis Fruit Company;

(f) Hronis;

(g) Hronis Land Company

(h) Hronis Ranch;

(i) Hronis Resource Management;

(j) The Hronis Family Limited Partnership;

5.4.16 Certifications of Trust:

(a) The Kosta Hronis Living Trust;

(b) The Peter John Hronis Living Trust;

(c) The Sophia Hronis Irrevocable Trust One; and

5.4.17 Miscellaneous agreements to provide insurance, powers of attorney, notices of insurance requirements, errors and omissions agreements, disbursement requests and authori ations, and such other agreements and documents as the Lender may require; and

Notwithstanding the foregoing, Lender agrees that the deliverables described in Schedule 5.4 may be delivered to Lender by November 29, 2024, and Borrower's failure to do so by November 29, 2024, shall constitute a Default.

5.5 Loss of alue of Collateral. Borrower shall immediately notify the Lender of any material loss or decrease in the value of the Collateral.

5.6 Collection of Accounts. Borrower shall promptly collect all Accounts. Borrower shall take all reasonable steps, including the placement of such designations on invoices as may be appropriate, to cause all Account Debtors to make all payments to the .S. Bank Account. pon an Event of Default, Borrower does hereby irrevocably designate, make, constitute and appoint the Lender (and all Persons designated by the Lender) as Borrower's true and lawful attorney-in-fact, with power, in Borrower's or the Lender's name, to: (a) demand payment of Accounts; (b) enforce payment of Accounts by legal proceedings or otherwise; (c) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect an Account; (d) sell or assign any Account upon such terms, for such amount and at such time or times as the Lender deems advisable; (e) settle, adjust, compromise, extend or renew any Account; (f) discharge and release any Account; (g) take control in any manner of any item of payment or proceeds of any Account; (h) prepare, file and sign Borrower's name upon any items of payment or proceeds thereof and deposit the same to the Lender's account on account of the Liabilities; (i) endorse Borrower's name upon any chattel paper, document, Instrument, invoice warehouse receipt, bill of lading, or similar document or agreement relating to any Account or any goods pertaining thereto; (j) sign Borrower's name on any verification of Accounts and notices thereof to Account Debtors; (k) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar proceeding against any Account Debtor; (l) instruct the Lender to pay over all deposit accounts to the Lender; and (m) do all acts and things which are necessary, in the Lender's sole discretion, to fulfill Borrower's obligations under this Agreement.

5.7 Account Covenants. Borrower shall: (a) promptly upon Borrower's learning thereof, inform the Lender, in writing, of any material delay in Borrower's performance of any of Borrower's obligations to any Account Debtor or of any assertion of any claims, offsets or counterclaims by any Account Debtor; (b) not permit or agree to any extension, compromise or settlement or make any change or modification of any kind or nature with respect to any Account that results in an adjustment exceeding 10,000 (including, without limitation, any of the terms relating thereto) without immediately giving notice thereof to the Lender; and (c) promptly upon Borrower's learning thereof, furnish to and inform the Lender of all material adverse information relating to the financial condition of any Account Debtor if Accounts attributable to such Account Debtor aggregate in excess of 10,000 or if such information would render such Account no longer an Eligible Account.

5.8 Account Records and erification Rights. Borrower hereby represents to the Lender that Borrower now keeps and shall at all times hereafter keep correct and accurate records relating to the Accounts and the financial and payment records of the Account Debtors, all of which records shall be available upon demand during Borrower's usual business hours to any of the Lender's officers, employees or agents. Any of the Lender's officers, employees or agents shall have the right at any time or times hereafter, in the Lender's name, to verify the validity,

amount or any other matter relating to any Accounts, by mail, telephone, electronic mail, telegraph or otherwise. Borrower shall promptly notify the Lender of any amounts due and owing from an Account Debtor in excess of 10,000 which are in dispute for any reason.

5.9 Notice to Account Debtors. The Lender may, in the Lender's sole discretion, at any time or times upon or after an Event of Default through the date such Event of Default may be cured, and without prior notice to Borrower, notify any or all Account Debtors that the Accounts have been assigned to the Lender and that the Lender has been granted a security interest therein. ntil such Event of Default may be cured, the Lender may direct any or all Account Debtors to make all payments upon the Accounts directly to the Lender.

