# EXHIBIT A

# PART 5

Schedule 6.31.4

List of Borrower's Suppliers

| |
|---|
| **1100** |
| A & P DIESEL ELECTRIC INC. |
| **1102** |
| JOHNSON CONTROLS SECURITY SOLUTIONS |
| **1114** |
| AGPACK TRUCKING, INC. |
| **1140** |
| LINDE GAS & EQUIPMENT INC. |
| **1142** |
| GREG'S PETROLEUM SERVICE, INC. |
| **1143** |
| JIM'S SUPPLY CO., INC. |
| **1144** |
| MAXCO SUPPLY INC |
| **1162** |
| S & S SPRAYERS, LLC |
| **1172** |
| COMPLIANCE HR LLC |
| **1202** |
| FRUIT ROYALE, INC. |
| **1203** |
| FOUR STAR SALES, INC. |
| **1205** |
| DANDREA PRODUCE, LLC |
| **1206** |
| CROWN JEWELS PRODUCE COMPANY |
| **1305** |
| PACIFIC TIRE SERVICE |
| **1310** |
| GRAINGER |
| **1317** |
| KERN MACHINERY, INC. |
| **1320** |
| AT&T |
| **1323** |
| FEDEX |
| **1326** |
| FASTENAL COMPANY |
| **1327** |
| COMMUNICATION ENTERPRISES |
| **1335** |
| S.A. CAMP |

| |
|---|
| **1337** |
| MORTON AND BROWN PLUMBING, INC. |
| **1339** |
| PG&E |
| **1340** |
| PACIFIC TIRE #6 |
| **1341** |
| APPLIED TECHNOLOGY GROUP, INC. |
| **1343** |
| S.S.J.M.U.D. |
| **1346** |
| KERN-TULARE WATER DISTRICT |
| **1347** |
| SPARKLE UNIFORM & LINEN SVC |
| **1348** |
| GOLDEN VALLEY ORCHARD SUPPLY, INC. |
| **1354** |
| OFFICE DEPOT BUSINESS CREDIT |
| **1356** |
| SEVIER'S AUTO SUPPLY |
| **1358** |
| SEQUOIA PAINT ENTERPRISE |
| **1359** |
| BAKERSFIELD COUNTRY CLUB |
| **1364** |
| SAUCELITO IRRIGATION DISTRICT |
| **1365** |
| ARVIN-EDISON WATER STORAGE DISTRICT |
| **1367** |
| SPARKLETTS |
| **1369** |
| SO. CALIFORNIA EDISON |
| **1370** |
| BUTTONWILLOW WAREHOUSE CO. INC. |
| **1371** |
| HELENA AGRI-ENTERPRISES, LLC |
| **1372** |
| DELANO PROPANE |
| **1382** |
| SOCALGAS |
| **1384** |
| DELANO-EARLIMART IRRIGATION DISTRICT |
| **1387** |
| SIERRA VALLEY AG SUPPLY |
| **1391** |
| MCMASTER-CARR |
| **1395** |
| SECURITAS SECURITY SERVICES USA, INC. |

| |
|---|
| **1400** |
| SAN JOAQUIN PAINT & GLASS INC. |
| **1402** |
| DELANO CHEVROLET BUICK GMC |
| **1404** |
| DACO FARM SUPPLY INC. |
| **1406** |
| PACIFIC IRRIGATION INC |
| **1407** |
| NUTRIEN AG SOLUTIONS, INC. (DELANO) |
| **1408** |
| C & B INSURANCE SERVICES, INC. |
| **1409** |
| C & H FENCE & PATIO, INC. |
| **1420** |
| SUNBELT RENTALS |
| **1421** |
| HOME DEPOT CREDIT SERVICES |
| **1424** |
| VERIZON WIRELESS |
| **1426** |
| SENSITECH INC. |
| **1427** |
| CLARK PEST CONTROL |
| **1434** |
| VALLEY TECH AGRICULTURAL SERVICES |
| **1443** |
| INDUSTRIAL REFRIGERATION SERVICE CO, INC |
| **1444** |
| ID TECHNOLOGY, LLC |
| **1445** |
| BEAULIEU MOBILE SERVICE |
| **1447** |
| HERC RENTALS |
| **1449** |
| UNWIRED BROADBAND, INC. |
| **1455** |
| KERN PRINT SERVICES |
| **1459** |
| SIGN MASTER |
| **1463** |
| GIBBS INT'L TRUCK CENTERS |
| **1467** |
| DOUBLE EAGLE PRODUCE AND TRANSPORTATION |
| **1481** |
| SNOWDEN ENTERPRISES, INC. |
| **1500** |
| B & B SURPLUS INC. |

| |
|---|
| **1504** |
| JORDAN KAUFMAN - KCTTC |
| **1511** |
| CALIFORNIA TABLE GRAPE COMMISSION |
| **1525** |
| BR CONSULTING, LLC |
| **1535** |
| SC CONSULTING LLC |
| **1536** |
| CHEP USA |
| **1537** |
| VERITIV OPERATING COMPANY |
| **1538** |
| CARGO DATA CORPORATION |
| **1539** |
| AIR TECHS |
| **1543** |
| RICH ENVIRONMENTAL SERVICE |
| **1548** |
| MADLAND TOYOTA-LIFT, INC. |
| **1552** |
| CASHIER - STANDARDIZATION 41101 |
| **1554** |
| LAMONT SANITATION, INC. |
| **1557** |
| STANDARD PLUMBING SUPPLY CO. |
| **1562** |
| HUNSAKER AND SON, INC. |
| **1566** |
| QUINN COMPANY |
| **1601** |
| BEST WEIGH SCALE COMPANY, INC. |
| **1637** |
| FAMOUS SOFTWARE LLC |
| **1640** |
| BILL'S FAST LUBE & SMOG |
| **1709** |
| TERRA BELLA IRRIGATION DISTRICT |
| **1728** |
| ALLIED PACKAGING CORPORATION |
| **1733** |
| ARROW BEARINGS & DRIVES |
| **1756** |
| PELTZER FARM MANAGEMENT, INC. |
| **1789** |
| SIERRA VISTA AG SERVICES LLC |
| **1795** |
| AG WATER CHEMICAL |

| |
|---|
| **1812** |
| AG IPM CONSULTANTS, INC. |
| **1822** |
| MENTORS MOVING AND STORAGE |
| **1824** |
| MOLICA, SHELLEY |
| **1870** |
| CALPINE CONTAINERS, INC. |
| **1883** |
| DIRECT AG SALES INC. |
| **1911** |
| FRUIT GROWERS SUPPLY CO. |
| **1923** |
| GUERO TIRE SERVICE |
| **1939** |
| BARNES WELDING SUPPLY |
| **1953** |
| CARQUEST OF ARVIN |
| **1954** |
| SUNRIDGE NURSERIES, INC. |
| **1958** |
| VAMCO LTD., INC. |
| **1964** |
| EXPRESS BODYWORKS INC. |
| **1967** |
| LAUREL AG & WATER, LLC |
| **1968** |
| BERCHTOLD EQUIPMENT COMPANY |
| **1975** |
| SUNRISE TOOL SUPPLIES LLC |
| **2006** |
| MCCROMETER, INC. |
| **2007** |
| 99 STEEL SPECIALTIES WELDING & FABRICATI |
| **2017** |
| ULINE |
| **2039** |
| ZAG TECHNICAL SERVICES, INC. |
| **2055** |
| PACE ANALYTICAL SERVICES LLC |
| **2069** |
| WOLTERS KLUWER |
| **2072** |
| CUSTOM LABEL & DECAL, LLC |
| **2085** |
| CASTERLINE AG CONSULTING, LLC |
| **2095** |
| BEHR TRANSPORT INC. |

| |
|---|
| **2101** |
| VALLEY TECH AG CONSULTING |
| **2103** |
| FLS SUPPLY |
| **2106** |
| WILDLIFE MANAGEMENT TECHNIQUES |
| **2109** |
| TD AUTO FINANCE |
| **2137** |
| GIUMARRA VINEYARDS CORP. |
| **2169** |
| T & T TRUCK & CRANE SERVICE |
| **2188** |
| AGPACK, INC. |
| **2231** |
| WILLIAMS SCOTSMAN, INC. |
| **2241** |
| NORTH KERN WATER STORAGE DISTRICT |
| **2281** |
| KRF - LLC |
| **2285** |
| MLT SOIL SUPPLEMENTS INC. |
| **2322** |
| SIMPLOT GROWER SOLUTIONS |
| **2325** |
| HORTAU |
| **2339** |
| TOM MURRAY ENTERPRISES INC |
| **2355** |
| MCEWEN NURSERY |
| **2382** |
| INLAND WATER TECHNOLOGY, INC. |
| **2385** |
| DISTINCT CUSTOM APPERAL LP |
| **2387** |
| BAKERSFIELD ICE |
| **2391** |
| XEROX FINANCIAL SERVICES |
| **2393** |
| WONDERFUL LABORATORIES LLC |
| **2395** |
| JACK GRIGGS, INC. |
| **2410** |
| INTERSTATE BILLING SERVICE, INC. |
| **2507** |
| HUNSAKER, JUDITH PATRICIA |
| **2544** |
| SOUTH VALLEY COMPANIES, INC. |

| |
|---|
| **2546** |
| INTERNATIONAL FRUIT COMPANY INC. |
| **2746** |
| NUTRIEN AG SOLUTIONS, INC. (HANFORD) |
| **2748** |
| CIG |
| **2756** |
| TRINITY SAFETY COMPANY |
| **2792** |
| CAL-EDISON FARM EXCHANGE |
| **2797** |
| LOBO'S PACKAGING SOLUTIONS |
| **2798** |
| LMG LOGISTICS LLC |
| **2804** |
| EXECUTIVE HOUSEKEEPER |
| **2807** |
| CHAVEZ, MARYANN |
| **2808** |
| NU POOLS |
| **2828** |
| QAI, INC. |
| **2844** |
| VOLM COMPANIES, INC. |
| **2899** |
| O'REILLY AUTOMOTIVE, INC. |
| **2900** |
| CRANE'S WASTE OIL, INC. |
| **2915** |
| RLH FIRE PROTECTION |
| **2917** |
| KIMBER PALLETS & FIREWOOD, INC. |
| **2925** |
| BRIX PROCURE |
| **2947** |
| THE MARCOM GROUP |
| **2977** |
| GM FINANCIAL LEASING |
| **3035** |
| INSEASON AG INNOVATIONS, LLC |
| **3037** |
| RINCON CONSULTANTS, INC. |
| **3090** |
| UPS |
| **3167** |
| COMMODORE TRANSPORTATION LLC |
| **3185** |
| GUARDIAN HARVEST INC. |

| |
|---|
| **3187** |
| C & P SANITARY SUPPLY |
| **3194** |
| SAFE FOOD ALLIANCE |
| **3237** |
| WQS FOOD VERIFICATION LLC |
| **3257** |
| BRETT MCCOWAN FARMS, INC |
| **3289** |
| DSG LOGISTICS LLC |
| **3297** |
| BELTRAN, JENNIFER L. |
| **3311** |
| SUNVIEW MARKETING INTERNATIONAL |
| **3355** |
| HOMEGROWN ORGANIC FARMS |
| **3525** |
| CENTRAL VALLEY RATERS INC. |
| **3571** |
| CENTRAL VALLEY ELECTRIC |
| **3583** |
| TURNUPSEED ELECTRIC SERVICE, INC. |
| **3629** |
| ROBINHOOD LOGISTICS INC |
| **3703** |
| MH TRUCK BROKERAGE LLC |
| **3723** |
| CARGO SOLUTIONS |
| **3755** |
| VALLEY AUTOMATION SOLUTION INC. |
| **3811** |
| OPENHAUL LOGISTICS LLC |
| **3831** |
| MOREL CONSULTING |
| **3841** |
| INTERNATIONAL FRESH PRODUCE ASSOCIATION |
| **3843** |
| JJ's DISTRIBUTING |
| **3889** |
| TNG TRADE & LOGISTICS LLC |
| **3917** |
| NORTH AMERICA LOGISTICS LLC |
| **3923** |
| SUNKIST GROWERS INC |
| **3931** |
| SAN JOAQUIN PRODUCE SALES INC |
| **3937** |
| PROUD EXPRESS INC |

| |
|---|
| **3963** |
| STEADFAST SHIPPING INC |
| **3967** |
| WE ARE FLAVOR HUNTERS INC |
| **3975** |
| PREFERRED WAREHOUSE MANAGEMENT LLC |

Schedule 6.31.5

List of Borrower's Litigation

None

Schedule 6.31.6

List of Counties in which Borrower Keeps any Farm Products and or Inventory

Kern County, California
Tulare County, California

Schedule 6.32

Financial Statements

(Omitted)