5.10 Records And Reporting. Borrower hereby represents to the Lender that Borrower now keeps and shall at all times hereafter keep correct and accurate records itemi ing and describing the kind, type, quality, and quantity of Farm Products and Inventory, Borrower's cost therefor and selling price thereof and daily reductions therefrom and additions thereto, and all purchase, sale and consignment agreements, all of which records shall be available on demand during Borrower's usual business hours to any of the Lender's officers, employees or agents.

5.11 Special Collateral. Immediately upon Borrower's receipt thereof and upon request by the Lender, Borrower shall (except as provided for in Section 5.3 hereof with regard to warehouse receipts) deliver or cause to be delivered to the Lender, with such endorsements and assignments as are necessary to vest title and possession in the Lender, chattel paper, Instruments, and Documents which Borrower now owns or which Borrower may at any time or times hereafter acquire. Borrower shall promptly mark all copies of such chattel paper, instruments and Documents to show that they are subject to the Lender's security interest therein.

5.12 Remittance of Proceeds to the Lender. In the event any proceeds of any Collateral shall come into the possession of Borrower (or any of Borrower's shareholders, directors, officers, employees, agents, managers, members, or any Persons acting for or in concert with Borrower), Borrower or such Person shall receive, as the sole and exclusive property of the Lender, and as trustee for the Lender, all monies, checks, notes, drafts and all other payments for and or other proceeds of Collateral, and no later than the first Business Day following receipt thereof, Borrower shall remit the same (or cause the same to be remitted), in kind, to the Lender or to such agent or agents (at such agent's or agents' designated address or addresses) as are appointed by the Lender for that purpose, to be applied to the Liabilities pursuant to Section 10.14 of this Agreement.

5.13 Safekeeping of Collateral. Except for conduct constituting willful misconduct, the Lender shall not be responsible for: (a) the safekeeping of the Collateral; (b) any loss or damage to the Collateral; (c) any diminution in the value of the Collateral; or (d) any act or default of any carrier, warehouseman, bailee, forwarding agency or any other Person relating to the Collateral. All risk of loss, damage, destruction or diminution in value of the Collateral shall be borne by Borrower.

5.14 Sales and se of Collateral. Except as set forth in this Section 5.14, Borrower shall not sell, lease, transfer or otherwise dispose of any Collateral unless the purchase price for the full value of the Collateral is paid to the Lender and applied to Borrower's Liabilities with the Lender.

The Collateral shall not be taken or removed from Borrower's premises, except in the case of Inventory or Farm Products for the purpose of sale, and only if the purchaser thereof pays the purchase price for the full value of the Inventory and Farm Products to the Lender for application to Borrower's Liabilities. pon an Event of Default, the Collateral shall not be sold or taken or removed from Borrower's premises except with the prior written consent of the Lender and upon payment of an amount equivalent to the value of the Collateral to be sold or removed, such amounts to be paid to the Lender to be applied to Borrower's Liabilities.

5.15 <u>Real Property Collateral</u>. Borrower shall pay all costs associated with the recording of the Deeds of Trust and any further modifications thereto with the appropriate authorities and shall take all other actions requested by the Lender in order to vest in the Lender a perfected lien on the Real Property Collateral described therein, subject to no other liens, claims or encumbrances, except those expressly acknowledged thereby.

5.16 <u>Title Insurance</u>. Borrower shall cooperate with the Lender to obtain delivery to the Lender of a policy of title insurance from an insurance company with a Demotech rating of A insuring the Lender's interest in the Real Property Collateral, which cooperation shall be deemed to include, but not by way of limitation, doing all things necessary to satisfy the requirements set forth in said title insurance commitment or added thereto by the issuer thereof (including the payment of premiums). The Lender shall have no obligation to make any Line of Credit Advances unless and until all requirements set forth in said title insurance commitment have been satisfied. The Lender shall have the right to request such title insurance commitment and mechanic's lien insurance updates at such times as the Lender, in its sole discretion, shall deem appropriate, and shall have the right to instruct the issuer of the commitment to set forth as added requirements such things as would be necessary to eliminate added exceptions to coverage. In the event the Lender reasonably determines that a policy of title will not be issued in accordance with said title insurance commitment by reason of Borrower's failure to cooperate as aforesaid, then the Lender shall have the right to terminate this Agreement pursuant to <u>Section 2.8</u> hereof and Borrower shall remain obligated to the Lender for all Liabilities incurred to date thereof (including without limitation, all fees and cost reimbursements provided for herein).