# EXHIBIT 2

B3155-1137 10/29/2024 2:58 PM Received by California Secretary of State

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only

**-FILED-**

File No.: U240083964841
Date Filed: 10/29/2024

Submitter Information:

| | |
|---|---|
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071<br>GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| HRONIS CAPITAL ASSETS, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CAPITAL MANAGEMENT, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CITRUS, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS FARMING, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS, INC. | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS LAND COMPANY | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS RANCH, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| THE HRONIS FAMILY LIMITED PARTNERSHIP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY<br>STE 201<br>WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All Assets.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:

101398658

B3155-1138 10/29/2024 2:58 PM Received by California Secretary of State

# EXHIBIT 3

CONTERRA
FINANCING AMERICAN AGRICULTURE

June 27, 2025

**VIA EMAIL ONLY**

Hronis Inc., et al.
10443 Hronis Road
Delano, CA 93215
Attention: Peter John Hronis
peter.hronis@hronis.net

RE: Letter Agreement
Loan No. PA2000: October 29, 2024, Revolving Line of Credit in the amount of note

Dear Mr. Hronis:

Reference is hereby made to that certain Loan and Security Agreement dated as of October 29, 2024 (the "***Loan Agreement***"), by and among Hronis Capital Assets, LP ("***Hronis Capital Assets***"), Hronis Capital Management, LLC ("***Hronis Capital Management***"), Hronis Citrus, LLC ("***Hronis Citrus***"), Hronis Farming, LP ("***Hronis Farming***"), Hronis Fruit Company LLC ("***Hronis Fruit Company***"), Hronis, Inc. ("***Hronis, Inc.***"), Hronis Land Company ("***Hronis Land Company***"), Hronis Ranch, LLC ("***Hronis Ranch***") Hronis Resource Management, LLC ("***Hronis Resource Management***"), The Hronis Family Limited Partnership ("***The Hronis Family Limited Partnership***" and, together with Hronis Capital Assets, Hronis Capital Management, Hronis Citrus, Hronis Farming, Hronis Fruit Company, Hronis, Hronis Land Company, Hronis Ranch, and Hronis Resource Management are collectively referred to herein as the "***Borrowers***"), Peter John Hronis ("***PJHronis***"), Kosta James Hronis ("***KJHronis***"), Demetrius Albert Hronis ("***DAHronis***"), The Kosta Hronis Living Trust Dated February 12, 2014 ("***The Kosta Hronis Living Trust***"), The Peter John Hronis Living Trust Dated February 28, 2006 ("***The Peter John Hronis Living Trust***"), Kosta Hronis and Peter J. Hronis, Trustees of the Sophia Hronis Irrevocable Trust One Dated December 27, 2012 ("***The Sophia Hronis Irrevocable Trust One***" and together with PJHronis, KJHronis, DAHronis, The Kosta Hronis Living Trust, and The Peter John Hronis Living Trust are collectively referred to herein as the "***Guarantors***"), Conterra Agricultural Capital, LLC (the "***Lender***" and together with the Borrowers and the Guarantors, collectively, the "***Parties***"), and Shamrock Transport, LLC, a California limited liability company ("***Shamrock***"), and Hronis Racing, LLC, a California limited liability company ("***Hronis Racing***" and together with Shamrock are collectively referred to herein as "***Additional Parties***"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed thereto in the Loan Agreement.

The purpose of this correspondence (this "***Letter Agreement***"), which shall be effective as of June 27, 2025 (the "***Effective Date***"), is to provide the terms under which Lender will agree to a limited waiver for additional draws pursuant to the mutually agreed upon budget and draw procedures and schedule attached as Exhibit 1 (the "***Budget***") whereby the Lender will continue to lend and the Borrowers will continue to utilize Lender's funds in an amount up to the amount of $85,850,000.00 ("the Additional Advance") which shall be deployed up through August 31, 2025 as specified further below. The Budget constitutes, based on the representations of Borrowers and the financial information provided by Borrowers, the necessary expenses required

by Borrowers to operate their business and maintain and harvest the 2025 crop which constitutes Lender's collateral under the Loan Agreement and related October 29, 2024, Promissory Note in the amount of up to $55,000,000.00 (the "***Note***"). The Note, the Loan Agreement, and all other documents and instruments evidencing or securing the Loan and any amendments, restatements, and supplements are collectively referred to herein as the "***Loan Documents***". This Letter Agreement is entered into by Conterra Holdings, LLC, an Iowa limited liability company d/b/a Conterra Ag Capital (the "***Agent***"), as agent and loan servicer for Lender. Borrowers further acknowledge (i) the prior letter agreement dated October 21, 2024, regarding the deposit of funds from Collateral sales pending designation of a U.S. Bank Account; and (ii) the prior letter agreement dated April 9, 2025, in which Lender provided a limited one-time waiver for one or more additional draws of funds in the amount up to $6,000,000.00 under the Loan Agreement and related October 29, 2024, Promissory Note in the amount of up to $55,000,000.00. Except as specifically stated in this Letter Agreement, the obligations under these prior letter agreements remain in full force and effect.

Borrowers acknowledge Section 2.1.1 of the Loan Agreement, which provides, in part, that

> Notwithstanding any other provision of this Agreement, nothing in this Agreement shall be interpreted as a promise by Lender to make any Line of Credit Advances. Lender may refuse to make a requested Line of Credit Advance at any time and for any reason, whether arising before, on, or after the date of this Agreement, whether or not Borrower is in compliance with the covenants contained in this Agreement, and whether or not an Event of Default has occurred, or for no reason at all. Lender may in its sole discretion elect to make any requested Line of Credit Advances, whether in the requested amount or a lower amount, may reject such request in its entirety, or may condition its willingness to make such requested Line of Credit Advances on one or more conditions, including but not limited to such amendments to this Agreement and the other Financing Agreements, as Lender, in its sole discretion, deems appropriate.

Borrowers agree and understand that, except as specifically stated in this Letter Agreement, this Letter Agreement does not modify the Loan Agreement to create any obligation for Lender to make an advance to Borrowers. Rather, this Letter Agreement sets forth the terms and conditions required of Borrowers to induce Lender to agree to waive use restrictions under the Note and Loan Agreement, and to increase the amount available under the Note.

Borrowers hereby acknowledge and agree that one or more continuing Defaults and Events of Default have occurred under the Loan Agreement, including, without limitation, a Default as defined under Section 1.1 of the Loan Agreement (w) as a result of Borrowers failing to promptly notify Lender of any condition or event which constitutes (or which upon the giving of notice or lapse of time or both would constitute) a Default under Section 1.1 of the Loan Agreement, (x) as a result of Borrowers failing or neglecting to perform, keep or observe the covenants, conditions, representations, promises and agreements contained in Sections 3, 4, 5, 6, 7, and 8 of the Loan Agreement, (y) as a result of warranties and representations made by or on behalf of any Borrower or Guarantor to the Lender being untrue and/or incorrect in any material respect , and (z) as a result of Lender's deeming itself insecure or that the prospect for

repayment of the Liabilities and obligations under the Financing Agreements is impaired (collectively, the "***Specified Defaults***"). The fact that any such other Defaults or Events of Default are not specified herein shall not be construed as a waiver thereof or a waiver of the right to exercise any rights and remedies with respect thereto. The parties hereto acknowledge and agree that each Specified Default constitutes an Event of Default under the Loan Agreement that has occurred and is continuing, and that, notwithstanding anything in the Loan Agreement or in any other of the Loan Documents to the contrary, no grace period otherwise provided for in the Loan Agreement shall be required in connection with such events or occurrences to constitute Events of Default thereunder. Further, no such grace period shall be available to Borrowers for any Defaults or Events of Default previously occurring or hereafter occurring (whether for the Specified Defaults or otherwise).

Notwithstanding the Specified Defaults, Lender is agreeable, as a one-time accommodation, to provide a limited waiver from the use restrictions under the Note and Loan Agreement, and to increase the availability under the Note in an amount up to $85,850,000.00, such increase for use in the operations of Borrowers' business and maintenance and harvesting of the 2025 crop, up to and including August 31, 2025, (the "***Advance***"), subject to Borrowers agreeing to and performing all the following:

1. As additional consideration to Lender for entering into this Letter Agreement, Borrowers shall, on the date of this Letter Agreement, pay the sum of $850,000 to Lender, which shall be made through an immediate increase in the principal balance of the Note in the same amount, and which shall be repaid under the terms of the Note. By their signatures to this Letter Agreement, Guarantors hereby agree and consent to this increase in the principal balance of Note.

2. No later than the Effective Date, the Borrowers shall hire a Chief Restructuring Officer (the "CRO") acceptable to the Lender, and such engagement shall continue until: (i) the full satisfaction of all amounts due to Lender under the Loan Documents; or (ii) the Parties mutually agree that the CRO is not required. The Borrowers shall timely pay all fees and expenses of the CRO. In hiring the CRO, Borrowers shall purchase or include as a named insured on existing insurance (including Directors & Officers, EPLI & Fiduciary Liability policies, as deemed necessary by the CRO). Unless otherwise agreed to in a writing signed by Lender, the terms of the engagement of the CRO shall include the following:

    a. The CRO and Borrowers will form a management committee, which shall meet no less than once a week, and in which all material aspects of the business of the Borrowers shall be discussed. The Borrowers will not undertake any material decision for the business of Borrowers without first raising it with the management committee. Detailed minutes shall be taken of each meeting and shall be preserved no fewer than two years after the termination of the engagement of the CRO;

    b. The CRO shall have unfettered access to: (i) all books, records, officers, and employees, of Borrowers, (ii) all files, accounts, websites, and software used by Borrowers, and (iii) all professionals, vendors, or companies hired by Borrowers. Borrowers shall arrange to provide the CRO this same access to Grapeco Farm Management, Inc.;

    c. The CRO will have full and sole responsibility regarding borrowing of funds by Borrowers, including requesting Advances under this Letter Agreement

and the Loan Agreement;

d. The CRO shall have full and final authority over all bookkeeping, accounting, and financial reporting of the Borrowers, and Borrowers shall fully cooperate in assisting CRO with these tasks;

e. Borrowers shall not enter into any transaction outside the ordinary course of business without (i) receiving prior approval of the CRO for the transaction; and (ii) notifying Lender no earlier than three business days before the transaction is entered into, unless exigency requires shorter notice;

f. Borrowers shall not make payments to any vendor, officer, employee, lender, or other party without obtaining prior approval of the payment by the CRO. The CRO shall approve the payment if it complies with the Budget. If the payment does not comply with the budget, the CRO may approve the payment if it deems it necessary to maintain and harvest the 2025 crop, but shall provide the Lender at least three business days' notice of the proposed payment, unless demonstrated exigency requires shorter notice;

g. The CRO shall confirm that Borrowers comply with the requirements of Section 5.6 of the Loan Agreement requiring that all account debtors of Borrowers make all payments to the U.S. Bank Account (as defined in the Loan Agreement). Borrowers shall not move or transfer funds out of the U.S. Bank Account except to make payments pursuant to Section 2.f, and any such transfer shall be approved in advance by CRO.

h. The Borrowers, under the direction of the CRO, will provide the Parties with such weekly cash actual to actual to budget and variance reports by no later than Thursday at 5:00 pm PDT in the week immediately following the week such reports are attributed;

i. The CRO and Lender may negotiate revisions to the Budget from time-to-time as necessary to account for variances and unanticipated changes, however Lender is under no obligation to agree to any modification of the Budget and reserves the right to reject any proposed modification in Lender's sole discretion. Such Budget will include CRO costs and expenses pursuant to the CRO rights and obligations contained herein;

j. The Borrowers and CRO shall provide a certification regarding available funds to meet Budget requirements as follows:

    i. On the 20th day of each month, or the next business day if the 20th day falls on a weekend or holiday, the CRO and Borrowers shall jointly provide a certification to Lender that Borrowers have available funds to meet the requirements of the Budget for the following month. For purposes of this section, the term "available funds" shall include only the following: (i) cash or other liquid assets on hand, less expenses to be paid up to the end of the month; (ii) projected revenue, with all data used to project revenue to be created by or confirmed by CRO; (iii) draw amounts available to Borrowers under the Note and Loan Agreement, as modified by this Letter Agreement or any

subsequent amendment or modification to the Loan Agreement; and (iv) any additional source of funds not included in the budget, including additional loans or equity contributions made to Borrowers, so long as the CRO has determined with reasonable certainty that such funds will be available for the use of Borrowers to make all payments required under the Budget and that obtaining those funds will not, in the opinion of counsel retained by CRO or Borrowers, cause a breach of any agreement to which Borrowers are a party.

ii. If the CRO or Borrowers determine that they cannot jointly make the certification required under this paragraph, then the CRO shall, on the 20th day of each month, or the next business day if the 20th day falls on a weekend or holiday, provide a written statement to Lender setting forth that the CRO and Borrowers cannot make the required certification and setting forth the projected funds available for the following month. The making of a statement that the certification pursuant to section 2.i.i, cannot be made, or if such certification is not timely made (with time being of the essence), shall constitute an immediate material breach of this Letter Agreement and an Event of Default under the Loan Documents.