5.17 <u>.S. Bank Account</u>. Borrower shall execute and deliver to Lender all documentation to establish and maintain in good standing the .S. Bank Account as required by Lender from time to time. Borrower shall deposit into the .S. Bank Account all Collateral proceeds checks. Borrower shall take all reasonable steps, including the placement of such designations on invoices as may be appropriate, to cause all Account Debtors to make all payments to the .S. Bank Account. Borrower does hereby irrevocably designate, make, constitute and appoint the Lender (and all Persons designated by the Lender) as Borrower's true and lawful attorney-in-fact, with power, in Borrower's or the Lender's name, to endorse any checks deposited in the .S. Bank Account and to do any and all of the following: (a) demand payment of Accounts; (b) enforce payment of Accounts by legal proceedings or otherwise; (c) exercise all of Borrower's rights and remedies with respect to proceedings brought to collect an Account; (d) sell or assign any Account upon such terms, for such amount and at such time or times as the Lender deems advisable; (e) settle, adjust, compromise, extend or renew any Account; (f) discharge and release any Account; (g) take control in any manner of any item of payment or proceeds of any Account;

(h) prepare, file and sign Borrower's name upon any items of payment or proceeds thereof and deposit the same to the .S. Bank Account on account of the Liabilities; (i) endorse Borrower's name upon any chattel paper, document, Instrument, invoice warehouse receipt, bill of lading, or similar document or agreement relating to any Account or any goods pertaining thereto; (j) sign Borrower's name on any verification of Accounts and notices thereof to Account Debtors; (k) prepare, file and sign Borrower's name on any proof of claim in bankruptcy or similar proceeding against any Account Debtor; (l) instruct the Lender to pay over all deposit accounts to the Lender; and (m) do all acts and things which are necessary, in the Lender's sole discretion, to fulfill Borrower's obligations under this Agreement.

6. WARRANTIES

Each Borrower jointly and severally represents and warrants that as of the date of the execution of this Agreement:

6.1 Binding Effect. This Agreement and all of the other Financing Agreements set forth the legal, valid and binding obligations of Borrower and are enforceable against Borrower in accordance with their respective terms.

6.2 Correctness of Financial Statements. The financial statements delivered by Borrower to the Lender present fairly the financial condition of Borrower and have been prepared in accordance with generally accepted accounting principles consistently applied. As of the date of such financial statements, and since such date, there has been no materially adverse change in the condition or operation of Borrower, nor has Borrower mortgaged, pledged or granted a security interest in or encumbered any of Borrower's assets or properties since such date.

6.3 Employee Controversies. There is no litigation or dispute reasonably likely to lead to litigation pending or threatened between Borrower or any of Borrower's employees.

6.4 Compliance with Laws and Regulations. Borrower is in compliance with all laws, including Environmental Laws, orders, regulations and ordinances of all federal, foreign, state and local governmental authorities relating to the business operations and the assets of Borrower and that Borrower has obtained all the necessary licenses, permits and approvals necessary to operate.

6.5 Collateral. Borrower owns all of the Collateral free and clear of all security interests, liens, claims, and encumbrances except for the Permitted Liens. No goods held by Borrower on consignment or under sale or return contracts have been represented to be Collateral and no amounts receivable by Borrower in respect to the sale of such goods (except markups or commissions which have been fully earned by Borrower) have been represented to be Accounts. Borrower represents that all amounts in the form of ordinary trade payables which are owing to suppliers of any of the Collateral have been paid when due and that none of such suppliers has asserted any interest in the Collateral. Borrower will furnish, at the Lender's request, the names and addresses of all Persons who deliver goods to Borrower on consignment or under sale or return contracts.

6.6 Account Warranties. Borrower warrants and represents to the Lender that: (a) except as disclosed to the Lender from time to time in writing, all Accounts which are at any time included in the Position Report or which are reflected on Borrower's financial statements delivered to the Lender pursuant to Section 6.33 and Section 7.1 of this Agreement are genuine, in all respects what they purport to be, have not been reduced to any judgment, are evidenced by not more than one executed original instrument, agreement, contract or document (which, if any, has been delivered to the Lender), and represent undisputed, bona fide transactions completed in accordance with the terms and condition of any document related thereto; (ii) the Accounts have not been sold or pledged to any Person other than the Lender; and (iii) except as disclosed to the Lender from time to time in writing, Borrower has no knowledge of any fact or circumstance which would impair the validity or collectability of any of the Accounts.