k. The CRO shall have the full and final power and authority to enter into, on behalf of Borrowers and in consultation with Borrowers' owners, a sale of some or all assets of the Borrowers, in transactions outside the ordinary course of business. The CRO may undertake, in consultation with Borrowers, any marketing or brokering process the CRO deems necessary to effect a sale, and may hire any professionals, consultants, or other parties necessary to broker and/or market the assets of Borrowers. Borrowers shall cooperate in any brokering, marketing or sale process. Any proceeds of a sale shall be paid to Lender and applied to the balance of the Note;

l. The CRO shall sell the Aircraft, as defined below, with all haste;

m. The CRO is authorized to disclose and discuss with Lender all matters that may be inquired by Lender and shall prepare and provide to Lender such reports as Lender may reasonably request from time to time, at the expense of Borrowers. However, the Lender shall not have any authority, express or implied, to control or direct the CRO;

n. If the CRO determines that: (i) the Borrowers will lack funds to operate the business and maintain and harvest the 2025 crop and that Borrowers will be unable to secure additional financing or funds necessary to do so; or (ii) the Borrowers and CRO are unable to jointly and timely provide the certification of available funds required by section 2.i.i, then CRO and Borrowers shall immediately and jointly, and in good faith, prepare a liquidation plan for Borrowers in which they will timely sell all assets of Borrowers. The liquidation plan may include a bankruptcy petition under Title 11 of the United States Code, stipulation to appointment of a receiver in a Court located in California, an assignment for the benefit of creditors, or other insolvency proceeding. To the extent any such insolvency proceeding occurs, Borrowers consent to the CRO acting as the receiver,

trustee, assignee, or other outside fiduciary role of the insolvent Borrowers;

o. Any other mutually agreed commercially reasonable terms necessary to protect repayment of Lender on the Note and the Advance; and

p. Each of Borrowers shall take all necessary steps to provide the CRO the full authority required by this Section 1 through passing all resolutions, and as deemed necessary by the Borrower's governing documents, bylaws, or similar governing documents of each respective Borrower.

3. Shamrock shall grant the CRO all necessary authority for the CRO to market and sell the aircraft described as: 2007 CESSNA 525B (Citation CJ3) Aircraft with an FAA Registration Number of N1 SPG (Serial Number 525B-0140) (the "Aircraft"). All proceeds of the sale shall be used to pay down the balance of the Note.

4. Borrowers shall, no later than February 28, 2026, satisfy all obligations owed to Lender under the Note and the Loan Documents through a sale, refinance, or other transaction. Borrowers further agree that if this deadline is not met, Borrowers shall immediately liquidate consistent with section 2.n. This deadline may be extended by the mutual written agreement of Lender and Borrowers. Nothing in this section shall be construed as a waiver or forbearance of Lender's rights under the Loan Agreement. Rather, this section shall constitute an additional remedy available to Lender.

5. Borrowers agree to cooperate in any and all additional documentation determined by Lender, in Lender's sole discretion, necessary to effectuate the terms of this Letter Agreement, to appoint a CRO as set forth in section 1 above by the Effective Date, and to amend the terms of the Loan Documents to include the terms of this Letter Agreement. Borrowers shall provide all corporate resolutions, bylaws, or other governing documents necessary to approve any sale or other act that the CRO is approved to perform under section 1 of this Letter Agreement, and by entering into this Letter Agreement, Borrowers confirm that they have authority to provide such governance documents. Borrowers further agree that any failure on the part of Borrowers to timely cooperate in entering into any and all additional documentation required by this Letter Agreement, in Lender's sole discretion, shall constitute a Default or Event of Default under the Loan Agreement and subject Borrowers to applicable default interest under the Note effective as of the date of this Letter Agreement.

6. In addition to and not in lieu of Borrowers' expense payment obligations under Section 10 of the Loan Agreement, Borrowers agree to pay any and all costs and expenses, including attorneys' fees and costs, incurred by Lender and/or Agent in connection with this Letter Agreement, the Advance, any prior letter agreement, the appointment of a CRO as set forth in section 1, above, and any required modification to the Loan Documents, which sums may be added to the principal amount of the Loan and will bear interest as set forth in the Note and Loan Documents.

7. Borrowers shall deliver to Agent executed counterparts of this Letter Agreement prior to, and as a condition of, Agent processing the Request for Funds and Lender funding the Advance.

The failure by Borrowers to perform their obligations set forth in this Letter Agreement as and when due shall constitute an immediate Default or Event of Default under the Loan Agreement. Borrowers agree that, in the event of any material breach of this Letter Agreement, or if Borrowers and CRO fail to timely provide the certification of available funds required by section 2.i.i,, then Borrowers shall fully cooperate with, and will not dispute, Lender's exercising of its remedies under the Loan Agreement, including any additional remedies as provided for under this Letter Agreement. Borrowers shall cooperate and assist Lender in exercising its remedies, including providing all information to Lender necessary for Borrowers to exercise their rights under section 9-607(a)(1) of the Uniform Commercial Code.

Borrowers acknowledge and agree that as of the date of June 26, 2025 and prior to any Advance by Lender under this Letter Agreement, the current outstanding principal balance of the Loan is $66,340,949.34, and the current amount of accrued interest is $791,761.86. Borrowers further acknowledge and agree: (x) that any Advance under this Letter Agreement exceeds the current face value of the Note;(y) that Borrowers shall repay all amounts extended through any Advance in accordance with the terms of the Note; and (z) Borrowers will execute a modification or modifications to the Note, along with any other Loan Documents reasonably required by Lender, reflecting the increase(s) in the amount of the Loan due to any Advance(s) and for repayment of the Advance(s) under this and all prior Letter Agreements. Guarantors and Additional Parties agree to also sign any modification of any guaranty or other required documents consistent with the Loan Documents.

In further consideration of Lender's execution of this Letter Agreement, Borrowers, Guarantors, and Additional Parties, on behalf of themselves and their successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, agents (**"Releasors"**) hereby forever, fully, unconditionally and irrevocably waive and release Lender, Agent, and its successors, assigns, parents, subsidiaries, affiliates, officers, directors, employees, attorneys, and agents (collectively, the "**Releasees**") from any and all claims, liabilities, obligations, debts, causes of action (whether at law or in equity or otherwise), defenses, counterclaims, setoffs, of any kind, whether known or unknown, whether liquidated or unliquidated, matured or unmatured, fixed or contingent, directly or indirectly arising out of, connected with, resulting from, or related to any act or omission by any Lender or any other Releasee with respect to the Loan Agreement and any collateral, on or before the date of this Agreement (collectively, the "**Claims**"). Borrowers further agree that Borrowers shall not commence, institute, or prosecute any lawsuit, action, or other proceeding, whether judicial, administrative, or otherwise, to collect or enforce any Claim.

Subject to the terms above, Releasors, after consultation with their own counsel, or the opportunity to do so, shall have, and shall be deemed to have, waived and relinquished, to the fullest extent permitted by law, any and all provisions, rights, and benefits of any federal, state or foreign law, rule or common-law doctrine that is similar, comparable, equivalent, or identical to, or which has the effect of, Section 1542 of the Civil Code of the State of California ("Section 1542"), which provides as follows:

> **"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

Releasors each hereby represent and warrant no additional approval, consent, authorization, or other action by, or notice to any Person (including, without limitation, any members, managers, boards of managers, or partners of any of the Borrowers or Guarantors, or

any other securityholder of or lender to Borrowers), is necessary or required in connection with the Advance, except any such approvals, consents, authorizations that have been obtained, actions taken or notices given, as applicable, prior to entry into this Letter Agreement.

Such Advance shall not constitute: (i) a waiver, modification or other amendment of the terms of the Loan Documents or of Borrowers' payment, performance or any other obligations set forth therein (including, without limitation, the obligations specified in any prior letter agreement(s) with Lender and in this Letter Agreement); (ii) a consent by Lender to any other pending request which Borrowers have made of Lender; (iii) any agreement by Lender to make further advances, it being understood and agreed that any such further advances shall only be made in Lender's sole discretion (notwithstanding any provision in any prior letter agreement(s) with the Lender, the Loan Agreement or any other agreement or instrument to the contrary); (iv) a cure or waiver of any Defaults or Events of Default that may exist as of the date hereof under the Loan Documents (including, without limitation, the Specified Defaults) or a forbearance from Lender's exercise of remedies pursuant to the same; (v) a waiver of any rights or remedies that Lender may have under the Loan Documents, at law or in equity; or (vi) a course of conduct obligating Lender to act in a similar fashion in the future.

Lender reserves all rights with respect to all obligations under the Loan Agreement, the Note and the other Loan Documents, including principal, interest, and any fees and expenses thereunder incurred or accruing. Lender further reserves the right to take such action as it deems necessary and advisable to recover payment in full of such obligations, including, without limitation, foreclosure of the liens and security interests arising under the Loan Documents and exercising its other rights and remedies permitted under the Loan Documents and under applicable law or in equity. Failure to exercise any of such remedies shall not constitute a waiver of any Defaults or Events of Default (including any Specified Defaults) or of Lender's right to exercise such remedies at a future date.

Nothing contained in this Letter Agreement or in any prior letter agreement(s) with the Lender is intended to or shall be construed as: (a) a waiver, release, modification or forbearance of any of the rights, remedies, privileges and powers of Lender against Borrowers, Guarantors, Additional Parties, or any other Person or any assets securing the obligations under the Loan Documents or a waiver of any Defaults or Events of Default, whether specified herein or otherwise, (b) a course of dealing in variance with the terms and provisions of the Loan Agreement or any other of the Loan Documents, or (c) a consent to any departure by Borrowers or any other Loan Party from the express provisions of the Loan Agreement or any other of the Loan Documents. Lender shall not by virtue of any action or omission, including the acceptance of any payment under the Loan Agreement or the other Loan Documents, be deemed to have altered or prejudiced any remedies, powers, rights, or privileges under the Loan Agreement or any other of the Loan Documents in connection with the Specified Defaults or any other Default or Event of Default.

Notwithstanding any prior or contemporaneous discussions or understandings with respect to a forbearance, waiver or extension by Lender, whether express or implied, oral or written, Lender does not have any obligation to waive or forbear from enforcing its rights and remedies with respect to, any Default or any Event of Default (including, without limitation, the Specified Defaults), nor shall any such discussions or understandings be construed as an undertaking of Lender, Agent or any other agent of Lender to continue such discussions or enter into any such forbearance or waiver, nor shall this Letter Agreement be construed as an agreement to forbear on Lender's rights under the Loan Documents. Lender has not waived the Specified Defaults or any other Defaults or Events of Default that may exist. Any forbearance, waiver or extension must be in writing and agreed to, executed and delivered in accordance with the provisions of the Loan Agreement.

Neither this Letter Agreement nor any prior letter agreement(s) shall, by implication or otherwise, limit, impair, constitute a waiver of, or affect the rights and remedies of Lender under any provision of the Loan Agreement or any other of the Loan Documents, and all of the provisions of the Loan Agreement and the other Loan Documents shall remain in full force and effect except as expressly modified herein and by any prior letter agreement(s) entered into by the Parties and Additional Parties. None of Lender's failure to require strict performance by Borrowers or any other Loan Party, or any Additional Parties, of any provision of any of the Loan Documents, Lender's failure to exercise, or delay in exercising, any remedy, power, right or privilege under any of the Loan Documents or the election by Lender to exercise any particular remedy, power, right or privilege under any of the Loan Documents shall operate as a waiver thereof or waive, affect or diminish any right of Lender thereafter to demand strict compliance and performance therewith. Although Borrowers, Guarantors, and the Additional Parties have been informed of the matters set forth herein, Lender does not have any obligation to provide Borrowers notice of the matters set forth herein, nor shall the provision of such notice herein to Borrowers be construed as an agreement to inform Borrowers or any other Person of such matters or any other matters in the future.

Thank you for your prompt attention to this matter. Should you have any questions or concerns regarding the foregoing, you may contact us by mail at Conterra Ag Capital, 5465 Mills Civic Parkway, Suite 201, West Des Moines, Iowa 50266, by phone at (855) 381-3451, or by email at servicing@conterraag.com. If you agree to the terms outlined in this Letter Agreement, please return an executed copy of this Letter Agreement by email.