6.7 Location of Assets. The principal residence and mailing address of Borrower is located in Kern County, California. As of the execution of this Agreement, the books and records of Borrower, and all of Borrower's Chattel Paper and records of account are located at the offices of Borrower. If any change in such location shall occur, Borrower shall promptly notify the Lender of such change.

6.8 Inventory and Farm Product Warranties. Borrower warrants and represents to the Lender that: (a) except for goods covered by Documents which have been delivered to the Lender, and except as promptly disclosed to the Lender from time to time in writing, all Farm Products and Inventory are located on the premises described in Section 7.15 of this Agreement or are in transit; and (b) except as promptly disclosed to the Lender from time to time in writing, all Farm Products and Inventory shall be of good and merchantable quality, free from any defects which might affect the market value of such Farm Products and Inventory.

6.9 Solvency. Borrower is solvent, able to pay Borrower's debts generally as such debts mature, and has capital sufficient to carry on Borrower's business and all businesses in which Borrower is about to engage. The saleable value of Borrower's Total Assets at a fair valuation, and at a present fair saleable value, is greater than the amount of Borrower's total obligations to all Persons. Borrower will not be rendered insolvent by the execution or delivery of this Agreement or of any of the other Financing Agreements or by the transactions contemplated hereunder or thereunder.

6.10 Tax Liabilities. Borrower has filed all federal, state and local tax reports and returns required by any law or regulation to be filed by Borrower and has either duly paid all taxes, duties and charges indicated to be due on the basis of such returns and reports or has made adequate provision for the payment thereof, and the assessment of any material amount of additional taxes in excess of those paid and reported is not reasonably expected. The reserves for taxes reflected on Borrower's balance sheet are adequate in amount for the payment of all Liabilities for all taxes (whether or not disputed) of Borrower accrued through the date of such balance sheet. There are no material unresolved questions or claims concerning any tax liability of Borrower.

6.11 Pension Reform Act. No events, including without limitation, any Reportable Event or Prohibited Transactions, as those terms are defined in the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time (herein, including

any and all such amendments, called ERISA ), have occurred in connection with any defined benefit pension plan (herein called Pension Plan ) of Borrower which might constitute grounds for the termination of any such Pension Plan by the Pension Benefit uaranty Corporation or for the appointment by the appropriate nited States District Court of a trustee to administer any such Pension Plan. All of Borrower's Pension Plans meet, as of the date of the execution hereof, the minimum funding standards of section 302 of ERISA.

6.12 Indebtedness and Producer Payables. Except (a) for the loan from the Lender contemplated by this Agreement; and (b) as disclosed on the financial statements and reports identified in Section 6.2 of this Agreement, Borrower and uarantor have no other indebtedness, contingent obligations or Liabilities, outstanding bonds, letters of credit or acceptances to any other Person or loan commitments from any other Person. Borrower's and uarantor's Producer Payables are not past due.

6.13 Margin Security. Borrower does not own any margin security and none of the Advances hereunder shall be used for the purpose of purchasing or carrying any margin securities or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase any margin securities or for any other purpose not permitted by Regulations or of the Board of overnors of the Federal Reserve System.

6.14 Other Corporate or Fictitious Names. Borrower has not, during the preceding five (5) years, been known by or used any other corporate, fictitious or trade names.

6.15 Affiliates. Borrower has no Affiliates, other than those Persons disclosed below:

Stephanie Hronis
Laurie Hronis
Marcie Hronis
Adoniah Hronis
Kostandino Hronis
Peter Nicholas Hronis
Priscilla Hronis

6.16 Survival of Warranties. All representations and warranties contained in this Agreement or any of the other Financing Agreements shall survive the execution and delivery of this Agreement and shall be true from the date of this Agreement until the Liabilities shall be paid in full and the Lender shall cease to be committed to make Line of Credit Advances under this Agreement.

6.17 Related Party Transactions. No current or former Affiliate, joint venturer, officer, manager, member, or employee of Borrower, is presently, or since the inception of the Borrower has been, directly or indirectly through his, her or its affiliation with any other person, a party to any transaction with the Borrower providing for the furnishing of services by or to, or rental of real or personal property from or to, or otherwise requiring cash payments to or by any such person.

6.18 ERISA Plans and Contracts.