Sincerely,

**Conterra Ag Capital**

By: DocuSigned by: [signature] 97236057BBE847B...
Its: President and CEO

***** SIGNATURES ON NEXT PAGE *****

**Accepted and Agreed to as of the Effective Date of the Letter Agreement:**

**BORROWERS:**

**HRONIS CAPITAL ASSETS, LP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: Manager

**HRONIS CAPITAL MANAGEMENT, LLC**, a California limited liability company

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: Manager

**HRONIS CITRUS, LLC**, a California limited liability company

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: Manager

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: Manager

**HRONIS FARMING, LP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: Manager

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

Signed by:
By: Peter J. Hronis
6795D87F109E4FC...
Peter John Hronis
Its: Member

By: ______________________________
Kosta James Hronis
Its: Member

By: ______________________________
Peter Nickolas Hronis
Its: Member

By: ______________________________
Demetri Albert Hronis
Its: Member

**HRONIS, INC.**, a California corporation

By: ______________________________
Kosta Hronis
Its: President

Signed by:
By: Peter J. Hronis
6795D87F109E4FC...
Peter J. Hronis
Its: Secretary

**HRONIS LAND COMPANY**, a California partnership

By: ______________________________
Kosta Hronis
Its: Partner

Signed by:
By: Peter J. Hronis
6795D87F109E4FC...
Peter Hronis
Its: Partner

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

By: ______________________________
Peter John Hronis
Its: Member

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta James Hronis
Its: Member

By: ______________________________
Peter Nickolas Hronis
Its: Member

By: ______________________________
Demetri Albert Hronis
Its: Member

**HRONIS, INC.**, a California corporation

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: President

By: ______________________________
Peter J. Hronis
Its: Secretary

**HRONIS LAND COMPANY**, a California partnership

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: Partner

By: ______________________________
Peter Hronis
Its: Partner

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

By: ______________________________
Peter John Hronis
Its: Member

By: ______________________________
Kosta James Hronis
Its: Member

Signed by:
By: Peter N. Hronis
Peter Nickolas Hronis
Its: Member

By: ______________________________
Demetri Albert Hronis
Its: Member

**HRONIS, INC.**, a California corporation

By: ______________________________
Kosta Hronis
Its: President

By: ______________________________
Peter J. Hronis
Its: Secretary

**HRONIS LAND COMPANY**, a California partnership

By: ______________________________
Kosta Hronis
Its: Partner

By: ______________________________
Peter Hronis
Its: Partner

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

By: ______________________________
Peter John Hronis
Its: Member

By: ______________________________
Kosta James Hronis
Its: Member

By: ______________________________
Peter Nickolas Hronis
Its: Member

Signed by:
By: Demetri A. Hronis
150E78874F438...
Demetri Albert Hronis
Its: Member

**HRONIS, INC.**, a California corporation

By: ______________________________
Kosta Hronis
Its: President

By: ______________________________
Peter J. Hronis
Its: Secretary

**HRONIS LAND COMPANY**, a California partnership

By: ______________________________
Kosta Hronis
Its: Partner

By: ______________________________
Peter Hronis
Its: Partner

**HRONIS RANCH, LLC**, a California limited liability company

Signed by:
By: Demetri A. Hronis
150B7587174F43B...
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: ______________________________
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: ______________________________
Kosta Hronis
Its: Manager

**GUARANTORS:**

______________________________
**PETER JOHN HRONIS, individually**

______________________________
**KOSTA JAMES HRONIS, individually**

Signed by:
Demetri A. Hronis
150B7587174F43B...
**DEMETRIUS ALBERT HRONIS, individually**

______________________________
**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

______________________________
**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

**HRONIS RANCH, LLC**, a California limited liability company

By: ______________________________
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

Signed by:
By: Kosta Hronis
B0B5BE792041418...
Kosta Hronis
Its: Manager

**GUARANTORS:**

______________________________
**PETER JOHN HRONIS, individually**

Signed by:
Kosta Hronis
B0B5BE792041418...
______________________________
**KOSTA JAMES HRONIS, individually**

______________________________
**DEMETRIUS ALBERT HRONIS, individually**

______________________________
**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

______________________________
**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

**HRONIS RANCH, LLC**, a California limited liability company

By: ______________________________
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: ______________________________
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: ______________________________
Kosta Hronis
Its: Manager

**GUARANTORS:**

Signed by:
Peter J. Hronis
6795D87F109E4FC...
______________________________
**PETER JOHN HRONIS, individually**

______________________________
**KOSTA JAMES HRONIS, individually**

______________________________
**DEMETRIUS ALBERT HRONIS, individually**

______________________________
**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

Signed by:
Peter J. Hronis
6795D87F109E4FC...
______________________________
**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

Signed by:
kosta Hronis
B0B5BE792041418...
______________________________
**KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

______________________________
**PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

**ADDITIONAL PARTIES:**

**SHAMROCK TRANSPORT, LLC,** a California limited liability company

By: ______________________________
PETER J. HRONIS
Its Manager

By: Signed by: kosta Hronis B0B5BE792041418...
KOSTA HRONIS
Its Manager

By: ______________________________
MARK DEDONATO
Its Manager

**HRONIS RACING, LLC,** a California limited liability company

By: ______________________________
PETER HRONIS
Its Member

By: Signed by: kosta Hronis B0B5BE792041418...
KOSTA HRONIS
Its Member

**HRONIS RANCH, LLC**, a California limited liability company

By: ______________________________
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: ______________________________
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: ______________________________
Kosta Hronis
Its: Manager

**GUARANTORS:**

______________________________
**PETER JOHN HRONIS, individually**

______________________________
**KOSTA JAMES HRONIS, individually**

______________________________
**DEMETRIUS ALBERT HRONIS, individually**

Signed by:
Kosta Hronis
B0B5BE792041418...
______________________________
**KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO**

______________________________
**PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO**

______________________________
**KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

Signed by:
Peter J. Hronis
6795D87F109E4FC...
______________________________
**PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

**ADDITIONAL PARTIES:**

**SHAMROCK TRANSPORT, LLC,** a California limited liability company

Signed by:
By: Peter J. Hronis
6795D87F109E4FC...
PETER J. HRONIS
Its Manager

By: ______________________________
KOSTA HRONIS
Its Manager

By: ______________________________
MARK DEDONATO
Its Manager

**HRONIS RACING, LLC,** a California limited liability company

Signed by:
By: Peter J. Hronis
6795D87F109E4FC...
PETER HRONIS
Its Member

By: ______________________________
KOSTA HRONIS
Its Member

______________________________
**KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

______________________________
**PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012**

**ADDITIONAL PARTIES:**

**SHAMROCK TRANSPORT, LLC,** a California limited liability company

By: ______________________________
PETER J. HRONIS
Its Manager

By: ______________________________
KOSTA HRONIS
Its Manager

Signed by:
By: Mark DeDonato
84C401E1B3543F
MARK DEDONATO
Its Manager

**HRONIS RACING, LLC,** a California limited liability company
By: ______________________________
PETER HRONIS
Its Member

By: ______________________________
KOSTA HRONIS
Its Member

# EXHIBITS OMITTED

# EXHIBIT 4

# OFFER SUMMARY – REVENUE BASED FINANCING

| | | |
|---|---|---|
| **Funding Provided** | $13,453,570.20 | This is how much funding DLP FUNDING LLC will provide. Due to deductions or payments to others, the total funds that will be provided to you directly is $12,780,891.69.<br><br>For more information on what amounts will be deducted, please review the attached document "Itemization of Amount Financed." |
| **Estimated Annual Percentage Rate (APR)** | 214.88% | APR is the estimated cost of your financing expressed as a yearly rate. APR incorporates the amount and timing of the funding you receive, fees you pay, and the periodic payments you make. This calculation assumes your estimated average monthly income through sales of goods and services will be $20,955,667.00. Since your actual income may vary from our estimate, your effective APR may also vary.<br><br>APR is not an interest rate. The cost of this financing is based upon fees charged by DLP FUNDING LLC rather than interest that accrues over time. |
| **Finance Charge** | $6,117,137.25 | This is the dollar cost of your financing.<br><br>Your finance charge will not increase if you take longer to pay off what you owe. |
| **Estimated Total Payment Amount** | $19,507,676.79 | This is the total dollar amount of payments we estimate you will make under the contract. |
| **Estimated Monthly Cost** | $4,016,286.54 | Although you do not make payments on a monthly basis, this is our calculation of your average monthly cost based upon the payment amounts disclosed below. |
| **Estimated Payment** | **$191,251.74 per day** | |
| **Payment Terms** | We based your present daily payment of $191,251.74 upon our estimate of 19.25% of your total income, based upon average monthly income of $20,955,667.00 for the last 4 month. Since we cannot predict the exact dollar amount of sales revenue your business will collect in the future, your payment is "estimated"<br>How you can change the payment amount. You have the right to obtain a lower payment amount if your sales revenue decreases. For more details on your right to change the payment amount, see Section 1.4 of your contract.<br><br>How we collect your payments. We will debit your business bank account. | |
| **Estimated Term** | 152 Calendar Days | Based on assumptions we made about your income, this is our estimate of how long it will take to collect amounts due to us under your contract. |
| **Prepayment** | If you pay off the financing faster than required, you still must pay all or a portion | |

| | |
|---|---|
| | of the finance charge, up to $6,054,106.59 based upon our estimates. |
| | If you pay off the financing faster than required, you will not be required to pay additional fees. |

**Applicable law requires this information to be provided to you to help you make an informed decision. By signing below, you are confirming that you received this information.**

PETE HRONIS 11/14/2025

Recipient Signature Date

| ITEMIZATION OF AMOUNT FINANCED | |
|---|---|
| 1. Amount Given Directly to You | $12,780,891.69 |
| 2. Amount paid on your behalf to third parties (Sum of below) | $0.00 |
| 3. Amount Paid on Your Account with Us. | $0.00 |
| 4. Amount Provided to You or on Your Behalf (1 + 2 + 3+5) | $13,453,570.20 |
| 5. Prepaid finance Charges: Underwriting Fee & Origination Fee. | $672,678.51 |
| 6. Amount Financed (4 minus 5) | $12,780,891.69 |

DLP FUNDING

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484



# MERCHANT AND SECURITY AGREEMENT

This Merchant and Security Agreement (hereinafter referred to as the "Agreement") is made as of 11/14/2025 between DLP FUNDING LLC ("DLP FUNDING") and the merchant listed below (the "Merchant").

**MERCHANT INFORMATION**

Merchant's Legal Name: HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B"

D/B/A: HRONIS FRUIT COMPANY State of Incorporation / Organization: CA

Type of entity: Limited Liability Company

Business Address: 10443 Hronis Road City: Delano State: CA Zip: 93215-9556

Mailing Address: 10443 Hronis Road City: Delano State: CA Zip: 93215-9556

Merchant Email: pete.hronis@hronis.net Merchant Phone: 661-725-6411

| Average Monthly Revenue | Purchase Price: | Purchased Amount: | Purchased Percent: |
|---|---|---|---|
| $20,955,667.00 | $13,453,570.20 | $19,507,676.79 | 19.25% |

**Payment Frequency: Daily Remittance: $191,251.74**

**PURCHASE AND SALE OF FUTURE RECEIVABLES**

Merchant hereby sells, assigns and transfers to DLP FUNDING (making DLP FUNDING the absolute owner) in consideration of the "Purchase Price" specified above, the Purchased Percentage of all of Merchant's Future Receipts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Future Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchants Account(s)), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the "Purchased Amount" has been delivered by or on behalf of Merchant to DLP FUNDING.

Merchant is selling a portion of a future revenue stream to DLP FUNDING at a discount, not borrowing money from DLP FUNDING, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by DLP FUNDING.

The Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement.

DLP FUNDING is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and DLP FUNDING assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give DLP FUNDING a reasonable and fair opportunity to receive the benefit of its bargain. Merchant and Guarantor are only guaranteeing their performance of the terms of this Merchant and Security Agreement and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5. DLP FUNDING will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to and pre-approved by DLP FUNDING (the "Account"), into which Merchant and/or Merchant's customers shall remit the Future Receipts from each Transaction, until such time as DLP FUNDING receives payment in full of the Purchased Amount. Merchant hereby authorizes DLP FUNDING to ACH debit the initial Remittance from the Account on the agreed upon Payment Frequency. A daily basis means any day that is not a United States banking holiday. DLP FUNDING payment of the Purchase Price shall be deemed the acceptance and performance by DLP FUNDING of this Agreement. Merchant understands that it is responsible for ensuring that the initial Remittance to be debited by DLP FUNDING remains in the Account and will be held responsible for any fees incurred by DLP FUNDING resulting from a rejected ACH attempt or an Event of Default. DLP FUNDING is not responsible for any overdrafts or rejected transactions that may result from DLP FUNDING ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between DLP FUNDING and Merchant, upon the occurrence of an Event of Default of the Merchant Agreement the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A and is incorporated by reference into this Agreement.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS" AND THE "SECURITY AGREEMENT AND GUARANTY" HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

FUNDING

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484



| | | | |
|---|---|---|---|
| **FOR THE MERCHANT(#1)** | By: | PETER JOHN HRONIS, Owner<br>(Print Name and Title) | PETE HRONIS<br>(Signature) |
| **FOR THE MERCHANT(#2)** | By: | KOSTA JAMES HRONIS, Owner<br>(Print Name and Title) | Kosta James Hronis<br>(Signature) |
| **BY OWNER (#1)** | By: | PETER JOHN HRONIS, Owner<br>(Print Name and Title) | PETE HRONIS<br>(Signature) |
| **BY OWNER (#2)** | By: | KOSTA JAMES HRONIS, Owner<br>(Print Name and Title) | Kosta James Hronis<br>(Signature) |

DLP FUNDING

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484



**ADDITIONAL TERMS AND CONDITIONS OF MERCHANT AGREEMENT**

**TERMS OF ENROLLMENT IN PROGRAM**

**I.1** **Merchant Deposit Agreement and Processor.** Merchant shall: (A) execute an agreement acceptable to DLP FUNDING with a Bank acceptable to DLP FUNDING to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to DLP FUNDING with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Future Receipts into the Account. Merchant shall provide DLP FUNDING and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes DLP FUNDING and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to DLP FUNDING for the receipts as specified herein and to pay such amounts to DLP FUNDING. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre-approved by DLP FUNDING or not. This additional authorization is not a waiver of DLP FUNDING's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which DLP FUNDING did not first pre-approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of DLP FUNDING. Failure to supply the above-mentioned passwords, log-in, and/or information to verify Merchant's receivables, receipts, deposits and withdrawals into and from the Account shall constitute a breach of this Agreement.

**I.2** **Term of Agreement. This Agreement has no term.** This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by DLP FUNDING as per the conditions of this Agreement. The above-described "Payment Frequency" is solely upon estimation based upon Merchant's representations.

**I.3** **Future Purchase of Increments**. Subject to the terms of this Agreement, DLP FUNDING offers to purchase additional Receipts in the "Increments" stated in on the addendum of this Agreement, if any. DLP FUNDING reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion.

**I.4** **Reconciliation.** The Remittance is intended by Seller to represent the Purchased Percentage of Seller's Average Monthly Revenue. As long as an Event of Default, or breach of this Agreement, has not occurred, Merchant may request a retroactive reconciliation of the Remittance amount (for the purposes of this paragraph "Remittance Amount" shall be defined as all payments made by Merchant to DLP FUNDING after DLP FUNDING remitted the Purchase Price to Merchant). All requests hereunder must be in writing to Menucha@dlpfunding.com. Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable reports, for the requested month and the preceding month. DLP FUNDING retains the right to request additional documentation such as additional bank login or DecisionLogic access to view Merchant's accounts. It is the sole responsibility of Merchant to send the complete bank statements and written request for a reconciliation to DLP FUNDING. Merchant's failure to timely send the written reconciliation request, with all required information, shall constitute Merchant's waiver of any right to the reconciliation of the Future Receipts during the preceding calendar month. Such reconciliation, if applicable and after reasonable verification by DLP FUNDING, must be performed by DLP FUNDING within five (5) Business Days following its receipt of Merchant's request and receipt of requested documentation by DLP FUNDING, for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by DLP FUNDING shall equal the Purchased Percentage of the Future Receipts that Merchant collected from the date of this Agreement up to and including the date of the reconciliation request. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with DLP FUNDING's right and ability to debit Merchant's Account while the Request is pending or to unilaterally modify the initial Remittance amount, in any method other than the ones listed in this Agreement. MERCHANT RECOGNIZES AND AGREES THAT IT IS ITS SOLE RESPONSIBILITY TO MAKE A RECONCILIATION REQUEST, AND THAT, IN THE EVENT THAT MERCHANT FAILS TO MAKE A RECONCILIATION REQUEST AS SET FORTH IN THIS SECTION, MERCHANT WAIVES ANY ARGUMENT THAT THE REMITTANCE EXCEEDED THE PURCHASED PERCENTAGE OF MERCHANT'S AVERAGE MONTHLY REVENUE FOR THAT PERIOD.

**I.5** **DLP FUNDING May Request Changes to the Remittance**. After 30-days following a reconciliation requested by the Merchant, DLP FUNDING may require Merchant to provide information, including bank statements, to evaluate whether the Remittance should again be adjusted to more closely reflect the Merchant's actual Future Receipts times the Purchased Percentage. Failure to provide such information within five (5) business days will be a breach of this agreement.

**I.6** **Financial Condition.** Merchant and Guarantor(s) (as defined) authorize DLP FUNDING and its agents to investigate their financial responsibility and history, and will provide to DLP FUNDING any authorizations, bank and/or financial statements, tax returns, etc., as DLP FUNDING deems necessary in its sole and absolute discretion prior to or at any time after execution of this Agreement. This Agreement will be deemed as acceptable as an authorization for release of financial and credit information. DLP FUNDING is authorized to update such information and financial and credit profiles from time to time as it deems appropriate and Merchant and Guarantor(s) are required to provide requested financial information within five (5) days from such request.

**I.7** **Transactional History.** Merchant authorizes all of its banks, brokers and processors to provide DLP FUNDING with Merchant's banking, brokerage and/or processing history to determine qualification or continuation. Merchant shall provide DLP FUNDING with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five (5) days after a request from DLP FUNDING. Merchant's failure to comply with any such document request shall be deemed a default under this Agreement.

**I.8** **Indemnification.** Merchant and Guarantor(s) jointly and severally indemnify and hold harmless Processor, its officers, directors and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by Processor resulting from (a) claims asserted by DLP FUNDING for monies owed to DLP FUNDING from Merchant and (b) actions taken by Processor in reliance upon any fraudulent, misleading or deceptive information or instructions provided by DLP FUNDING.

**I.9** **No Liability.** In no event will DLP FUNDING be liable for any claims asserted by Merchant or Guarantor(s) under any legal theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s) having occurred in Merchant's regular course of business

**I.10** **Reliance on Terms.** Section 1.01, 1.06, 1.07, 1.08 and 2.04 of this Agreement are agreed to for the benefit of Merchant, DLP FUNDING, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

**I.11** **Sale of Receipts.** Merchant and DLP FUNDING agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as, a loan from DLP FUNDING to Merchant. Merchant agrees that the Purchase Price is in

exchange for the Future Receipts pursuant to this Agreement, and that it equals the fair market value of such Future Receipts. DLP FUNDING has purchased and shall own all the Future Receipts described in this Agreement up to the full Purchased Amount as the Future Receipts are created. Payments made to DLP FUNDING in respect to the full amount of the Future Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. DLP FUNDING and Merchant are mutually entering this Agreement with the explicate intent that this agreement does not constitute a loan and does not include any terms which can be interpreted as a loan and/or containing interest at any rate. DLP FUNDING explicitly asserts that DLP FUNDING does not have any usurious intent as this Agreement is a Merchant Cash Advance, and not a loan. Merchant acknowledges that no such usurious intent is present.

**I.12** **Power of Attorney.** For the pendency of this Agreement, which has no set term, Merchant appoints DLP FUNDING as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to DLP FUNDING from Processor, or in the case of a violation by Merchant of Section 1 or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to DLP FUNDING; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s) personal information to verify the existence of an account and obtain account balances; (vi) to file any claims or take any action or institute any proceeding which DLP FUNDING may deem necessary for the collection of any of the unpaid Purchased Amount from the collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by Merchant.

**I.13** **Protections Against Default.** The following Protections 1 through 5 may be invoked by DLP FUNDING immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the DLP FUNDING electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any manner that is adverse to DLP FUNDING; (c) Merchant changes the electronic check processor through which the Future Receipts are settled from Processor to another electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of DLP FUNDING, and (ii) the written agreement of any DLP FUNDING or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to DLP FUNDING; (e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide DLP FUNDING with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five (5) days after a request from DLP FUNDING, or; (g) Merchant breaches any terms of this Agreement, including but not limited to any of the Events of Default contained in Section 3.1 herein. **These protections are in addition to any other remedies available to DLP FUNDING at law, in equity or otherwise pursuant to this Agreement.**

**Protection 1.** The full Purchased Amount, less any amount already remitted, plus all fees (including reasonable attorney fees) due under this Agreement and the attached Security Agreement become payable upon Merchant's breach.

**Protection 2.** DLP FUNDING may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3.** DLP FUNDING may enforce its security interest in the collateral.

**Protection 4.** DLP FUNDING may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if DLP FUNDING recovers a Judgment against Merchant, Merchant shall be liable for all of DLP FUNDING's costs of the lawsuit, including but not limited to all reasonable attorney fees, court costs, and prejudgment interest from the date of default at the rate of 16% per annum.

**Protection 5.** DLP FUNDING may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to DLP FUNDING.

**I.14** **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor, in respect of himself or herself personally, authorizes DLP FUNDING to disclose information concerning Merchant's and each Owner's and each Guarantor's credit standing (including credit bureau reports that DLP FUNDING obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor hereby and each waives to the maximum extent permitted by law any claim for damages against DLP FUNDING or any of its affiliates relating to any (i) investigation undertaken by or on behalf of DLP FUNDING as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

**I.15** **Confidentiality.** Merchant understands and agrees that the terms and conditions of the products and services offered by DLP FUNDING, including this Agreement and any other DLP FUNDING documents (collectively, "Confidential Information") are proprietary and confidential information of DLP FUNDING. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of DLP FUNDING to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles DLP FUNDING to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without a Bond or Security.

**I.16** **Publicity.** Merchant and each of Merchant's Owner(s) and all Guarantor(s) hereto all hereby authorizes DLP FUNDING to use its, his or her name in listings of clients and in advertising and marketing materials.

**I.17** **D/B/A's.** Merchant hereby acknowledges and agrees that DLP FUNDING may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between DLP FUNDING and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

**I.18** **Sharing of Information.** Merchant hereby authorizes DLP FUNDING to share information regarding Merchant's performance under this Agreement with third parties.

**I.19** **Electronic Transactions Authorization.** The parties agree that all business between one another shall be conducted by electronic means and adopt the provisions of the New York Electronic Signatures and Records Act ("ESRA") as set forth in N.Y. STT. Law. Section 301 through §309 inclusive. Each document that is subject to or provided in furtherance of this Agreement, all documents provided in furtherance thereof, as amended, modified or supplemented from time to time that a party has sent to the other by electronic means or the Merchant has clicked to approve to adopt this Agreement shall be intended as and

constitute an original and deemed to contain a valid signature for all purposes acknowledging and consenting to the terms of the agreement applicable thereto. In furtherance of the above, Merchant hereby authorizes DLP FUNDING to regard the Merchant's printed name or electronic approval for any document, agreement, assignment schedules or invoices as the equivalent of a manual signature by one of Merchant's authorized officers or agents. DLP FUNDING may rely upon, and assume the authenticity of, any such electronic approval, and any material applicable to such approval as the duly confirmed, authorized and approved signature of the Merchant by the person approving same, shall constitute an "authenticated" record for all purposes (including, without limitation, the UCC) and shall satisfy the requirements of any applicable statute of frauds. Merchant is not required to agree to conduct business pursuant to ESRA and the purchase of Future Receipts in furtherance of this Agreement is not conditioned upon Merchant agreeing to conduct business in accordance with the ESRA. Merchant has the option to request paper copies of any electronic records upon written request to DLP FUNDING. Merchant may terminate this Electronic Transactions Authorization by providing DLP FUNDING with not less than ten (10) days written notice in conformity with this Agreement.

**I.20** **Monitoring, Recording, and Solicitations.** Merchant authorizes DLP FUNDING, its affiliates, agents and independent contractors to contact Merchant at any telephone number Merchant provides to DLP FUNDING or from which Merchant places a call to DLP FUNDING, or any telephone number where DLP FUNDING believes it may reach Merchant, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Merchant incurs charges for receiving such communications. Merchant also agrees that DLP FUNDING, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Merchant. Merchant expressly consents to conduct business by electronic means.

## II. REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents, warrants and covenants that, as of this date and during the term of this Agreement:

**II.1** **Financial Condition and Financial Information.** Merchant's and Guarantor(s) bank and financial statements, copies of which have been furnished to DLP FUNDING, and future statements which will be furnished hereafter at the discretion of DLP FUNDING, fairly and accurately represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s) have a continuing, affirmative obligation to advise DLP FUNDING of any material adverse change in their financial condition, operation or ownership. DLP FUNDING may request statements at any time during the performance of this Agreement and the Merchant and Guarantors shall provide them to DLP FUNDING within five (5) business days after request from DLP FUNDING. Merchant's or Guarantors' failure to do so is a material breach of this Agreement.

**II.2** **Governmental Approvals.** Merchant has, and continues to, represent that Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

**II.3** **Authorization.** Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

**II.4** **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s) or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without DLP FUNDING's prior written consent. Any such changes shall be a material breach of this Agreement.

**II.5** **Change of Name or Location.** Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and DLP FUNDING, nor shall Merchant change any of its places of business without prior written consent by DLP FUNDING. Merchant acknowledges that the changing of their name and or location does not obviate Merchant's obligations under this Agreement.

**II.6** **Daily Batch Out.** If applicable, Merchant will batch out receipts with the Processor on a daily basis.

**II.7** **Estoppel Certificate.** Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from DLP FUNDING to Merchant, execute, acknowledge and deliver to DLP FUNDING and/or to any other person, firm or corporation specified by DLP FUNDING, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

**II.8** **No Bankruptcy or Pending Litigation.** As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six (6) months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it. Merchant warrants that there are no pending lawsuits and/or claims against Merchant.

**II.9** **Unencumbered Receipts.** Merchant has good, complete, unencumbered and marketable title to all Future Receipts, free and clear of any and all liabilities, liens, claims, changes, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of DLP FUNDING.

**II.10** **Business Purpose.** Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes. Merchant shall conduct its business consistent with past business practice and shall use the Purchase Price consistent with past business practice, whether the funding of such Purchase Price occurs contemporaneous with the execution of this Agreement or anytime time thereafter.

**II.11** **Defaults under Other Contracts.** Merchant represents that Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with any other person or entity.

**II.12** **Good Faith.** Merchant and Guarantors hereby affirm that Merchant is receiving the Purchase Price and selling DLP FUNDING the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business.

**II.13** **No Sale of Future Receivables.** Merchant has not entered into any other agreement for the sale of Future Receipts and/or cash advance agreement except as disclosed to DLP FUNDING in writing, shall not enter into any other Future Receipts and/or cash advance agreement, and has not accepted and shall not accept any other cash advance absent DLP FUNDING's advance written consent.

**II.14** **Authority to Sign.** The person who signed this Agreement on behalf of Seller was authorized by Seller to sign this Agreement on behalf of Seller.

**I. EVENTS OF DEFAULT AND REMEDIES**

I.1 **Events of Default.** The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Merchant or Guarantor shall violate any term or covenant in this Agreement;
(b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;
(c) The sending of notice of termination by Merchant or verbally notifying DLP FUNDING of its intent to breach this Agreement;
(d) Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;
(e) Merchant's bank returns a code of NSF three (3) or more consecutive times and Merchant fails to respond to any inquiry by DLP FUNDING;
(f) Merchant shall transfer or sell all or substantially all of its assets;
(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(h) Merchant shall use multiple depository accounts without the prior written consent of DLP FUNDING;
(i) Merchant shall enter into any financing agreements with any other party including but not limited to: loans, merchant cash advances, receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party, without prior written consent of DLP FUNDING;
(j) Merchant shall change its depositing account without the prior written consent of DLP FUNDING;
(k) Merchant shall close its depositing account used for Remittance without the prior written consent of DLP FUNDING;
(l) Merchant's bank returns a code other than NSF preventing DLP FUNDING from the Remittance; or
(m) Merchant shall default under any of the terms, covenants and conditions of any other agreement with DLP FUNDING.

I.2 **Limited Personal Guaranty.** In the Event of a Default, DLP FUNDING will enforce its rights against the Guarantor(s) of this transaction. Said Guarantor(s) will be jointly and severally liable to DLP FUNDING for all of DLP FUNDING's losses and damages, in addition to all costs and expenses and legal fees associated with such enforcement. The Guarantor(s) is only as liable to DLP FUNDING as Merchant is.

I.3 **Remedies.** In case any Event of Default occurs and is not waived pursuant to Section 4.4 hereof, DLP FUNDING may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder or any other legal or equitable right or remedy, and enforcing the Security Agreement contained herein. All rights, powers and remedies of DLP FUNDING in connection with this Agreement may be exercised at any time by DLP FUNDING after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

I.4 **Costs.** Merchant shall pay to DLP FUNDING all reasonable costs associated with (a) an Event or Default; (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof; and (c) the enforcement of DLP FUNDING's remedies set forth in this Agreement, including but not limited to court costs and attorney fees.

I.5 **Required Notifications.** Merchant is required to give DLP FUNDING written notice within twenty-four (24) hours of any filing under Title 11 of the United States Code. Merchant is required to give DLP FUNDING seven (7) days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

**II. MISCELLANEOUS**

II.1 **Modifications; Agreements.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by DLP FUNDING.

II.2 **Assignment.** DLP FUNDING may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

II.3 **Notices.** All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement.

II.4 **Waiver Remedies.** No failure on the part of DLP FUNDING to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

II.5 **Binding Effect; Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Merchant, DLP FUNDING and their respective successors and assigns, except that Merchant shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of DLP FUNDING, which consent may be withheld in DLP FUNDING's sole discretion. DLP FUNDING reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if DLP FUNDING so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant agrees that the Acceptable Forums are convenient to it and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant waives any right to oppose any motion or application made by DLP FUNDING to transfer such proceeding to an Acceptable Forum.

II.6 **Service of Process by Mail and/or Email.** Merchant hereby irrevocably waives personal service of any summons, complaint or other process and agrees that the service thereof may be made by email to the email address listed on page one (1) of this Agreement (or any other email address provided by Merchant to DLP FUNDING), or by certified mail, registered mail or by a recognized overnight delivery service (such as FedEx overnight mail or UPS overnight mail) or by First Class mail directed to it at the address listed on page one (1) of this Agreement. Merchant agrees that such service of process shall be deemed served on the day such summons, complaint or other process is placed in a depository under the exclusive custody and control of the United States Postal Service or other mailing service provider such as FedEx or UPS, using one of the methods listed above (such as certified mail, registered mail, First Class mail, or a recognized overnight delivery service, or in the event such service of process is effected via email, on the date such email is sent to Merchant, and that no additional notice or mailings shall be required before a judgment by default is sought or entered. Nothing in this Agreement shall affect the right of any party to this Agreement to serve process in any other manner permitted by law or pursuant to the New York Civil Practice Laws and Rules.

Merchant 1 Initial(s): PH Merchant 2 Initial(s): KJH Guarantor 1 Initial(s): PH Guarantor 2 Initial(s): KJH

II.7 **<u>Survival</u>.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

II.8 **<u>Interpretation</u>.** All Parties hereto have reviewed this Agreement with an attorney of their own choosing and have relied only on their own attorney guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

II.9 **<u>Severability</u>.** In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

II.10 **<u>Entire Agreement.</u>** Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant and DLP FUNDING and supersede all prior agreements and understandings relating to the subject matter hereof.

II.11 **<u>JURY TRIAL WAIVER</u>.** THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THE ENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

II.12 **<u>CLASS ACTION WAIVER</u>. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (a) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND (b) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

II.13 **<u>Facsimile & Digital Acceptance</u>.** Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

FUNDING



**SECURITY AGREEMENT AND GUARANTY**

Merchant's Legal Name: HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B" Federal Tax ID: [redacted]

D/B/A: HRONIS FRUIT COMPANY

Business Address: 10443 Hronis Road City: Delano State: CA Zip: 93215-9556

**Additional Guarantor(s):**

ENTITIES APPEARING ON EXHIBIT B

**SECURITY AGREEMENT**

**Security Interest**

This Agreement will constitute a security agreement under the Uniform Commercial Code. Merchant and Guarantor(s) grant(s) to DLP FUNDING a security interest in and lien upon all of their present and future: (a) accounts (the "Accounts Collateral"), accounts receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s); (b) all proceeds, as that term is defined in Article 9 of the UCC; (c) funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds; (d) present and future Electronic Check Transactions; and (e) any amount which may be due to DLP FUNDING under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). The security interest in Account Collateral shall be effective immediately. The Security interest in Secured Assets other than Accounts Collateral shall be effective automatically upon the occurrence of an Event of Default. Merchant agrees to provide other security to DLP FUNDING upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover DLP FUNDING's entitlements under this Agreement, DLP FUNDING is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of DLP FUNDING's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, DLP FUNDING or an affiliate of DLP FUNDING. DLP FUNDING is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder. This security interest may be exercised by DLP FUNDING without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. DLP FUNDING shall have the right to notify account debtors at any time. Pursuant to Article 9 of the UCC, as amended from time to time, DLP FUNDING has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets. With respect to such security interests and liens, DLP FUNDING will have all rights afforded under the UCC, any other applicable law and in equity. Merchant will obtain from DLP FUNDING written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) agree(s) that this is a contract of recoupment and DLP FUNDING is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by DLP FUNDING. Merchant and Guarantor(s) agree(s) to execute and deliver to DLP FUNDING such instruments and documents DLP FUNDING may reasonably request to perfect and confirm the lien, security interest and right of set-off set forth in this Agreement. DLP FUNDING is authorized to execute all such instruments and documents in Merchant's and Guarantor(s) name. Merchant and Guarantor(s) each acknowledge and agree that any security interest granted to DLP FUNDING under any other agreement between Merchant or Guarantor(s) and DLP FUNDING (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s) each agrees to execute any documents or take any action in connection with this Agreement as DLP FUNDING deems necessary to perfect or maintain DLP FUNDING's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s) each hereby authorizes DLP FUNDING to file any financing statements deemed necessary by DLP FUNDING to perfect or maintain DLP FUNDING's security interest. Merchant and Guarantor(s) shall be liable for, and DLP FUNDING may charge and collect, all costs and expenses, including but not limited to attorney fees, which may be incurred by DLP FUNDING in protecting, preserving and enforcing DLP FUNDING's security interest and rights.

In the event Merchant, any of its officers or directors or any Owner/Guarantor, during the term of this agreement or while Merchant remains liable to DLP FUNDING for any obligations under this agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due DLP FUNDING under this Agreement. With respect to any such entity, DLP FUNDING shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. DLP FUNDING shall be held harmless by Merchant and each Owner/Guarantor and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. DLP FUNDING shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of DLP FUNDING's rights, including without limitation, DLP FUNDING's right to collect all accounts, and to notify any payment card processor or creditor of such entity that DLP FUNDING has such rights in such entity's assets. Merchant also agrees that, at the DLP FUNDING's discretion, DLP FUNDING may choose to amend any existing financing statement to include any such newly formed entity as debtor.

**Negative Pledge**

Merchant and Guarantor(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Remedies**

Upon any Event of Default, DLP FUNDING may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to DLP FUNDING, whether by acceleration or otherwise.

FUNDING

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484



**GUARANTY OF PERFORMANCE**

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

As an additional inducement for DLP FUNDING to enter into this Agreement, the undersigned Guarantor(s) hereby provides DLP FUNDING with this Guaranty. Guarantor(s) will not be personally liable for any amount due under this Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of this Agreement. Each Guarantor shall be jointly and severally liable for all amounts owed to DLP FUNDING in the Event of Default. Guarantor(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, and covenants made by Merchant in this Agreement as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor Waivers.** In the event of a breach of the above, DLP FUNDING may seek recovery from Guarantors for all of DLP FUNDING's losses and damages by enforcement of DLP FUNDING's rights under this Agreement without first seeking to obtain payment from Merchant, any other guarantor, or any Collateral or Additional Collateral DLP FUNDING may hold pursuant to this Agreement or any other guaranty. DLP FUNDING does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) DLP FUNDING's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to DLP FUNDING. In addition, DLP FUNDING may take any of the following actions without releasing Guarantor from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to DLP FUNDING; (ii) release Merchant from its obligations to DLP FUNDING; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to DLP FUNDING under the Merchant Agreement and this Agreement are paid in full, Guarantor shall not seek reimbursement from Merchant or any other guarantor for any amounts paid by it under this Agreement. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other guarantor, or any collateral provided by Merchant or any other guarantor, for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution.

**Guarantor Acknowledgement.** Guarantor acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity; and (v) He/She specifically and irrevocably consents to the terms of Section 4.06 of the Merchant and Security Agreement, namely the section entitled 4.06 Service of Process by Mail and/or Email

DLP FUNDING

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484



| | | |
|---|---|---|
| **FOR THE MERCHANT (#1)** | **PETER JOHN HRONIS, Owner**<br>**By:**________________<br>(Print Name and Title)<br>**SSN#** [redacted] | PETE HRONIS<br>(Signature)<br>Driver's License: N8982499 |
| **FOR THE MERCHANT (#2)** | **KOSTA JAMES HRONIS, Owner**<br>**By:**________________<br>(Print Name and Title)<br>**SSN#** [redacted] | Kosta James Hronis<br>(Signature)<br>Driver's License: N5142204 |
| **BY OWNER (#1)** | **PETER JOHN HRONIS, Owner**<br>**By:**________________<br>(Print Name and Title)<br>**SSN#** [redacted] | PETE HRONIS<br>(Signature)<br>Driver's License: N8982499 |
| **BY OWNER (#2)** | **KOSTA JAMES HRONIS, Owner**<br>**By:**________________<br>(Print Name and Title)<br>**SSN#** [redacted] | Kosta James Hronis<br>(Signature)<br>Driver's License: N5142204 |
| **FOR THE GUARANTOR(S) (#1)** | **PETER JOHN HRONIS, Owner**<br>**By:**________________<br>(Print Name and Title)<br>**SSN#** [redacted]<br>**E-Mail:** pete.hronis@hronis.net<br>**Address:** 10443 Hronis Road, Delano, CA 93215 | PETE HRONIS<br>(Signature)<br>Driver's License: N8982499 |
| **FOR THE GUARANTOR(S) (#2)** | **KOSTA JAMES HRONIS, Owner**<br>**By:**________________<br>(Print Name and Title)<br>**SSN#** [redacted]<br>**E-Mail:** kosta.hronis@hronis.net<br>**Address:** 10443 Hronis Road, Delano, CA 93215 | Kosta James Hronis<br>(Signature)<br>Driver's License: N5142204 |

DLP FUNDING LLC, 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484



## APPENDIX A - FEE STRUCTURE:

A. Underwriting Fee $0.00 to cover underwriting and related expenses.

B. Origination Fee $63,030.66 to cover cost of Origination and ACH Setup.

C. NSF Fee (Standard) $50.00 (each)

D. Default Fee $5,000, or 10% of the outstanding Purchased Amount at the time of Default, whichever is greater.

E. Rejected ACH $100.00 per occurrence in the event that a Merchant directs the Merchant Bank Account to reject DLP FUNDING's debit ACH.

F. Blocked ACH $1,000.00 per occurrence.

G. Bank Change Fee $25.00 When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

H. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $25.00 for a Fed Wire.

I. UCC Filing Fee - $100.00 to cover the cost of filing UCC-1 Financing Statement in connection with the Agreement.

J. Stacking Fee - In the event that the Merchant enters into any cash advance or any loan agreement that relates to or involves the Receipts with any person or entity other than DLP FUNDING LLC during any portion of the effective period of this Agreement, then: Merchant shall pay to DLP FUNDING LLC a "Stacking" fee equal to $5,000.00 or 10% of that portion of the Purchased Amount that has not been paid to DLP FUNDING LLC, whichever amount is greater.

DLP FUNDING



**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS) PAYMENTS WILL APPEAR ON YOUR BANK STATEMENTS AS "DLP FUNDING".**

HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B" ("Merchant") hereby authorizes DLP FUNDING LLC ("DLP FUNDING") to present automated clearing house (ACH) debits to the following checking account in the amount of fees and other payments due to DLP FUNDING from Merchant under the terms of the Merchant and Security Agreement (the "Agreement") entered into between Merchant and DLP FUNDING, as it may be amended, supplemented or replaced from time to time. Merchant also authorizes DLP FUNDING to initiate additional entries (debits and credits) to correct any erroneous transfers. In addition, if an Event of Default (as defined in the Agreement) occurs, Merchant authorizes DLP FUNDING to debit any and all accounts controlled by Merchant or controlled by any entity with the same Federal Tax Identification Number as Merchant up to the total amount, including but not limited to, all fees and charges, due to DLP FUNDING from Merchant under the terms of the Agreement. Merchant agrees to be bound by the rules and operating guidelines of NACHA and represents and warrants that the designated account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Merchant authorizes DLP FUNDING to contact Merchant's financial institution to obtain available funds information and/or to verify any information Merchant has provided about the designated checking account and to correct any missing, erroneous or out-of-date information. Merchant understands and agrees that any revocation or attempted revocation of this Authorization will constitute an Event of Default under the Agreement. In the event that Merchant closes the designated checking account, or the designated checking account has insufficient funds for any ACH transaction under this Authorization, Merchant authorizes DLP FUNDING to contact Merchant's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Merchant with Merchant's financial institution, and to initiate ACH transactions under this Authorization to such additional account(s). To the extent necessary, Merchant grants DLP FUNDING a limited Power of Attorney to take action in Merchant's name to facilitate this authorization.

DLP FUNDING is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association).

This Authorization Agreement is to remain in full force and effect until DLP FUNDING has received written notification from Merchant at the address set forth below at least five (5) banking days prior of its termination to afford DLP FUNDING a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

Transfer Funds To/From:

Name of Bank: JPMORGAN CHASE
ABA Transit/Routing #: [redacted]
Checking Account #:[redacted]

This authorization is to remain in full force and effect until all amounts due to DLP FUNDING under the Agreement have been paid in full, in such time and in such manner as to afford DLP FUNDING a reasonable opportunity to act on it.

Merchant Information:

Merchant's Name: HRONIS FRUIT COMPANY AND ENTITIES APPEARING ON EXHIBIT "B"

Signature of Authorized Representative: PETE HRONIS

Print Name: PETER JOHN HRONIS
Title:Owner
Merchant's Tax ID: [redacted]
Date: 11/14/2025

**[Attached Voided Check Here]**

Please note that prior to funding your account, our underwriting department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step.

**Please provide information required for read-only access* to your business account.**

| | |
|---|---|
| Bank Portal Website: | 1 |
| Username: | 1 |
| Password: | 11 |
| Security Question 1: | 1 |
| Security Answer 1: | 1 |
| Security Question 2: | 1 |
| Security Answer 2: | 1 |
| Security Question 3: | 1 |
| Security Answer 3: | 1 |

Any other information necessary to access your account: 11

*Read only access can be easily arranged by calling your Bank, allowing our Underwriters to view account information without being able to transfer, debit or otherwise access funds.

DLP FUNDING LLC 447 Broadway 2nd floor, Unit 805, New York, NY 10013, 877-378-0484

# EXHIBIT B

LIST OF ADDITIONAL ENTITIES INCLUDED IN THE DEFINITION OF THE TERM "MERCHANT" THAT HAVE SOLD FUTURE RECEIPTS AND DLP FUNDING LLC A BLANKET SECURITY INTEREST

BUSINESS LEGAL NAME: HRONIS RANCH, LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: HRONIS CITRUS, LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: CALIFORNIA GRAPE GROWERS COOPERATIVE
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: INTERNATIONAL FRUIT COMPANY, INC.
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: CENTRAL CALIFORNIA ORANGE GROWERS COOPERATIVE
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: SHAMROCK TRANSPORT, LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: HRONIS, INC., A CALIFORNIA CORPORATION
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:
BUSINESS LEGAL NAME: THE PETER HRONIS COMPANY LLC
ADDRESS: 10443 Hronis Road Delano, CA, 93215
FEIN:

DLP FUNDING may file a UCC-1 financing statement with the appropriate secretary of states(s) reflecting a blanket security interest in the assets of the above-listed entities.

ACKNOWLEDGED AND AGREED ON BEHALF OF THE FORGOING ENTITIES:

PETE HRONIS
Signature: ______________________
Name: PETER JOHN HRONIS
Date: 11/14/2025

Kosta James Hronis
Signature: ______________________
Name: KOSTA JAMES HRONIS
Date: 11/14/2025

**ADDENDUM**
**PAYMENT OF PURCHASE PRICE VIA INSTALLMENTS**

This is an Addendum dated 11/14/2025 to the Agreement dated 11/14/2025 ("Agreement") between DLP FUNDING LLC ("DLP FUNDING") and HRONIS FRUIT COMPANY ("Merchant"). This Addendum incorporates the Agreement by reference. The terms of this Addendum will control to the extent they conflict with any of the terms in the Agreement.

**I. Schedule of Payments.** Merchant agrees that DLP FUNDING shall purchase Receivables from Merchant in installments instead of a single payment.

The schedule below ("Payment Schedule"), agreed to and informed by Merchant, lists the date on or after which DLP FUNDING will pay Merchant(s), the amount that will be paid in installment, the net amount being paid to or on behalf of Merchant after deduction of applicable fees, and the corresponding amount of Receivables purchased by the payment. The first disbursement within the Payment Schedule shall begin two (2) business days after this Addendum is accepted by DLP FUNDING, with the next disbursement(s) to follow a weekly schedule.

No payment to DLP FUNDING hereunder is intended to be a repurchase of Receivables by Merchant, nor shall any such payment be construed as a repurchase of Receivables by Merchant.

**Payment Schedule**

| Disbursement | Payment Amount | Net Funds Provided | Receivables Purchased |
|---|---|---|---|
| 1 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 2 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 3 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 4 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 5 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |
| 6 | $1,263,614.66 | $1,200,584.00 | $1,832,241.26 |

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT**
**FOR PAYMENT OF PURCHASE PRICE IN INSTALLMENTS**

| | | | |
|---|---|---|---|
| **7** | **$1,263,614.66** | **$1,200,584.00** | **$1,832,241.26** |
| **8** | **$1,263,614.66** | **$1,200,584.00** | **$1,832,241.26** |
| **9** | **$1,263,614.66** | **$1,200,584.00** | **$1,832,241.26** |
| **10** | **$558,439.66** | **$530,584.00** | **$809,737.51** |
| **11** | **$553,703.42** | **$526,084.00** | **$802,869.96** |
| **12** | **$206,290.00** | **$196,000.00** | **$299,120.50** |
| **13** | **$138,930.00** | **$132,000.00** | **$201,448.50** |
| **14** | **$138,930.00** | **$132,000.00** | **$201,448.50** |
| **15** | **$138,930.00** | **$132,000.00** | **$201,448.50** |
| **16** | **$138,930.00** | **$132,000.00** | **$201,448.50** |
| **17** | **$138,930.00** | **$132,000.00** | **$201,448.50** |
| **18** | **$99,987.50** | **$95,000.00** | **$144,981.88** |

**II. Deductions.** DLP FUNDING may collect the fee listed in the Agreement in installments by deducting from each payment to Merchant in the Payment Schedule an amount equal to the total amount of the fee divided by the number of installments to be paid in the Payment Schedule. Unless the parties agree otherwise in writing, if Merchant instructs DLP FUNDING, in proper form and substance, that any part of the Purchase Price be paid to a person or entity other than Merchant(s) (other than deductions for payment of fees referenced

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT**
**FOR PAYMENT OF PURCHASE PRICE IN INSTALLMENTS**

in this section), then that amount will be paid in as few installments as possible and from the earliest payment(s) made by DLP FUNDING.

**III. Cancellation of Payments.** DLP FUNDING elects not to make a payment under the Payment Schedule if: (1) an Event of Default has been considered to have taken place under the Agreement; (2) the Agreement has been terminated; or (3) any Merchant states in writing its inability to pay its debts, makes a general assignment for the benefit of creditors, institutes or has instituted against it any proceeding seeking to adjudicate any Merchant bankrupt or insolvent, or seeks reorganization, arrangement, adjustment, or composition of itself or its debts.

**IV. Merchant Opt-out**. Merchant may Opt-out of receiving funds from DLP FUNDING via Instalment Agreement with a three (3) business day notice given by Merchant to directly DLP FUNDING. Merchant's selection of opting out does not obviate merchant from Merchant's responsibilities and obligations under the Agreement.

**V. Default**. Should a Default occur, the amount owed to DLP FUNDING shall be that of the agreed-upon value of the Receivables Purchased up-to and including the last date of disbursement from DLP FUNDING to Merchant, less any payments already made.

**VI. Redefinitions of Terms**. The term "Purchase Price" as it is used in the Agreement refers to the sum of all payments that have been made by DLP FUNDING under the Agreement. The term "Receivables Purchased Amount" as it is used in the Agreement refers to all Receivables that have been paid for by DLP FUNDING under the Agreement.

**VII. Reconciliation**. Should Merchant wish to reconcile their payment to DLP FUNDING **OR** disbursement from DLP FUNDING to Merchant, Merchant must follow the process, as described within the Agreement and DLP FUNDING must engage in reconciliation.

**FOR THE MERCHANT/OWNER (#1)**

| | | | |
|---|---|---|---|
| By: | PETER JOHN HRONIS | Owner | PETE HRONIS |
| | (Print Name) | (Print Title) | (Signature) |

**FOR THE MERCHANT/OWNER (#2)**

| | | | |
|---|---|---|---|
| By: | KOSTA JAMES HRONIS | Owner | Kosta James Hronis |
| | (Print Name) | (Print Title) | (Signature) |

**FOR DLP FUNDING**

By: ______________________ ______________________ ______________________

**ADDENDUM TO STANDARD MERCHANT CASH ADVANCE AGREEMENT**
**FOR PAYMENT OF PURCHASE PRICE IN INSTALLMENTS**

| | | |
|---|---|---|
| (Print Name) | (Print Title) | (Signature) |

# EXHIBIT 5

MILLER NASH LLP

**Bernie Kornberg**
Partner
bernie.kornberg@millernash.com
562.247.7622 (direct)

January 2, 2026

**VIA EMAIL**

Aimee S. Willig
Bush Kornfeld LLP
601 Union St., Suite 5000
Seattle, WA 98101
awillig@bskd.com

Subject: Hronis Farms
Notification and Request to Collect Under Commercial Code § 9607(a)(1)

Dear Ms. Willig:

This law firm represents Conterra Agricultural Capital, LLC ("Conterra"). Conterra is the lender on a loan (the "Loan") given to Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, "Hronis Farms"). The Loan is secured by a perfected, first-position security interest in, among other things, the accounts of Hronis Farms. Enclosed please find a copy of Conterra's filed financing statement which describes its interest in the collateral of Hronis Farms.

Hronis Farms has informed Conterra that your client, Costco Wholesale, is one of Hronis Farms' account debtors, as defined by section 9102 of the Commercial Code, and that Hronis Farms has a right to payment from you. Hronis Farms has further informed us that it has provided a junior interest in its accounts to certain merchant cash advance lenders, including DLP Funding, LLC, who have asserted their own claims to the accounts of Hronis Farms. Any claims by these merchant cash advance lenders, or any other party, are junior to the first position claim of Conterra.

The Hronis Farms entities are in default of their payment obligations to Conterra. In accordance with the statutory provisions of the Commercial Code section 9607, Conterra is authorized to notify you to pay directly to Conterra the amounts you owe to any of the Hronis Farms entities.

MILLER NASH LLP



You are thus hereby notified that you must remit any and all amounts owing to any of the Hronis Farms entities directly to Conterra as set forth below.

Pursuant to the terms of the Loan, Hronis Farms was to direct all payments from its customers to be paid to the depository account held by U.S. Bank National Association, Account No. ********1093. If you were previously making payments to Hronis Farms at this bank account, you should continue to make payments to this account.

Alternatively, you may send payment directly to Conterra at:

Conterra Agricultural Capital, LLC
5465 Mills Civic Pkwy, Ste 201
West Des Moines, IA 50266

To avoid the risk of confusion, please provide me with direct notice regarding any payments made and manner in which they are tendered. If you previously have made payments to Hronis Farms to a different account than the U.S. Bank Account notated above, please provide information regarding the amount and dates of these payments. If you have any questions, please contact me at (562) 247-7622 or at bernie.kornberg@millernash.com.

Thank you for your prompt attention to this matter.

Respectfully,

[signature]

Bernie Kornberg

cc: Jacob Weinstein - jacob@weinsteinllp.com
Zev Shechtman - zev.shechtman@saul.com

B3155-1137 10/29/2024 2:58 PM Received by California Secretary of State

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only
**-FILED-**
File No.: U240083964841
Date Filed: 10/29/2024

Submitter Information:

| | |
|---|---|
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071<br>GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| HRONIS CAPITAL ASSETS, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CAPITAL MANAGEMENT, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CITRUS, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS FARMING, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS, INC. | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS LAND COMPANY | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS RANCH, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| THE HRONIS FAMILY LIMITED PARTNERSHIP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY<br>STE 201<br>WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All Assets.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:

101398658

B3155-1138 10/29/2024 2:58 PM Received by California Secretary of State

# EXHIBIT 6

MILLER NASH LLP

**Bernie Kornberg**
Partner
bernie.kornberg@millernash.com
562.247.7622 (direct)

January 2, 2026

**VIA EMAIL**
**VIA FED EX OVERNIGHT**

Walmart Inc.
c/o CT Corporation System
330 N Brand Blvd.
Suite 700
Glendale, CA
VendorGarnTPS@walmart.com

Rachel Brand
Executive Vice President of Global Governance, Chief Legal Officer and Corporate Secretary
Walmart, Inc.
1 Customer Dr.
Bentonville, AR 72716

Subject: Hronis Farms
Notification and Request to Collect Under Commercial Code § 9607(a)(1)

To Whom it May Concern:

This law firm represents Conterra Agricultural Capital, LLC ("Conterra"). Conterra is the lender on a loan (the "Loan") given to Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, "Hronis Farms"). The Loan is secured by a perfected, first-position security interest in, among other things, the accounts of Hronis Farms. Enclosed please find a copy of Conterra's filed financing statement which describes its interest in the collateral of Hronis Farms.

Hronis Farms has informed Conterra that your client, Walmart, Inc., and or its subsidiaries and affiliates, are Hronis Farms' account debtors, as defined by section 9102 of the Commercial Code, and that Hronis Farms has a right to payment from you. Hronis Farms has further informed us that it has provided a junior interest in its accounts to certain merchant cash advance lenders, including DLP Funding, LLC, who have asserted their own claims to the accounts of Hronis Farms. Any claims by these merchant cash advance lenders, or any other party, are junior to the first position claim of Conterra.

The Hronis Farms entities are in default of their payment obligations to Conterra. In accordance with the statutory provisions of the Commercial Code section 9607, Conterra is authorized to

notify you to pay directly to Conterra the amounts you owe to any of the Hronis Farms entities. You are thus hereby notified that you must remit any and all amounts owing to any of the Hronis Farms entities directly to Conterra as set forth below.

Pursuant to the terms of the Loan, Hronis Farms was to direct all payments from its customers to be paid to the depository account held by U.S. Bank National Association, Account No. ********1093. If you were previously making payments to Hronis Farms at this bank account, you should continue to make payments to this account.

Alternatively, you may send payment directly to Conterra at:

Conterra Agricultural Capital, LLC
5465 Mills Civic Pkwy, Ste 201
West Des Moines, IA 50266

To avoid the risk of confusion, please provide me with direct notice regarding any payments made and manner in which they are tendered. If you previously have made payments to Hronis Farms to a different account than the U.S. Bank Account notated above, please provide information regarding the amount and dates of these payments. If you have any questions, please contact me at (562) 247-7622 or at bernie.kornberg@millernash.com.

Thank you for your prompt attention to this matter.

Respectfully,

Bernie Kornberg

cc: Jacob Weinstein - jacob@weinsteinllp.com
Zev Shechtman - zev.shechtman@saul.com

4932-3094-0549.1

B3155-1137 10/29/2024 2:58 PM Received by California Secretary of State

**STATE OF CALIFORNIA**
*Office of the Secretary of State*
**UCC FINANCING STATEMENT (UCC 1)**
California Secretary of State
1500 11th Street
Sacramento, California 95814
(916) 657-5448

For Office Use Only
**-FILED-**
File No.: U240083964841
Date Filed: 10/29/2024

Submitter Information:

| | |
|---|---|
| Contact Name | WOLTERS KLUWER LIEN SOLUTIONS |
| Organization Name | LIEN SOLUTIONS |
| Phone Number | 800-331-3282 |
| Email Address | uccfilingreturn@wolterskluwer.com |
| Address | P.O. BOX 29071<br>GLENDALE, CA 912099071 |

Debtor Information:

| Debtor Name | Mailing Address |
|---|---|
| HRONIS CAPITAL ASSETS, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CAPITAL MANAGEMENT, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS CITRUS, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS FARMING, LP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS, INC. | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS LAND COMPANY | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| HRONIS RANCH, LLC | 10443 HRONIS ROAD<br>DELANO, CA 93215 |
| THE HRONIS FAMILY LIMITED PARTNERSHIP | 10443 HRONIS ROAD<br>DELANO, CA 93215 |

Secured Party Information:

| Secured Party Name | Mailing Address |
|---|---|
| CONTERRA AGRICULTURAL CAPITAL, LLC | 5465 MILLS CIVIC PARKWAY<br>STE 201<br>WEST DES MOINES, IA 50266 |

Indicate how documentation of Collateral is provided:
Entered as Text

Description:
All Assets.

Indicate if Collateral is held in a Trust or is being administered by a Decedent's Personal Representative:
Not Applicable

Select an alternate Financing Statement type:

Select an additional alternate Financing Statement type:

Select an alternative Debtor/Secured Party designation for this Financing Statement:

Optional Filer Reference Information:

101398658

B3155-1138 10/29/2024 2:58 PM Received by California Secretary of State

# EXHIBIT 7

MILLER NASH LLP

**Bernie Kornberg**
Partner
bernie.kornberg@millernash.com
562.247.7622 (direct)

January 5, 2026

**VIA EMAIL AND FEDEX OVERNIGHT**

Jacob Z. Weinstein
The Law Office of Jacob Z. Weinstein PLLC
420 Central Avenue
Suite 301
Cedarhurst, NY 15516
jacob@weinsteinllp.com

Subject: DLF Funding, LLC
Demand to Cease and Desist and for an Accounting

Dear Mr. Weinstein:

This law firm represents Conterra Agricultural Capital, LLC ("Conterra"). Conterra is the lender on a loan (the "Conterra Loan") given to Hronis Capital Assets, LP, Hronis Capital Management, LLC, Hronis Citrus, LLC, Hronis Farming, LP, Hronis, Inc., Hronis Land Company, Hronis Ranch, LLC, and The Hronis Family Limited Partnership (collectively, the "Conterra Borrowers"). The Loan is secured by a perfected, first-position security interest in, among other things, the accounts of the Conterra Borrowers. Attached to this letter is a copy of the Loan and Security Agreement dated October 29, 2024 (the "Conterra Loan Agreement"), and the UCC-1 Financing Statement, filed with the California Secretary of State on October 29, 2024 (the "Conterra Financing Statement"), which reflect this duly perfected first position security interest.

Conterra has learned of the existence of a Merchant and Security Agreement dated November 14, 2025 (the "MSA") between your client, DLP Funding, LLC ("DLP"), on one hand, and Hronis Fruit Company, Hronis Ranch, LLC, Hronis Citrus, LLC, California Grape Gowers Cooperative, International Fruit Company, Inc., Central California Orange Growers Cooperative, Shamrock Transport, LLC, Hronis, Inc., and the Peter Hronis Company, LLC (collectively, the "DLP Borrowers"). Under the MSA, DLP agreed to fund a total of $13,453,570.20 to the DLP Borrowers, to be paid out under the schedule set forth in the MSA. These funds are, under the MSA, to be repaid through the assignment of the accounts of the DLP Borrowers to DLP. Conterra has been informed by Hronis Farms that at least $2,452,229 has been advanced by DLP under the MSA.

Conterra has learned that DLP served notices on certain account debtors of the Conterra Borrowers. These notices purport to require these account debtors to pay over all accounts directly to DLP. Conterra is aware of notices having been sent to Costco Wholesale ("Costco") and Walmart, Inc. ("Walmart"). This has caused Costco and Walmart to hold funds owed to the Hronis Borrowers. Those payments were, pursuant to the Conterra Loan Agreement, scheduled to be paid to a depository account controlled by Conterra, and if made would have resulted in payment on the Conterra Loan.

This diversion of payments to DLP violates Conterra's rights in the accounts of the Conterra Borrowers. Conterra's security interest in the accounts precedes that of DLP and has priority. Cal. Com. Code § 9322(a). The security interest in the accounts equally transfers to the proceeds of the accounts upon payment. Cal. Com. Code § 9315(a). Accordingly, Conterra's security interest in the accounts and their proceeds is superior to any interest of DLP. *First Bethany Bank & Tr., N.A. v. Arvest United Bank*, 2003 OK 64, ¶ 14 ("Because First Bethany perfected its security interests in the two accounts receivable first, it is entitled to the proceeds thereof which are held by Arvest").

The acts of DLP constitute conversion of Conterra's collateral. S*ee Imperial NH3 v. Cent. Valley Feed Yards, Inc.*, 70 Cal. App. 3d 513, 520 (Cal. Ct. App. 1977). Conterra is informed that Costco is holding $1,175,692.01 and Walmart is holding approximately $4,700,000. The damages incurred from the loss of use of these funds are directly attributable to DLP. Further, to the extent DLP has actually received funds on accounts paid to Conterra, Conterra has been harmed by the misappropriation of the funds at issue. Finally, Conterra is entitled to recovery of its attorneys' fees under the tort of another doctrine. *Sooy v. Peter*, 220 Cal. App. 3d 1305, 1310 (Cal. Ct. App. 1990).

Similarly, the Conterra Loan Agreement expressly provides that "Borrower shall not sell, lease, transfer or otherwise dispose of any Collateral unless the purchase price for the full value of the Collateral is paid to the Lender." Conterra Loan Agreement § 5.14. DLP had knowledge of the existence of this term either through its due diligence, or simply through the knowledge that this is a standard term of loan agreements. Therefore, the acts of DLP constitute interference with the Conterra Loan Agreement. *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 56 (1998) ("knows that the interference is certain or substantially certain to occur as a result of his action").

Demand is therefore made that DLP, no later than January 9, 2025, shall (i) account to Conterra as to all account debtors to whom DLP has made demand for payment on the MSA; (ii) send notices to each of those account debtors, including Costco and Watmart, in which DLP states that it makes no claim to the accounts; and (iii) account for and return to Conterra all payments made on the MSA. Should DLP not do so by this deadline, Conterra shall bring legal action to enjoin further transfers to DLP and to recover Conterra's damages, as set forth above.

Respectfully,

Bernie Kornberg

cc: Zev Shechtman - zev.shechtman@saul.com

# EXHIBITS OMITTED