# EXHIBIT A
# PART 2

6.18.1 Without the Lender's prior written consent, Borrower will not be a party to (or ever maintained or was a party to) any employee welfare benefit plan, as defined in section 3(1) of the Employee Retirement Income Security Act of 1974, as amended ( ERISA ), or any other written, unwritten, formal or informal plan or agreement involving direct or indirect compensation, other than workers' compensation, unemployment compensation and other government programs, under which the Borrower has any present or future obligation or liability. Borrower does not maintain and is not a party to (or ever maintained or was a party to) any employee pension benefit plan, as defined in section 3(2) or ERISA, and Borrower does not contribute to (or has ever contributed to) any multi-employer plan, as defined in section 3(37) of ERISA.

6.18.2 There is no contract, agreement, plan or arrangement covering any employee or former employee of Borrower that, individually or collectively, could give rise to the payment of any amount that would not be deductible by reason of section 280 of the Internal Revenue Code.

6.18.3 pon demand, Borrower will provide a list of each employment, severance or other similar contract, arrangement or policy (written or oral) providing for insurance coverage (including any self-insured arrangements), non-statutory workers' compensation, disability benefits, supplemental unemployment benefits, vacation benefits, retirement benefits, deferred compensation, profit-sharing, bonuses, stock options, stock appreciation or other forms of incentive compensation or post-retirement insurance, compensation or benefits entered into, by Borrower.

6.19 Compliance: Licenses, Permits.

6.19.1 Borrower shall have complied with and will comply in all respects with the federal, state, local or foreign laws, ordinances, regulations or orders applicable to the businesses and operations of Borrower. Borrower has all federal, state, local and foreign governmental licenses and permits which are required for the conduct of the business as presently or previously conducted and as planed to be conducted, which licenses and permits are in full force and effect, and no violations are outstanding or uncured with respect to any such licenses or permits and no proceeding is pending or, to the best knowledge of Borrower threatened to revoke or limit any thereof.

6.19.2 Borrower is not, and will not be under its business plan, in violation of any applicable Environmental Laws and no condition or event has occurred which, with notice or the passage of time or both, would constitute a violation of any Environmental Laws.

6.19.3 Borrower is in possession of all Environmental Permits required under all applicable Environmental Laws for the conduct and operation of the business and is and will at all times be in compliance with all of the requirements and limitations included in such Environmental Permits.

6.19.4 Borrower is not and will not be responsible, or potentially responsible, for the remediation or cost of remediation of wastes, substances or materials at, on or beneath any

facilities or at, on or beneath the Real Property Collateral any land adjacent thereto or used in connection therewith.

6.19.5 Borrower is not and will not be the subject of federal, state, local or private litigation or proceedings involving a demand for damages or other potential liability with respect to violations of Environmental Laws.

6.19.6 Borrower is not and will not be liable, directly or indirectly, in connection with any release of ha ardous substance into the environment in violation of Environmental Laws, nor do there currently exist any facts upon which a finding of such liability could be based.

6.19.7 Borrower has and will comply with the filing and reporting requirements under all applicable Environmental Laws and has maintained all required data, documentation and records under all applicable Environmental Laws.

6.20 Ha ardous Substances. Borrower represents and warrants that: (a) during the course of Borrower's business, there has been and will be no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Ha ardous Waste or substance by any person on, under, or about any property used in connection with Borrower's business; (b) Borrower has no knowledge of, or reason to believe that there has been or will be, (i) any use, generation, manufacture, storage, treatment, disposal, release, or threatened release of any Ha ardous Waste or substance by any occupants of any of Borrower's property or the Real Property Collateral, or (ii) any actual or threatened litigation or claims of any kind by any person relating to such matters; (c) neither Borrower nor any tenant, contractor, agent or other user of any of Borrower's property or the Real Property Collateral shall use, generate, manufacture, store, treat, dispose of, or release any Ha ardous Waste or substance on, under, or about the Real Property Collateral and Borrower's property; and (d) all activities on, around or pertaining to the Real Property Collateral and Borrower's property shall be conducted in compliance with all Environmental Laws. Borrower authori es the Lender and its agents to enter upon Borrower's property to make such inspections and tests as the Lender may deem appropriate to determine Borrower's compliance of the Real Property Collateral with this Section 6.20. Any inspections or tests made by the Lender shall be for the Lender's purposes only and shall not be construed to create any responsibility or liability on the part of the Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Real Property Collateral and Borrower's property for Ha ardous Waste and compliance with all Environmental Laws. Borrower hereby (a) releases and waives any future claims against the Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any Environmental Laws, and (b) agrees to indemnify and hold harmless the Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which the Lender may directly or indirectly sustain or suffer resulting from Borrower's failure to comply with all Environmental Laws or from a breach of this Section 6.20 of this Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to or after Borrower's ownership or interest in the Real Property Collateral and Borrower's property, whether or not the same was or should have been known to Borrower. The provisions of this Section 6.20 of this Agreement, including the obligation to indemnify, shall survive the payment of the indebtedness and the satisfaction of this Agreement and shall not be affected by the Lender's

acquisition of any interest in any of the Real Property Collateral and Borrower's property, whether by foreclosure or otherwise.

6.21 Affiliate Transactions. Except for prior transactions already disclosed to the Lender, no current or former Affiliate, stockholder, director, officer, partner or employee of Borrower or uarantor, is presently, or since the inception of the Borrower or uarantor has been, directly or indirectly through his, her or its affiliation with any other Person, a party to any transaction with the Borrower or the uarantor providing for the furnishing of services by or to, or rental of real or personal property from or to, or otherwise requiring cash payments to or by any such person unless the Lender has consented thereto in writing.

6.22 Compliance with Laws and Regulations. Borrower is in compliance with all laws, including Environmental Laws, orders, regulations and ordinances of all federal, foreign, state and local governmental authorities relating to the business operations and the assets of Borrower and that Borrower has obtained all the necessary licenses, permits and approvals necessary to operate Borrower's business.

6.23 SA Patriot Act Notification. The following notification is provided to Borrower pursuant to Section 326 of the SA Patriot Act of 2001, 31 .S.C. Section 5318:

> IMPORTANT INFORMATION ABO T PROCED RES FOR OPENIN A NEW ACCO NT. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person or entity that opens an account, including any deposit account, treasury management account, loan, other extension of credit, or other financial services product. What this means for Borrower: When Borrower opens an account, if Borrower is an individual, the Lender will ask for Borrower's name, taxpayer identification number, residential address, date of birth, and other information that will allow the Lender to identify Borrower and, if Borrower is not an individual, the Lender will ask for Borrower's name, taxpayer identification number, business address, and other information that will allow the Lender to identify Borrower. The Lender may also ask, if Borrower is an individual, to see Borrower's driver's license or other identifying documents and, if Borrower is not an individual, to see Borrower's legal organi ational documents or other identifying documents.

6.24 Borrower Existence and Interests Properly Issued.

6.24.1 Hronis Capital Assets is a limited partnership duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Capital

Asset's partnership interests have been properly issued, and the issuance of such partnership interests have not violated any articles of organi ation, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Capital Assets. All the outstanding partnership interests which Hronis Capital Assets has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. Hronis Capital Assets has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.2 Hronis Capital Management is a limited liability company duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Capital Management's membership interests have been properly issued, and the issuance of such membership interests has not violated any articles of organi ation, operating agreement, registration agreement or subscription agreement pertaining to Hronis Capital Management. All the outstanding membership interests which Hronis Capital Management has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. Hronis Capital Management has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.3 Hronis Citrus is a limited liability company duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Citrus's membership interests have been properly issued, and the issuance of such membership interests has not violated any articles of organi ation, operating agreement, registration agreement or subscription agreement pertaining to Hronis Citrus. All the outstanding membership interests which Hronis Citrus has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. Hronis Citrus has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.4 Hronis Farming is a limited partnership duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Farming's

partnership interests have been properly issued, and the issuance of such partnership interests has not violated any articles of organi ation, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Farming. All the outstanding partnership interests which Hronis Farming has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. Hronis Farming has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.5 Hronis is a corporation duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis's shares have been properly issued, and the issuance of such shares have not violated any articles of organi ation, bylaws, registration agreement or subscription agreement pertaining to Hrnois. All the outstanding membership interests which Hronis has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. Hronis has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.6 Hronis Land Company is a general partnership duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Land Company's partnership interests have been properly issued, and the issuance of such partnership interests have not violated any articles of organi ation, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Land Company. All the outstanding partnership interests which Hronis Land Company has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. Hronis Land Company has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.7 Hronis Ranch is a limited liability company duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of Hronis Ranch's membership interests have been properly issued, and the issuance of such membership

interests have not violated any articles of organi ation, operating agreement, registration agreement or subscription agreement pertaining to Hronis Ranch. All the outstanding membership interests which Hronis Ranch has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. Hronis Ranch has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.24.8 The Hronis Family Limited Partnership is a limited partnership duly organi ed and in good standing under the laws of the State of California and is duly qualified in California and is in good standing in all states where the nature and extent of the business transacted by such Borrower or the ownership of such Borrower's assets makes such qualification necessary. All of The Hronis Family Limited Partnership's partnership interests have been properly issued, and the issuance of such partnership interests have not violated any articles of organi ation, partnership agreement, registration agreement or subscription agreement pertaining to Hronis Farming. All the outstanding partnership interests which The Hronis Family Limited Partnership has issued and which is outstanding is exempt from registration under the Federal Securities Acts of 1933 and 1934 and the rules and regulations promulgated thereunder under California and other applicable states' securities and Blue Sky laws. The Hronis Family Limited Partnership has the power and authority and has received the necessary governmental and administrative authority to carry on its business as presently conducted and as proposed to be conducted and to perform this Agreement and the other Financing Agreements and the other material agreements of the Borrower.

6.25 <u>Borrower and uarantor Authority</u>. The execution and delivery by Borrower and uarantor of this Agreement and all of the other Financing Agreements and the performance of Borrower's and uarantor's obligations hereunder and thereunder: (a) are within Borrower's and uarantor's powers; (b) are duly authori ed by Borrower's and uarantor's members, managers, partners, officers, and shareholders, as applicable; (c) are not in contravention of any law or laws, or the terms of Borrower's or uarantor's Articles of Organi ation, Operating Agreement, Bylaws, Partnership Agreement, as applicable, or of any indenture, agreement or undertaking to which any Borrower is a party or by which any Borrower or any of Borrower's or any uarantor or any of uarantor's property, property is bound; (d) do not require any governmental consent, registration or approval not already obtained; (e) do not contravene any contractual or governmental restriction binding upon any Borrower or any uarantor; and (f) will not, except as contemplated or permitted by this Agreement, result in the imposition of any lien, charge, security interest or encumbrance upon any property of any Borrower or of any uarantor under any existing indenture, mortgage, deed of trust, loan or credit agreement or other material agreement or instrument to which any Borrower or any uarantor is a party or by which any Borrower or any uarantor or any of Borrower's property or uarantor's property may be bound or affected.

6.26 Management and Equity Interests. All Borrower's managers, members, partners, officers, and shareholders, as applicable, and the amount and percentage of equity interests are as set forth below:

6.26.1 Hronis Capital Assets:

ENERAL PARTNERS:

Hronis Capital Management, LLC

LIMITED PARTNERS:

| Limited Partners | Percentage Interest |
|---|---|
| Kosta James Hronis | 50 |
| Peter John Hronis | 50 |
| Total | 100 |

6.26.2 Hronis Capital Management:

MANA ER:

Kosta James Hronis

MEMBERS:

| Members | Percentage Interest |
|---|---|
| Kosta James Hronis | 50 |
| Peter John Hronis | 50 |
| Total | 100 |

6.26.3 Hronis Citrus:

MANA ER:

Hronis Capital Management, LLC

MEMBERS:

| Members | Percentage Interest |
|---|---|
| Kosta James Hronis | 8 |

| | |
|---|---|
| Peter John Hronis | 8 |
| Hronis Trust for Demetrius A. Hronis | 14 |
| Hronis Trust for Haily L. Hronis | 14 |
| Hronis Trust for Antonia S. Hronis | 14 |
| Hronis Trust for Chase J. Hronis | 14 |
| Hronis Trust for Paige Hronis | 14 |
| Hronis Trust for Peter N. Hronis | 14 |
| Total | 100 |

6.26.4 Hronis Farming:

ENERAL PARTNERS:

Hronis Capital Management, LLC

LIMITED PARTNERS:

| Limited Partners | Percentage Interest |
|---|---|
| Kosta James Hronis | 50 |
| Peter John Hronis | 50 |
| Total | 100 |

6.26.5 Hronis Fruit Company:

MANA ERS:

Kosta James Hronis
Peter John Hronis
Peter Nickolas Hronis
Demetrius Albert Hronis

MEMBER:

| Members | Percentage Interest |
|---|---|
| Kosta James Hronis | 25 |
| Peter John Hronis | 25 |
| Peter Nickolas Hronis | 25 |
| Demetrius Albert Hronis | 25 |
| Total | 100 |

6.26.6 Hronis:

OFFICERS:

Kosta James Hronis, President
Peter John Hronis, Secretary

SHAREHOLDERS:

| Shareholders | Percentage Interest |
|---|---|
| Kosta James Hronis | 50 |
| Peter John Hronis | 50 |
| Total | 100 |

6.26.6 Hronis Land Company

PARTNERS:

| Partners | Percentage Interest |
|---|---|
| Kosta James Hronis | 50 |
| Peter John Hronis | 50 |
| Total | 100 |

6.26.7 Hronis Ranch:

MANA ERS:

Kosta James Hronis
Peter John Hronis
Demetrius Albert Hronis

MEMBER:

| Members | Percentage Interest |
|---|---|
| Demetrius Albert Hronis | 100 |
| Total | 100 |

6.26.8 Hronis Resource Management, LLC

MANA ER:

Kosta James Hronis

MEMBERS:

| Members | Percentage Interest |
|---|---|
| Kosta James Hronis | 50 |
| Peter John Hronis | 50 |
| Total | 100 |

6.26.9 The Hronis Family Limited Partnership

ENERAL PARTNER:

Hronis Capital Management, LLC

LIMITED PARTNERS:

| Limited Partners | Percentage Interest |
|---|---|
| Kosta James Hronis | 15.3555746 |
| Peter John Hronis | 15.3555746 |
| Sophia Hronis Revocable Trust | 60.603963 |
| Hronis Trust for Demetrius A. Hronis | 1.1546046 |
| Hronis Trust for Haily L. Hronis | 1.1546046 |
| Hronis Trust for Antonia S. Hronis | 1.1546046 |
| Hronis Trust for Chase J. Hronis | 1.1546046 |
| Hronis Trust for Paige Hronis | 1.1546046 |
| Hronis Trust for Peter N. Hronis | 1.1546046 |
| Hronis Capital Management, LLC | 1.041164 |
| Total | 100 |

6.27 Litigation and Proceedings. No judgments are outstanding against Borrower nor are there now pending or threatened any litigation, contested claim, or governmental proceeding by or against any Borrower.

6.28 Certification. At the sole option of Lender, and from time to time as Lender may request, Borrower shall furnish to Lender a certification by an environmental lawyer, engineer, architect, or other qualified inspector acceptable to Lender that Borrower's operations comply with all applicable statutes, ordinances, codes, regulations, Environmental Laws, and similar requirements.

6.29 Borrower's Non Reliance pon Lender. Borrower acknowledges and agrees that any cash flow projections prepared by Borrower and submitted to Lender and all Lender's credit decisions pertaining to this Agreement do not constitute a representation, express or implied, upon the success, feasibility, or viability of Borrower's business as an ongoing concern.

6.30 Environmental uestionnaire. All information stated in the Environmental uestionnaire continues to be accurate in all material respects.

6.31 Borrower Lists. Attached hereto are true, correct and complete lists of the following:

6.31.1 Attached hereto as Schedule 6.31.1 is a complete, accurate, true and correct list of all Borrower's Farm Products;

6.31.2 Attached hereto as Schedule 6.31.2 is a complete, accurate, true and correct list of all Borrower's Inventory;

6.31.3 Attached hereto as Schedule 6.31.3 is a complete, accurate, true and correct list of all Borrower's buyers of Borrower's Farm Products;

6.31.4 Attached hereto as Schedule 6.31.4 is a complete, accurate, true and correct list of all Borrower's supplier list;

6.31.5 Attached hereto as Schedule 6.31.5 is a complete, accurate, true and correct list of all Borrower's litigation;

6.31.6 Attached hereto as Schedule 6.31.6 is a complete list of all Counties in which Borrower keeps any and all Farm Products and Inventory.

6.32 Financial Statements. Attached hereto as Schedule 6.32 is Borrower's October 31, 2023 Financial Statements which Borrower represents and warrants are complete and true and correct in all material respects.

7. AFFIRMATI E CO ENANTS

Each Borrower jointly and severally covenants and agrees that so long as any Liabilities remain outstanding, and (even if there shall be no Liabilities outstanding) so long as the Lender remains committed to make Line of Credit Advances under this Agreement:

7.1 Financial Statements and Other Reportings. Except as otherwise expressly provided for in this Agreement, Borrower shall keep proper books of record and account in which full and true entries will be made of all dealings and transactions of or in relation to the business and affairs of Borrower in accordance with generally accepted accounting principles consistently applied. Borrower shall cause to be furnished to the Lender, and in a form acceptable to the Lender, such information as the Lender may reasonably request, including, without limitation, the following:

7.1.1 (a) as soon as available and in any event no later than one hundred twenty (120) days after the end of each fiscal year the financial statements of each Borrower, reviewed by independent certified public accountants selected by such Borrower and acceptable to Lender (such statements to include a balance sheet and cash flow statement for the year just ended, an income statement for such year, and a statement of contingent liabilities for such year); (b) as soon as available and in any event no later than one hundred twenty (120) days after the end of each fiscal year, the separate personal financial statements of each uarantor, in form and substance satisfactory to Lender; and (c) copies of all tax returns filed by Borrower and uarantor no later

than thirty (30) days of the filing or mailing of such returns (including, if any extension is filed thereon, a copy of such extension no later than ninety (90) days after the end of the applicable fiscal year or calendar year, as applicable, and a copy of the corresponding tax return no later than October 15th of the year in which such extension was filed). Borrower shall certify and supply a compliance certificate with each financial statement provided. Additionally, Borrower shall and shall cause each uarantor to:

7.1.2 Borrower shall as soon as available and in any event within thirty (30) days after the end of each month, reports setting forth in comparative form the changes in the financial condition of the Borrower from the preceding month (which such reports shall expressly include, without limitation, any variances from Borrower's projected monthly budget), all in reasonable detail and satisfactory in scope to the Lender;

7.1.3 by the twentieth (20th) day of each month, Borrower shall provide a Position Report Certificate as of the last day of the preceding month, which such Position Report Certificate will be provided by email transmission and nited States mail;

7.1.4 at Lender's request, Borrower shall provide to Lender a current report of all Farm Products located on the Real Property Collateral;

7.1.5 Borrower shall provide to Lender such additional information, reports, financial statements, or documentation relating to Borrower or the Collateral as Lender may from time to time reasonably request, which information shall be provided as soon as reasonably practicable and in any event by no later than thirty (30) days after Lender's request;

7.1.6 by the sixtieth (60th) day of each fiscal year, Borrower shall supply to Lender with proof acceptable to Lender that all real and personal property taxes have been paid or are being contested;

7.1.7 upon Lender's request, Borrower shall provide Lender with such evidence as Lender reasonably requires establishing that Borrower has fully executed bona fide agreements to provide such operating loans as may be required to continue operation of Borrower's farming operations substantially in accordance with Borrower's past practices; and

7.1.8 Borrower shall notify Lender of any material adverse financial change in its financial condition promptly upon the occurrence of such change.

7.2 Third-Party Financial Consultant. Lender may hire one or more third-party financial consultants (including, without limitation, Kander LLC) acceptable to Lender (one hundred percent (100 ) of the costs and expenses incurred by Lender in connection therewith shall be reimbursed by Borrower), which such third-party financial consultant shall monitor Borrower's financial performance, and which such third-party financial consultant shall have access to all financial statements, reports and other documents set forth in Section 7.1 of this Agreement , all Position Report Certificates of Borrower and all other documents required to be delivered or disclosed pursuant to this Agreement.

7.3 Conduct of Business. Except as contemplated by this Agreement, Borrower shall: (a) maintain Borrower's joint venture existence and maintain in full force and effect all licenses, bonds, franchises, leases, patents, contracts and other rights necessary or desirable to the profitable conduct of Borrower's business; (b) continue in, and limit Borrower's operations to, the same general line of business as that presently conducted by Borrower; (c) comply with all Environmental Laws and with all applicable laws and regulations of any federal, state or local governmental authority; and (d) keep and conduct Borrower's business separate and apart from the business of Borrower's Affiliates and any related party.

7.4 Maintenance of Properties. Borrower shall keep the Real Property Collateral and Borrower's leaseholds, equipment and other fixed assets in good condition, repair and working order, normal wear and tear excepted, and shall not allow Borrower's chief place of business or any of the Collateral to be moved from the locations set forth in subsection 7.15 hereof (or to be placed on consignment) without the written consent of the Lender or except in accordance with subsection 5.14. Borrower shall keep the Farm Products and Inventory in good and merchantable condition and shall, as applicable, clean, feed, shelter, store, secure, refrigerate, water, medicate, fumigate, fertili e, cultivate, irrigate, prune, process and otherwise deal with the Inventory in accordance with the standards and practices adhered to generally by owners, bailees or processors, as applicable, of like properties.

7.5 Notice of Suit, Adverse Change in Business, or Event of Default. Borrower shall, as soon as possible, and in any event within five (5) Business Days after Borrower learns of the following, give written notice to the Lender of (a) any proceeding being instituted or threatened to be instituted by or against Borrower in any federal, state, local or foreign court or before any commission or other regulatory body (federal, state, local or foreign) for which claimed damages exceed 50,000; (b) any material adverse change in the business, assets or condition, financial or otherwise, of Borrower; and (c) the occurrence of any Event of Default (or any condition or event which, upon the giving of notice or lapse of time or both, would constitute an Event of Default).

7.6 se of Proceeds. Borrower shall use Line of Credit Advances only for the purposes stated in Section 2.4 of this Agreement and for no other purpose.

7.7 Borrower's Property Insurance. Borrower shall bear the full risk of loss from any cause of any nature whatsoever in respect to the Collateral. At Borrower's own cost and expense, Borrower shall keep all Collateral insured, with carriers, and in amounts acceptable to the Lender against the ha ards of fire, theft, collision, hail, those covered by extended or all risk coverage insurance and such others as may be required by the Lender. Borrower shall cause to be delivered to the Lender the insurance policies therefore or proper certificates evidencing the same. Such policies shall provide, in manner satisfactory to the Lender, that any losses under such policies shall be payable first to the Lender, as the Lender's interest may appear. Each such policy shall include a provision for thirty (30) days' prior written notice to the Lender of any cancellation or expiration thereof and show the Lender as mortgagee and or loss payee as provided in a form of loss payable endorsement in form and substance satisfactory to the Lender. In the event of any loss covered by any such policy, the carrier named in such policy is and shall be directed by Borrower to make payments for such loss to the Lender and not to Borrower. Borrower irrevocably makes, constitutes and appoints the Lender (and all officers, employees or agents designated by

the Lender) as Borrower's true and lawful attorney and agent-in-fact for the purpose of making, settling or adjusting claims under such policies of insurance. If payment as a result of any insurance losses shall be paid by check, draft or other instrument payable to the Lender, the Lender may endorse the name of Borrower on such check, draft or other instrument, and may do such other things as the Lender may deem advisable to reduce the same to cash. Except as limited below, all loss recoveries received by the Lender on account of any such insurance may be applied and credited by the Lender to the Liabilities. Borrower hereby assigns all such insurance coverage proceeds to the Lender as additional collateral security for the Liabilities. Any surplus of insurance proceeds in excess of the Liabilities shall be paid by the Lender to Borrower. Any deficiency reasonably determined by the Lender to exist after application of insurance proceeds to the Liabilities shall be paid by Borrower to the Lender, on demand. If Borrower fails to procure insurance as provided in this Agreement, or to keep the same in force, or fails to perform any of Borrower's other obligations hereunder, then the Lender may, at the Lender's option, and without obligation to do so, obtain such insurance and pay the premium thereon for the account of Borrower, or make whatever other payments the Lender may deem appropriate to protect the Lender's security for the Liabilities. Any such payment shall be additional Line of Credit Advances and Liabilities of Borrower to the Lender, payable on demand and secured by the Collateral.

7.8 Pension Plans. Borrower shall: (a) keep in full force and effect any and all Pension Plans which are presently in existence or may, from time to time, come into existence under ERISA, unless such Pension Plans can be terminated without material liability to Borrower in connection with such termination (as distinguished from any continuing funding obligation); (b) make contributions to all of Borrower's Pension Plans in a timely manner and in an amount sufficient to comply with the requirements of ERISA; (c) comply with all requirements of ERISA which relate to such Pension Plans; (d) notify the Lender immediately upon receipt by Borrower of any notice of the institution of any proceeding or other action which may result in the termination of any Pension Plans; and (e) acquire and maintain, when available, the contingent employer liability coverage insurance provided for under section 4023 of ERISA, such insurance to be satisfactory to the Lender in coverage and amount.

7.9 Further Actions. Borrower agrees to take such further actions, including, and without limitation, the execution and delivery of additional documents as may be reasonably necessary to carry out the terms of this Agreement and to permit the Lender to obtain, maintain, or perfect the liens contemplated by this Agreement.

7.10 Deposit Accounts. Borrower shall maintain all deposit accounts of any kind or nature at only Approved Local Banks, and Borrower shall execute and deliver to the Lender all documents and agreements as the Lender may require to obtain and maintain a perfected lien thereon.

7.11 Workers' Compensation Coverage. pon the Lender's request, Borrower shall provide to the Lender proof of the general contractor's compliance with all applicable workers' compensation laws and regulations with regard to all work performed on the Real Property.

7.12 Fidelity and Employee Dishonesty Bond. If requested by the Lender, Borrower shall maintain a fidelity and employee dishonesty bond in an amount not less than that requested by the Lender with an insurer acceptable to the Lender.

7.13 The Lender's Right of Entry and Inspection. The Lender and its agents or representatives shall have at all times the right of entry and free access to the Borrower's premises and the right to copy all records, accounting books, contracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Borrower's business.

7.14 Actions. The Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement. In connection with this right, the Lender may incur and pay reasonable costs and expenses, including, but not limited to, attorneys' fees, for both trial and appellate proceedings. Borrower covenants to pay the Lender to on demand all such expenses, together with interest from the date the Lender incurs the expense at the rate specified in the Note, and the Lender is authori ed to make Line of Credit Advances for such purposes.

7.15 Collateral Located Only At Approved Locations. All Farm Products and Inventory will be located on the Real Property Collateral and at the locations stated in Schedule 6.31.6. The Farm Products and Inventory may be taken from such locations only for delivery to buyers.

7.16 Indemnity. Borrower shall indemnify and hold the Lender, its affiliates, its assignees and or participants and any of their respective officers, directors, employees, advisors and agents (any such person, an Indemnified Party ), harmless from any and all claims asserted against an Indemnified Party by any person, entity, or governmental body, or arising out of or in connection with (i) the Borrower's property or business, (ii) this Agreement or (iii) the use of proceeds from the Loans. An Indemnified Party shall be entitled to appear in any action or proceeding to defend itself against such claims, and all costs, liabilities, losses or expenses incurred by an Indemnified Party in connection with such defense, including attorneys' fees, shall be paid by Borrower to such Indemnified Party. An Indemnified Party shall, in its sole discretion, be entitled to settle or compromise any asserted claims against it, and such settlement shall be binding upon Borrower for purposes of this indemnification. All amounts paid by an Indemnified Party under this paragraph shall be secured by the Lender's lien on the Collateral and shall be deemed additional Line of Credit Advances, and shall bear interest at the rate applicable to the Note.

7.17 Regulation . Borrower is not engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation of the Board of overnors of the Federal Reserve System), and no part of the proceeds of the Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock.

7.18 Purchase of Materials; Conditional Sales Contracts. No materials, equipment, fixtures, or articles of personal property placed in or incorporated into the Real Property Collateral shall be purchased or installed under any security agreement or other agreement whereby the seller reserves or purports to reserve title or the right of removal or repossession, or the right to consider

such items as personal property after their incorporation into the Real Property Collateral unless otherwise authori ed by the Lender in writing.

7.19 The Lender's Right of Entry and Inspection. The Lender and its agents shall have at all times the right of entry and free access to Borrowers' real property and the right to inspect the Collateral. The Lender shall have unrestricted access to and the right to copy all records, accounting books, contracts, subcontracts, bills, statements, vouchers, and supporting documents of Borrower relating in any way to the Collateral.

7.20 Further Action. The Borrower agrees to take such further action, including and without limitation, the execution and delivery of additional documents, as may be reasonably necessary to carry out the terms of this Agreement and to permit the Lender to obtain, maintain, or perfect the liens contemplated by this Agreement.

7.21 No Commitment for New Loan. Borrowers acknowledge and agree that the Lender has not committed to and has no obligation whatsoever to lend any additional money to Borrower after the date of this Agreement except as expressly stated herein. Nothing in this Agreement shall be considered either an express or implied commitment, and nothing contained in this Agreement obligates the Lender to enter into any loan agreement or financing agreement with Borrower other than that described in this Agreement.

7.22 Consent to Loan Participation, Sale or Transfer. Borrower agrees and consents to the Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers (each such new purchaser, a New Lender ), whether related or unrelated to the Lender. The Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge the Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy it may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against the Lender or against any purchaser of such a participation interest and unconditionally agrees that the Lender may solely enforce Borrower's obligation under the Loan irrespective of the participation of the Loan, and all rights under this Agreement and the Financing Agreements inure solely to the Lender. Borrower further agrees that any New Lender shall have the same rights, benefits and protections as any Lender party to this Agreement on the Effective Date.

7.23 Deposit Accounts. Each Borrower shall maintain all deposit accounts of any kind or nature at only the Approved Local Banks. Borrower shall execute and deliver to the Lender all Control Agreements, documents and agreements as the Lender may require to obtain and maintain a perfected lien on all Borrower's current and future deposit accounts. nless waived by Lender in writing Borrower will not maintain any deposit accounts at any Local Bank that will not sign a control agreement in form and substance satisfactory to Lender.

7.24 Actions. Lender shall have the right to commence, appear in, or defend any action or proceeding purporting to affect the rights, duties, or liabilities of the parties to this Agreement. In connection with this right, Lender may incur and pay reasonable costs and expenses, including, but not

limited to, attorneys' fees, for both trial and appellate proceedings. Borrower covenants to pay Lender to on demand all such expenses, together with interest from the date Lender incurs the expense at the rate specified in the Note to which Lender posted the Advance, and Lender is authori ed to make Advances for such purposes.

7.25 Title Insurance. No later than forty-five (45) days from the date of this Agreement, Borrower shall have provided to Lender an ALTA lender's extended coverage policy of title insurance (and mechanic's lien insurance if requested by the Lender) with such endorsements as the Lender may require, issued by a title insurance company acceptable to the Lender and in a form, amount, and content satisfactory to the Lender, insuring or agreeing to insure that the Deeds of Trust on the Real Property Collateral pursuant to this Agreement will be upon recordation valid first liens on the Real Property Collateral free and clear of all defects, liens, encumbrances, and exceptions except those as specifically accepted by the Lender in writing and except for deeds of trust for the benefit of AgAmerica.

7.26 Financial Covenants.

7.26.1 In the event (a) Borrower's Current Ratio is less than 1.25 to 1.0 as determined by Lender's review of the Position Report covering March 1, 2026 (required under this Agreement to be delivered to Lender by March 20, 2026), and or (b) the Loan-to- alue Ratio is greater than sixty-five percent (65 ) as of March 1, 2026, then Borrower shall pay immediately to Lender an amount equal to three percent (3 ) of Borrower's total gross revenue (based on Borrower's consolidated accountant reviewed financial statements) for the three-year period beginning with the reporting period ending on October 31, 2025.

7.26.2 No later than forty-five (45) days from the date this Agreement, Borrower shall refinance all its Debt owed to AgAmerica with Lender, provided that Lender issues a loan approval regarding the same. Nothing herein shall be construed as a promise or commitment by Lender to refinance such AgAmerica Debt. Any such refinance is expressly subject to Borrower's creditworthiness, market factors, and Lender's underwriting guidelines.

7.27 AAP. Borrower shall maintain a standard modern system of accounting in accordance with AAP.

8. NE ATI E CO ENANTS

Each Borrower jointly and severally covenants and agrees that so long as any Liabilities remain outstanding and (even if there shall be no Liabilities outstanding) so long as the Lender remains committed to make Line of Credit Advances under this Agreement:

8.1 Encumbrances. nless the Lender agrees otherwise in writing, except for those liens, security interests and encumbrances presently in existence and reflected in Borrower's financial statements referred to in Section 6.2 of this Agreement, Borrower shall not create, incur, assume or suffer to exist any security interest, mortgage, pledge, lien, levy, assessment, attachment, sei ure, writ, distress warrant, or other encumbrance of any nature whatsoever on or with regard to any of Borrower's assets (including, without limitation, the Collateral) other than:

(a) liens securing the payment of taxes, either not yet due or the validity of which is being contested in good faith by appropriate proceedings, and as to which Borrower shall, if appropriate under generally accepted accounting principles, have set aside on Borrower's books and records adequate reserves; (b) liens securing deposits under workmen's compensation, unemployment insurance, social security and other similar laws, or securing the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing indemnity, performance or other similar bonds for the performance of bids, tenders, contracts (other than for the repayment of borrowed money) or leases, or securing statutory obligations or surety or appeal bonds, or securing indemnity, performance or other similar bonds in the ordinary course of Borrower's business; (c) liens and security interests in favor of the Lender; and (d) the Permitted Liens.

8.2 Consolidations, Mergers or Acquisitions, Subsidiaries, Public Offering. Borrower shall not recapitali e or consolidate with, merge with, or otherwise acquire all or substantially all of the assets or properties of any other business or person and shall not create or capitali e any subsidiaries and shall not undertake any Initial Public Offering without the prior written consent of the Lender.

8.3 Deposits, Investments, Advances or Loans. Borrower shall not make or permit to exist deposits, investments, advances or loans (other than loans existing on the date of the execution of this Agreement and disclosed to the Lender in writing) to Affiliates or related parties or any other Person, except investments in negotiable certificates of deposit issued by the Lender, made payable to the order of Borrower.

8.4 Indebtedness. Except for those obligations and that indebtedness presently in existence and reflected in Borrower's financial statements referred to in Section 6.2 of this Agreement, Borrower shall not, without Lender's prior written consent, incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any obligations or indebtedness, direct or indirect fixed or contingent at any time, except: (a) the Liabilities; (b) obligations secured by liens or security interests permitted under Section 8.1 of this Agreement; and (c) trade obligations, Producer Payables and normal accruals in the ordinary course of Borrower's business not yet due and payable. Borrower shall not permit to exist any other depository account for the receipt of prepayments of any type whatsoever.

8.5 uaranties and Other Contingent Obligations. Borrower shall not guaranty, endorse or otherwise in any way become or be responsible for obligations of any other business or person, whether by agreement to purchase the indebtedness of such business or person or through the purchase of goods, supplies or services, or maintenance of working capital or other balance sheet covenants or conditions, or by way of stock purchase, capital contribution, advance or loan for the purpose of paying or discharging any indebtedness or obligation of such business or person or otherwise.

8.6 Disposition of Property. Borrower shall not without prior notice to the Lender sell, lease, transfer or otherwise dispose of any of Borrower's properties, assets or rights, to any Person in excess of 50,000 in any of Borrower's fiscal years, except in the ordinary course of Borrower's business and then only in accordance with Section 5.14 of this Agreement.

8.7 Capital Investment Limitations. Borrower shall not purchase, invest in or otherwise acquire real estate, equipment or other fixed assets ( Capital Expenditures ), totaling more than 750,000 per transaction or more than 750,000 in the aggregate in cost in any of Borrower's fiscal years without the prior written consent of the Lender. For the purpose of this Section 8.7, Capital Expenditures shall include a purchase or improvement that has a useful life of more than one year, such as real property, buildings, machinery and equipment.

8.8 Loans to Affiliates or Others. Borrower shall not make any loans to any Affiliates or to any person.

8.9 Continuity of Management. Borrower shall not make any changes in the key employees of Borrower or in their duties without the prior written consent of the Lender.

8.10 Environmental Laws. Borrower shall not cause or contribute to any noncompliance with all applicable Environmental Laws.

8.11 Loans, Acquisitions, uaranties, Other Businesses. Borrower will not (a) loan money, (b) purchase or acquire any interest in any other enterprise or entity, (c) incur any obligation as surety or guarantor other than in the ordinary course of business, or (iv) engage in any business activities substantially different than those in which Borrower is presently engaged.

8.12 Payables and Payment of Debt. Borrower will pay all bills and payables in the ordinary course of business.

8.13 Split Financing. Without Lender's prior written consent, Borrower shall not obtain loans for, or otherwise grant liens on, any of the Collateral from any other lender.

8.14 Managerial Fees, Compensation of Officers or Managers. Borrower shall not pay any management or similar fees whatsoever and shall not pay the following employees' wages and compensation (including salary, bonus, management fees and incentive compensation of any type) in excess of the aggregate amount of 1,500,000 in any of Borrower's fiscal years without the prior written consent of the Lender to any of the following:

Peter John Hronis
Kosta James Hronis
Demtrius Albert Hronis
Peter Nicholas Hronis
Affiliates expressly set forth in Section 6.15 of this Agreement

8.15 Dividends, Redemptions, Debt. Borrower shall not directly or indirectly: (a) redeem any of Borrower's equity interests; (b) prepay any principal, interest or other payments on or in connection with any indebtedness of Borrower other than the Note or owed to AgAmerica in the ordinary course; or (c) make any dividends, distributions or payments to any member without the Lender's prior written consent.

8.16 Issuance of Equity Interests. Borrower shall not issue or distribute any additional equity interests without the prior written consent of the Lender.

8.17 Amendment of Corporate overning Documents. Borrower shall not amend any Articles of Organi ation or operating agreement without the prior written consent of the Lender.

8.18 se of Corporate or Fictitious Names. Borrower shall not use any other corporate or fictitious name.

8.19 Continuity of Consent of Management. Borrower shall not make any changes in its management structure without the prior consent of Lender.

8.20 Environmental Laws. Borrower shall not cause or contribute to any noncompliance with all applicable Environmental Laws.

8.21 Loans, Acquisitions, uaranties, Other Businesses. Borrower will not: (a) loan money or assets; (b) purchase or acquire any interest in any other enterprise or entity; (c) incur any obligation as surety or guarantor other than in the ordinary course of business; or (d) engage in any business activities substantially different than those in which Borrower is presently engaged.

9. DEFA LT, RI HTS AND REMEDIES OF THE LENDER

9.1 Liabilities. pon an Event of Default, any or all of the Liabilities may, at the option of the Lender, and without demand or notice of any kind, be declared, and thereupon shall become, immediately due and payable in full, and the Lender shall cease to be committed to make Line of Credit Advances under this Agreement.

9.2 Rights and Remedies enerally. pon an Event of Default, the Lender shall have, in addition to any other rights and remedies contained in this Agreement or in any of the other Financing Agreements, all of the rights and remedies of a secured party under the Code or other applicable laws, all of which rights and remedies shall be cumulative and non-exclusive, to the extent permitted by law and which rights and remedies shall include but not be limited to the right to sell the Collateral so the net proceeds therefrom can be applied to the Liabilities. In addition, upon an Event of Default the Lender shall be entitled to the appointment of a receiver for all or any portion of the Collateral, and the Lender shall be entitled to the appointment of such receiver without regard to the solvency or insolvency of Borrower and without regard to the value of the Collateral, and such receiver may be appointed by any court of competent jurisdiction upon ex parte application (notice being expressly waived hereby) and all rents, issue, income, profits, proceeds, proceeds of proceeds, and products of and from the Collateral shall be paid according to the directions of the Court for application toward the Liabilities. In addition to all such rights and remedies, the sale, lease or other disposition of the Collateral, or any part thereof, by the Lender after an Event of Default, may be for cash, credit or any combination thereof, and the Lender may purchase all or any part of the Collateral at public or private sale, and in lieu of actual payment of such purchase price, may setoff the amount of such purchase price against the Liabilities then owing. Any sales of the Collateral may involve the sale of portions of the Collateral at different times, and at different locations, and may, at the Lender’s option be held at a site or sites different

from the site at which the Collateral (or any part thereof) is located. Any such sales, at the Lender's option, may be in conjunction with or separate from the foreclosure of any deeds of trust and may be adjourned from time to time with or without notice. The Lender may, in its sole discretion, cause the Collateral to remain on Borrower's premises, at Borrower's expense, pending sale or other disposition of the Collateral. The Lender shall have the right to conduct such sales on Borrower's premises, at Borrower's expense, or elsewhere, on such occasion or occasions as the Lender may see fit. The foregoing terms of disposition shall be deemed to be commercially reasonable.

9.3 Entry pon Premises. pon an Event of Default, the Lender shall have the right to enter upon the Real Property Collateral and all locations of Borrower's business at which any of the Collateral is located (or is believed to be located) without incurring any obligation to pay rent to Borrower or Borrower's landlords, or any other place or places where the Collateral is located (or is believed to be located) and kept, and remove the Collateral therefrom to the premises of the Lender or any agent of the Lender, for such time as the Lender may desire, in order to effectively collect or liquidate the Collateral, or the Lender may require Borrower to assemble the Collateral and make it available to the Lender at a place or places to be designated by the Lender. Borrower expressly agrees that the Lender may, if necessary to gain occupancy to the Real Property Collateral and premises at which Collateral is located (or is believed to be located), without further notice to Borrower: (a) hire Borrower's employees to assist in the loading and transportation of such Collateral; (b) utili e Borrower's equipment for use in such operation; (c) cut or otherwise temporarily move or remove any barbed wire or other fencing or similar boundary-maintenance devices; and (d) pick or otherwise render inoperative any locks on gates or doors to warehouses, barns, storage sheds, storage yards, pastures or other property not customarily habituated by people. Borrower agrees that any such actions authori ed by this Section 9.3 shall be deemed to have been authori ed and not a breach of the peace.

9.4 Sale of Other Disposition of Collateral by the Lender. Any notice required to be given by the Lender of a sale, lease or other disposition or other intended action by the Lender with respect to any of the Collateral which is deposited in the nited States mail, postage prepaid and duly addressed to Borrower at the address specified in Section 10.19 of this Agreement, at least ten (10) calendar days prior to such proposed action, shall constitute fair and reasonable notice to Borrower of any such action; provided, however, that nothing herein shall require the Lender to give Borrower ten (10) days' prior notice of disposition, and nothing herein shall cause a disposition made on less than ten (10) days' notice not commercially reasonable. The net proceeds reali ed by the Lender upon any such sale or other disposition, after deduction for the reasonable expense of retaking, holding, preparing for sale, selling or the like, and the reasonable attorneys' and paralegal fees and legal expenses incurred by the Lender in connection therewith, shall be applied as provided herein toward satisfaction of the Liabilities. Borrower shall remain liable for any deficiency. The commencement of any action, legal or equitable, or the rendering of any judgment or decree for any deficiency, shall not affect the Lender's security interest in the Collateral until the Liabilities shall have been paid in full.

9.5 Waiver of Demand. Demand, presentment, protest and notice of nonpayment are hereby waived by Borrower. Borrower also waives the benefit of all exemption laws.

9.6 Waiver of Notice. pon an Event of Default, Borrower hereby waives all rights to notice and hearing of any kind prior to the exercise by the Lender of the Lender's rights to repossess the Collateral without judicial process or to replevy, attach or levy upon the Collateral without prior notice or hearing to the extent permitted by applicable law.

10. MISCELLANEO S

10.1 Timing of Payments. For purposes of determining the outstanding balance of the Liabilities, including the computations of interest which may from time to time be owing to the Lender, the receipt by the Lender of any check or any other item of payment whether through a blocked account described in Section 5.6 of this Agreement or otherwise, shall not be treated as a payment on account of the Liabilities until such check or other item of payment is actually received by the Lender and is paid to the Lender in cash or a cash equivalent. The credit given for any such check subsequently dishonored shall be reversed.

10.2 Attorneys' Fees and Costs. If at any time or times hereafter the Lender employs counsel in connection with the negotiation and entering into of this Agreement or the other Financing Agreements (including the fees and costs of Magnetar Financial and its managed funds and accounts as a participant to assignee hereunder), and in connection with protecting or perfecting the Lender's security interest in the Collateral or in connection with any matters contemplated by or arising out of this Agreement, whether: (a) to commence, defend, or intervene in any litigation or to file a petition, complaint, answer, motion or other pleading; (b) to take any other action in or with respect to any suit or proceeding (bankruptcy or otherwise); (c) to consult with officers of the Lender to advise the Lender or to draft documents for the Lender in connection with any of the foregoing or in connection with any release of the Lender's claims or security interests or any proposed extension, amendment or refinancing of the Liabilities or in connection with any proposed change in Borrower's corporate structure or existing agreements within its Members, or the proposed issuance of stock by Borrower or any proposed initial public offering by Borrower; (d) to protect, collect, lease, sell, take possession of, or liquidate any of the Collateral; or (e) to attempt to enforce or to enforce any security interest in any of the Collateral, or to enforce any rights of the Lender to collect any of the Liabilities; then in any of such events, all of the attorneys' fees arising from such services, and any expenses, costs and charges relating thereto, including, without limitation, all fees of all paralegals, legal assistants and other staff employed by such attorneys, together with interest at the Default Rate provided for in Section 2.2 of this Agreement if an Event of Default has occurred, or at the highest interest rate set forth in the Note, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

10.3 Expenditures by the Lender. In the event that Borrower shall fail to pay taxes, insurance, assessments, costs or expenses which Borrower is, under any of the terms hereof or of any of the other Financing Agreements, required to pay, or fails to keep the Collateral free from other security interests, liens or encumbrances except as permitted herein, the Lender may, in the Lender's sole discretion and without obligation to do so, make expenditures for any or all of such purposes, and the amount so expensed, together with interest at the Default Rate provided for in Section 2.2 of this Agreement, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

10.4 The Lender's Costs and Expenses as Additional Liabilities. Borrower shall reimburse the Lender for all reasonable expenses and fees paid or incurred in connection with the documentation, negotiation and closing of the Note and other financial accommodations described in this Agreement, including, without limitation, filing and recording fees, and the reasonable fees and expenses the Lender's attorneys. Borrower further agrees to reimburse the Lender for all reasonable expenses and fees paid or incurred in connection with the documentation of any renewal or extension of the loans, any additional financial accommodations, or any other amendments to this Agreement. All such costs and expenses incurred by the Lender with respect to such negotiation and documentation together with interest at the highest interest rate set forth in the Note, shall constitute additional Liabilities, payable on demand and secured by the Collateral.

10.5 Claims and Taxes. Borrower agrees to indemnify and hold the Lender harmless from and against any and all claims, demands, liabilities, losses, damages, penalties, costs, and expenses (including, without limitation, reasonable attorneys' fees) relating to or in any way arising out of the possession, use, operation or control of any of Borrower's assets. Borrower shall pay or cause to be paid all license fees, bonding premiums and related taxes and charges, and shall pay or cause to be paid all of Borrower's real and personal property taxes, assessments and charges and all of Borrower's franchise, income, unemployment, use, excise, old age benefit, withholding, sales and other taxes and governmental charges assessed against Borrower, or payable by Borrower, at such times and in such manner as to prevent any penalty from accruing or any lien or charge from attaching to Borrower's property.

10.6 Custody and Preservation of Collateral. The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any of the Collateral in the Lender's possession if the Lender takes such action for that purpose as Borrower shall request in writing, but failure by the Lender to comply with any such request shall not of itself be deemed a failure to exercise reasonable care, and no failure by the Lender to preserve or protect any right with respect to such Collateral against prior parties, or to do any act with respect to the preservation of such Collateral not so requested by Borrower, shall of itself be deemed a failure to exercise reasonable care in the custody or preservation of such Collateral.

10.7 Inspection. The Lender (by and through its officers and employees), or any person designated by the Lender in writing, shall have the right, from time to time hereafter, to call at Borrower's place or places of business (or any other place where Collateral or any information relating thereto is kept or located) without hindrance or delay, to (i) inspect, audit, check and make copies of and extracts from Borrower's books, records, journals, order, receipts and any correspondence and other data relating to Borrower's business or to any transactions between the parties to this Agreement; (ii) make such verification concerning the Collateral as the Lender may consider reasonable under the circumstances; and (iii) review operating procedures, review maintenance of property and discuss the affairs, finances and business of Borrower with Borrower's officers, employees or managers and other customers, vendors and contractors of Borrower. Borrower shall pay, on demand, all reasonable expenses incurred by or on behalf of the Lender in making inspections under this Section 10.7, including, without limitation, travel and photocopying expenses, which expenses, at the option of the Lender shall be paid by the Lender initiated Advances pursuant to Section 2.1 of this Agreement.

10.8 Examination of Banking Records. Borrower consents to the examination by the Lender, the Lender's officers, employees and agents, or any of them, whether or not there shall have occurred an Event of Default, of any and all of Borrower's banking records, wherever they may be found, and hereby directs any Person which may be in control or possession of such records (including, without limitation, any Lender, other financial institution, accountant or lawyer) to provide such records to the Lender and the Lender's officers, employees and agents, upon their request. Such examination may be conducted by the Lender with or without notice to Borrower at the option of the Lender, any such notice being hereby waived by Borrower.

10.9 overnmental Reports. Borrower hereby authori es all duly constituted federal, state and municipal authorities to furnish to the Lender copies of their reports of examinations or inspections of Borrower.

10.10 Reliance by the Lender. All covenants, agreements, representations and warranties made herein by Borrower shall, notwithstanding any investigation by the Lender, be deemed to be material to and to have been relied upon by the Lender.

10.11 Parties. Whenever in this Agreement there is reference made to any of the parties hereto, such reference shall be deemed to include, wherever applicable, a reference to the respective successors and assigns of Borrower, uarantor and the Lender.

10.12 Applicable Law Severability. This Agreement shall be construed in all respect in accordance with, and governed by, the laws and decisions of the State of California. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

10.13 Judicial Reference. Borrower and the Lender hereby agree that any controversy, dispute, or claim between the parties arising out of or relating to this Agreement shall be resolved by a reference proceeding in California in accordance with the provisions of California Code of Civil Procedure Section 638. The referee shall be a retired California state court judge selected by mutual written agreement of the parties. If the parties are unable to agree upon a referee within ten (10) calendar days after one party serves a written notice of its intent to commence a judicial reference proceeding on the other party, then the referee will be selected by the court in accordance with California Code of Civil Procedure Section 640(b). The referee shall be appointed to sit as a temporary judge, with all of the powers of a temporary judge, as authori ed by law, and upon selection should take and subscribe to the oath of office as provided for in Rule 244 of the California Rules of Court (or any subsequently enacted rule). The referee shall determine the way the reference proceeding is conducted including the time and place of all hearings, the order of presentation of evidence, and all other questions that arise with respect to the course of the reference proceeding. The referee shall render a written statement of decision and shall conduct the proceedings in accordance with the California Code of Civil Procedure, the California Rules of Court, and the California Evidence Code, except as otherwise specifically agreed by the parties and approved by the referee. The referee s statement of decision shall set forth findings of fact and

conclusions of law. The referee s decision shall be entered as a judgment in the court in accordance with the provisions of California Code of Civil Procedure Sections 644 and 645 and shall be appealable in accordance with California law. If the enabling legislation which provides for appointment of a referee is repealed (and no successor statute is enacted), any dispute between the parties that would otherwise be determined by the reference procedure herein described will be resolved and determined by arbitration. The arbitration will be conducted by a retired California state court judge, in accordance with the California Arbitration Act and the California Code of Civil Procedure Sections 1280 through 1294.2 (as amended from time to time).

10.14 Application of Payments Waiver. Notwithstanding any contrary provision contained in this Agreement or in any of the other Financing Agreements, Borrower irrevocably waives the right to direct the application of any and all payments at any time or times hereafter received by the Lender from Borrower or with respect to any of the Collateral, and Borrower does hereby irrevocably agree that the Lender shall have the continuing exclusive right to apply and reapply any and all payments received at any time or times hereafter, whether with respect to the Collateral or otherwise, against the Liabilities, in such manner as the Lender may deem advisable, notwithstanding any entry by the Lender upon any of the Lender's books and records.

10.15 Marshalling: Payments Set Aside. The Lender shall be under no obligation to marshal any assets in favor of Borrower or against or in payment of any or all of the Liabilities. To the extent that Borrower makes a payment or payments to the Lender or the Lender receives any payment or proceeds of the Collateral for Borrower's benefit or enforces the Lender's security interests or exercises the Lender's rights of setoff, and such payment or payments or the proceeds of such Collateral, enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

10.16 Section Titles. The section titles contained in this Agreement shall be without substantive meaning or content of any kind whatsoever and are not a part of the agreement between the parties.

10.17 Continuing Effect. This Agreement, the Lender's security interests in the Collateral, and all of the other Financing Agreements shall continue in full force and effect so long as any Liabilities shall be owed to the Lender and (even if there shall be no Liabilities outstanding) so long as the Lender remains committed to make Advances under this Agreement.

10.18 No Waiver. The Lender's failure, at any time or times hereafter, to require strict performance by Borrower of any provision of this Agreement shall not waive, affect or diminish any right of the Lender thereafter to demand strict compliance and performance therewith. Any suspension or waiver by the Lender of any Event of Default under this Agreement or any of the other Financing Agreements, shall not suspend, waive or affect any other Event of Default under this Agreement or any of the other Financing Agreements, whether the same is prior or subsequent thereto and whether of the same or of a different kind or character. None of the undertakings,

agreements, warranties, covenants and representations of Borrower contained in this Agreement or any of the other Financing Agreements and no Event of Default under this Agreement or any of the other Financing Agreements, shall be deemed to have been suspended or waived by the Lender unless such suspension or waiver is in writing signed by an officer of the Lender, and directed to Borrower specifying such suspension or waiver. If the Lender shall have waived a requirement of this Agreement or of one or more of the Financing Agreements on one or more occasions, such waiver shall not be construed by Borrower as the Lender's express or implicit waiver of such requirement or rights of the Lender on a future occasion, and Borrower agrees that it will not employ or utili e any estoppel defense or claim in the event the Lender seeks to enforce any of its rights under this Agreement or under the Financing Agreements. The Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by the Lender. No delay or omission on the part of the Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by the Lender of a provision of this Agreement shall not prejudice or constitute a waiver of the Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by the Lender, nor any course of dealing between the Lender and Borrower, or between the Lender, or between the Lender and any Person who contracts or deals with Borrower shall constitute a waiver of any of the Lender's rights or of any obligations of Borrower or of any of Borrower's contractors as to any future transactions. Whenever the consent of the Lender is required under this Agreement, the granting of such consent by the Lender in any instance shall not constitute continuing consent in subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of the Lender.

10.19 Notices. Except as otherwise expressly provided herein, any notice required or desired to be served, given or delivered pursuant to this Agreement shall be in writing, and shall be deemed to have been validly served, given or delivered three (3) Business Days after deposit in the nited States mails, with proper postage prepaid, addressed to the party to be notified as follows:

10.19.1 If to the Lender:

Conterra Agricultural Capital, LLC
5465 Mills Civic Parkway, Suite 201
West Des Moines, IA 50266

With copies to:

Email: legal conterraag.com

10.19.2 If to the Borrower:

Hronis Capital Assets, LP
10443 Hronis Road
Delano, CA 93215

Hronis Capital Management, LLC
10443 Hronis Road
Delano, CA 93215

Hronis Citrus, LLC
10443 Hronis Road
Delano, CA 93215

Hronis Farming, LP
10443 Hronis Road
Delano, CA 93215

Hronis Fruit Company
10443 Hronis Road
Delano, CA 93215

Hronis, Inc.
10443 Hronis Road
Delano, CA 93215

Hronis Land Company
10443 Hronis Road
Delano, CA 93215

Hronis Ranch, LLC
10443 Hronis Road
Delano, CA 93215

Hronis Resource Management, LLC
10443 Hronis Road
Delano, CA 93215

The Hronis Family Limited Partnership
10443 Hronis Road
Delano, CA 93215

With a copy to:

peter.hronis hronis.net;
mark.dedonato hronis.net; and
alex.bryant hronis.net

or to such other address as each party designates to the other in the manner herein prescribed.

10.20 Maximum Interest. No agreements, conditions, provisions or stipulations contained in this Agreement or in any of the other Financing Agreements, or any Event of Default, or any exercise by the Lender of the right to accelerate the payment of the maturity of principal and interest, or to exercise any option whatsoever, contained in this Agreement or any of the other Financing Agreements, or the arising of any contingency whatsoever, shall entitle the Lender to collect, in any event, interest exceeding the maximum authori ed by law, and in no event shall Borrower be obligated to pay interest exceeding such rate, and all agreements, conditions or stipulations, if any, which may in any event or contingency whatsoever operate to bind, obligate or compel Borrower to pay a rate of interest exceeding the maximum allowed by law, shall be without binding force or effect, at law or in equity, to the extent only of the excess of interest over such maximum interest allowed by law. In the event any interest is charged in excess of the maximum allowed by law ( Excess ), Borrower acknowledges and stipulates that any such charge shall be the result of an accidental and bona fide error, and such Excess shall be, first, applied to reduce the principal of any Liabilities due, and, second returned to Borrower, it being the intention of the parties hereto not to enter at any time into a usurious or otherwise illegal relationship. Borrower and the Lender both recogni e that, with fluctuations in the variable rate of interest on the Lines of Credit, such an unintentional result could inadvertently occur. By the execution of this Agreement, Borrower covenants that: (a) the credit or return of any Excess shall constitute the acceptance by Borrower of such Excess; and (b) Borrower shall not seek to pursue any other remedy, legal or equitable, against the Lender based, in whole or in part, upon the charging or receiving of any interest in excess of the maximum authori ed by law. For the purpose of determining whether or not any Excess has been contracted for, charged or received by the Lender, all interest at any time contracted for, charged or received by the Lender in connection with Liabilities shall be amorti ed, prorated, allocated and spread in equal parts during the entire term of this Agreement.

10.21 Additional Advances. All fees, charges, expenses, costs, expenditures, obligations, liabilities, losses, penalties and damages incurred or suffered by the Lender and for which Borrower is bound to indemnify or reimburse the Lender under this Agreement shall, at the option of the Lender be paid by the Lender initiated Line of Credit Advances.

10.22 Right of Setoff. Borrower grants to the Lender a contractual possessory security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to the Lender all Borrower's right, title and interest in and to, Borrower's accounts with the Lender (whether checking, savings, or some other account), including without limitation all accounts held jointly with someone else and all accounts Borrower may open in the future, excluding, however, all IRA, Keogh, and trust accounts. Borrower authori es the Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Liabilities against any and all such accounts.

10.23 No Partnership. Nothing in this Agreement shall be construed to constitute the creation of a partnership or joint venture between the Lender and Borrower or any contractor. This Agreement does not create a contractual relationship with and shall not be construed to benefit or bind the Lender in any way with or create any contractual duties by the Lender to any contractor, subcontractor, material-man, laborer, or any other person.

10.24 Authority to File Notices. Borrower authori es, appoints, and designates the Lender as its attorney-in-fact to file for record any financing statement, Food Security Act notice, or other notice that the Lender deems necessary to protect its interest under this Agreement. This power shall be deemed coupled with an interest and shall be irrevocable while any sum or performance remains due and owing under any of the Financing Agreements.

10.25 Exhibits and Schedules. All exhibits and schedules attached hereto are incorporated herein by this reference.

10.26 Counterparts. This Agreement and any of the Financing Agreements may be executed in counterparts.

10.27 Release. Borrower and Borrower's officers, directors, members, managers, agents, employees, representatives, successors, and assigns and participants do hereby completely and unconditionally release and forever discharge the Lender and its successors and assigns, and its officers, directors, agents, employees, and representatives from any and all claims, demands, actions, causes of action, costs, expenses, damages, or liabilities of whatever kind or nature, direct, indirect, third-party, or derivative, known or unknown, absolute or contingent, now existing or hereafter arising, which are based directly or indirectly upon facts, events, transactions, or occurrences directly or indirectly involving or relating to any and all matters by, between, and among the Lender and the Borrower which transpired prior to the date of this Agreement.

10.28 No Reliance. From time to time, and possibly frequently, one or more representatives of the Lender shall inspect the Collateral and Borrower's business and may make comments or suggestions as to the management or operations of the Borrower's business. Borrower acknowledges and agrees that it is solely Borrower's decision to accept or disregard any such comments or suggestions of Lender's representatives. Borrower further acknowledges and agrees that the consequence of following or disregarding such comments and suggestions shall be born solely by Borrower. The purpose of this provision is to obtain Borrower's acknowledgement and agreement that in the event Borrower's operation fails Borrower shall not and cannot contend that such failure is in consequence to any discussions, comments or suggestions between Borrower and Lender concerning Borrower's commercial farming business.

10.29 Agreement to overn and Control. In the event of any conflict or ambiguity between the terms of this Agreement and the terms of the other Financing Agreements, the terms of this Agreement shall govern and control.

Remainder of Page Intentionally Blank

**LENDER:**

CONTERRA AGRICULTURAL CAPITAL, LLC, an Iowa limited liability company

By: ______________________
Paul Erickson
Its: CEO

**BORROWER:**

**HRONIS CAPITAL ASSET, LP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: ______________________
Kosta Hronis
Its: Manager

**HRONIS CAPITAL MANAGEMENT, LLC**, a California limited liability company

By: ______________________
Kosta Hronis
Its: Manager

**HRONIS CITRUS, LLC**, a California limited liability company

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: Manager

By: ______________________
Kosta Hronis
Its: Manager

**HRONIS FARMING, LP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: ______________________
Kosta Hronis
Its: Manager

**HRONIS FRUIT COMPANY LLC**, a California limited liability company

By: ______________________
Peter John Hronis
Its: Member

By: ______________________
Kosta James Hronis
Its: Member

By: ______________________
Peter Nickolas Hronis
Its: Member

By: ______________________
Demetri Albert Hronis
Its: Member

**HRONIS, INC.**, a California corporation

By: ______________________
Kosta Hronis
Its: President

By: ______________________
Peter J. Hronis
Its: Secretary

**HRONIS LAND COMPANY**, a California partnership

By: ______________________
Kosta Hronis
Its: Partner

By: ______________________
Peter Hronis
Its: Partner

**HRONIS RANCH, LLC**, a California limited liability company

By: ______________________________
Demetri Hronis
Its: Sole Member

**HRONIS RESOURCE MANAGEMENT, LLC**, a California limited liability company

By: ______________________________
Kosta Hronis
Its: Manager

**THE HRONIS FAMILY LIMITED PARTNERSHIP**, a California limited partnership

By: HRONIS CAPITAL MANAGEMENT, LLC, a California limited liability company
Its: General Partner

By: ______________________________
Kosta Hronis
Its: Manager

**GUARANTOR:**

______________________________
PETER JOHN HRONIS, individually

______________________________
KOSTA JAMES HRONIS, individually

______________________________
DEMETRIUS ALBERT HRONIS, individually

KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO

PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO

KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012

PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012

KOSTA HRONIS, TRUSTEE, OF THE KOSTA HRONIS LIVING TRUST DATED FEBRUARY 12, 2014, AND ANY AMENDMENTS THERETO

PETER JOHN HRONIS, TRUSTEE, OF THE PETER JOHN HRONIS LIVING TRUST DATED FEBRUARY 28, 2006, AND ANY AMENDMENTS THERETO

KOSTA HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012

PETER J. HRONIS, TRUSTEE OF THE SOPHIA HRONIS IRREVOCABLE TRUST ONE DATED DECEMBER 27, 2012

# Exhibit A

## Position Report Certificate

| Position Report | | | [Date] | [Date] | |
|---|---|---|---|---|---|
| | Consolidation | *Eliminations* | *Hronis Inc Consolidated* | *Hronis Fruit Company* | *Comments:* |
| **Current Assets** | | | | | |
| Cash, cash equivalents, and restricted cash: | $ - | | $ - | $ - | |
| Eligible Accounts receivable: | $ - | | $ - | $ - | |
| Finished Inventories - Grapes: | $ - | | $ - | $ - | |
| Finished Inventories - Citrus: | $ - | | $ - | $ - | |
| Cash Investment Growing Crops - Unfinished Inventory: | $ - | | $ - | $ - | |
| Related Parties: | $ - | | $ - | $ - | |
| Other: | $ - | | $ - | $ - | |
| ***Total*** | ***$ -*** | | ***$ -*** | ***$ -*** | |
| | | | | | |
| **Current Liabilities** | | | | | |
| Operating Loan Outstanding | $ - | | $ - | $ - | |
| AP | $ - | | $ - | $ - | |
| AP - Past Due | $ - | | $ - | $ - | |
| Brokerage Payable | $ - | | $ - | | |
| Grower Payable | $ - | | $ - | $ - | |
| Accrued interest | $ - | | $ - | | |
| MCA Debt: | $ - | | $ - | $ - | |
| Related Party Payables: | $ - | | $ - | $ - | |
| Other: | $ - | | $ - | $ - | |
| ***Total*** | ***$ -*** | | ***$ -*** | ***$ -*** | |
| | | | | | |
| **Current Position (Deficit)** | ***$ -*** | | ***$ -*** | ***$ -*** | |
| **Current Ratio** | ***#DIV/0!*** | | ***#DIV/0!*** | ***#DIV/0!*** | |

The undersigned hereby certifies that (i) assets reflected herein are owned by the borrower free and clear of any liens, claims, or reservations of title, except those in favor of Conterra Asset Management, (ii) all information contained in the Position Report and its supporting documents are true, correct and complete in all respects as of the date of this certificate, and (iii) that the undersigned is authorized to execute this certificate.

| | |
|---|---|
| Prepared By: | |
| Signature: | x |
| Title | |
| Date Prepared: | |

Schedule 1.1(a)

Real Property Collateral No. 1

(Attached)

Schedule 1.1(a)

**Real Property Collateral No. 1**

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED UNINCORPORATED AREA OF TULARE, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**TRACT A**

**PARCEL 1: APN: 318-010-002**

The Southwest quarter of the Northwest quarter of Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the rights or interest in said land conveyed to the County of Tulare, by deed recorded December 8, 1908 in Book 9, Page 282 of Rights of Way, which deed conveys a strip of land to be used as a public highway over the West 25 feet of the Northwest quarter of said Section 26.

Also Excepting therefrom an undivided one-half of all oil, gas and other hydrocarbon substances in and under said real property and the right to remove the same, as reserved by F.C. Drumm and Dona Mabel Drumm, husband and wife, in deed recorded December 27, 1956 in Book 1965, Page 56 as Document No. 38535 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Lee W. Halverstadt and Dorothy W. Halverstadt, husband and wife, in deed recorded June 30, 1993 as Document No. 93-046030 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Betty Lou Halverstadt, in deed recorded June 30, 1993 as Document No. 93-046031 of Official Records.

**PARCEL 2: APN: 318-020-005**

Lots 1 and 8 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Lee W. Halverstadt and Dorothy W. Halverstadt, husband and wife, in deed recorded June 30, 1993 as Document No. 93-046030 of Official Records.

Also Excepting therefrom an undivided one-fourth of all oil, gas, minerals and other hydrocarbon substances in and under said land, as reserved by Betty Lou Halverstadt, in deed recorded June 30, 1993 as Document No. 93-046031 of Official Records.

**PARCEL 3: APN: 318-020-016**

Parcel 2 of Lot Line Adjustment No. PLA 93-028, in the unincorporated area, County of Tulare, State of California, according to the decision of the Planning and Development Director of the County of Tulare approving Lot Line Adjustment Map No. PLA 93-028, recorded July 29, 1993 as Document No. 93-52969 of Official Records, in the office of the County Recorder of said County, and is described as follows:

Lots 7 and 10 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Excepting therefrom the South 200.00 feet of the East 325.00 feet of said Lot 7.

**PARCEL 4: APN: 318-020-011**

A right of way over the South 18 feet of the East three-quarters (3/4) of Lot 2 of Earlimart Colony Lands, in Section 26, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded March 16, 1908 in Book 8, Page 26 of Maps, in the office of the County Recorder of said County.

Parcel 4 is shown for conveyance purposes only, no insurance is hereby offered.

**PARCEL 5: APN: 318-340-001**

The West half of the Northwest quarter of Section 36, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the South 30 feet thereof, as conveyed to the County of Tulare in deed recorded September 13, 1954 in Book 1777, Page 7 as Document No. 27099 of Official Records.

Also Excepting therefrom the North 40 feet thereof, as conveyed to the County of Tulare, in deed recorded October 25, 1961, in Book 2295, Page 19 as Document No. 33391 of Official Records.

Also Excepting therefrom an undivided one-half interest in all oil, gas and minerals in and under said land, together with the right of the grantor, its successors and assigns, and legal representatives at all times to enter on the above described lands and take all the usual necessary or convenient means to bore wells, make excavations and to remove all the oil, gas and minerals found thereon and herein reserved, as reserved by Bank of America National Trust and Savings Association, a national banking association, in deed recorded December 7, 1934 in Book 600, Page 271 of Official Records.

**PARCEL 6: APN: 318-340-004**

The West 30 acres of the Northeast quarter of the Northwest quarter of Section 36, Township 23 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the North 40 feet thereof, as conveyed to the County of Tulare, in deeds recorded July 19, 1961 in Book 2276, Page 418 as Document No. 22864 of Official Records, and July 27, 1961 in Book 2278, Page 184 as Document No. 23847 of Official Records.

Also Excepting therefrom, all gas, oil and other hydrocarbon substances and minerals, together with a reasonable right of ingress and egress to develop and extract the same, as excepted in the Executor's Deed executed by Burnell G. Forgey, as executor of the will of Genevieve Forgey Robinson, deceased, recorded May 4, 1964 in Book 2503, Page 391 as Document No. 16086 of Official Records.

**PARCEL 7: APN: 319-010-008**

The Southwest quarter of the Northeast quarter of Section 22, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

**PARCEL 8: APN: 319-010-009**

The Northwest quarter of the Northeast quarter Section 22, Township 23, South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half of all oil gas and other hydrocarbon substances within or underlying said land, as reserved by James W. Clark and Mamie S. Clark, husband and wife, as joint tenants, in deed recorded May 17, 1955 in Book 1835, Page 166 as Document No. 17695 of Official Records.

**PARCEL 9: APN: 319-010-010**

The East half of the Northeast quarter of Section 22, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the right, title and interest in and to that portion of said land, described as "that portion
thereof acquired by the United States of America for the Friant-Kern Canal", as disclosed by deeds recorded January 29, 1997 as Document Nos. 97-005601 and 97-005602 of Official Records.

Also Excepting therefrom from the Northeast quarter of the Northeast quarter of said Section 22, one-half interest in and to all oil, gas and other hydrocarbons and minerals now or at any time hereafter situate therein and thereunder, together with, all easements and rights necessary or convenient for the production, storage and transportation thereof and the exploration and testing of the said real property and also the right to drill for, produce and use water from the said real property in connection with its drilling or mining operations thereof, subject to the terms and conditions contained therein, all as reserved by Capitol Company in deed recorded June 19, 1943 in Book 1034, Page 389 of Official Records.

**PARCEL 10: APN: 319-110-009**

The East half of the Northwest quarter; and the Southwest quarter of the Northwest quarter of Section 10, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in and to all oil, and/or natural gas underlying said land, together with, the right of ingress and egress to, from said property as may or shall be reasonable or necessary to utilize this exception and reservation and/or to enjoy the benefits thereof and/or to enable exploration for and/or production of such oil and/or natural gas, as reserved by Jim Christiansen in the deed recorded January 29, 1945 in Book 1109, Page 480 of Official Records.

**PARCEL 11: APN: 319-120-010**

The Northwest quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom as to an undivided one-half interest in and to all oil, gas and minerals in, on or under said property, together with incidental rights, as reserved by Maud Louise Hilliard, also known as Maude Louisa Hilliard, in deed recorded June 20, 1955 in Book 1842, Page 160 as Document No. 21480 of Official Records.

**PARCEL 12: APN: 319-120-011**

The Northeast quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom the East 40 feet thereof as conveyed to the County of Tulare, in deed recorded July 9, 1954 in Book 1764, Page 369 as Document No. 20675 of Official Records.

Also Excepting therefrom an undivided one-half interest in all minerals, oil, gas, petroleum and other hydrocarbon substances within and underlying said land, as reserved by Gordon R. Todd and Opal R. Todd, husband and wife, in deed recorded April 28, 1978 in Book 3526, Page 962 as Document No. 24201 of Official Records.

**PARCEL 13: APN: 319-120-012**

The Southeast quarter of the Southeast quarter of Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom that portion thereof conveyed to the United States of America For Friant-Kern Canal purposes, in deed recorded March 31, 1948 in Book 1294, Page 596 of Official Records.

Also Excepting therefrom that portion thereof conveyed to the United States of America for Friant Kem Canal purposes, in deed recorded November 16, 1949 in Book 1399, Page 310 of Official Records.

Also Excepting therefrom the East 40 feet thereof as conveyed to the County of Tulare, in deed recorded August 6, 1954 in Book 1770, Page 115 as Document No. 23456 of Official Records.

Also Excepting therefrom that portion thereof conveyed to Saucelito Irrigation District, in deed recorded October 28, 1960 in Book 2223, Page 109 as Document No. 31972 of Official Records.

Also Excepting therefrom an undivided 5% of all minerals, oil, gas, gasoline or other hydrocarbon substances on, in and under said land as granted by Carrie M. Broaded to George D. Broaded, in the Mineral Deed recorded March 14, 1955 in Book 1819, Page 123 as Document No. 9544 of Official Records.

**PARCEL 14: APN: 319-120-014**

The Southwest quarter of the Southeast quarter Section 15, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof.

Excepting therefrom an undivided one-half interest in all minerals, oil, gas petroleum and other hydrocarbon substances within or underlying said land, as reserved by George W. Wiseman, in deed recorded October 30, 1952 in Book 1629, Page 110 as Document No. 29418 of Official Records.

Also Excepting therefrom an undivided one-quarter interest in all minerals, oil, gas, petroleum and other hydrocarbon substances within and underlying said land, as reserved by Henry L. Lubking and August M. Lubking, husband and wife, in deed recorded April 28, 1978 in Book 3526, Page 959 as Document No. 24199 of Official Records.

**PARCEL 15: APN: 319-130-007, 012 and 013**
PART 1:

That portion of fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, lying West of the Westerly line of the Friant-Kern Canal right of way as granted to the United States of America, by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records.

Excepting therefrom that portion thereof granted to Saucelito Irrigation District, by deed recorded May 27, 1960 in Book 2197, Page 637 as Document No. 17083 of Official Records, described as follows:

Beginning, at the intersection of the Friant-Kern Canal center line and the South line of said Section 1;
thence, North 89° 42' West for a distance of 160.8 feet;
thence, North 33° 15' East for a distance of 48.9 feet to the true point of beginning;
thence, North 33° 15' East for a distance of 125.0 feet;
thence, North 56° 45' West for a distance of 50.0 feet;
thence, South 33° 15' West for a distance of 159.6 feet;
thence, North 88° 36' East for a distance of 60.8 feet to the true point of beginning.

Also Excepting the rights or interest conveyed to the County of Tulare, in deed recorded September 24, 1948 in Book 1311, Page 180 of Official Records, which deed conveys the North 40 feet of said land for the purpose of a public highway.

Also Excepting therefrom that portion thereof described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;
thence, North 00° 18' East 25 feet;

thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2,457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line, 1,542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line South 33° 41' West 1977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting that portion thereof described as follows:

Beginning, at a point in Southerly boundary of said Section 1, distant therealong South 89° 42' East 699.6 feet from the Southwest corner of said Section 1;

thence, along said Southerly boundary North 89° 42' West 525.0 feet;
thence, leaving said Southerly boundary North 00° 18' East 25.0 feet to a point in the Northerly boundary of the county road right of way;
thence, North 89° 29' East 1005 feet to a point in the Northwesterly boundary a certain tract of land as conveyed to the United States of America by deed recorded in Book 1289 Page 154, of Official Records, said point also being the most Southwesterly corner of that certain tract of land as conveyed to the Saucelito Irrigation District by deed dated February 5, 1960, and recorded May 27, 1960 in Book 2197, Page 637 as Document No. 17083 of Official Records;
thence, along said Northwesterly boundary as follows:
South 88° 36' West 480.1 feet;
thence, South 00° 18' West 25.0 feet to the point of beginning.

Also Excepting therefrom an undivided one-half interest in and to all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of C.L. Crow and Mildred B. Crow, his wife, their successors, heirs or assigns, to enter into, upon, or about and above the above described real property for the purpose of exploring, drilling, mining, storing or removing the same or any part thereof from the above described real property, as reserved by C.L. Crow and Mildred B. Crow, his wife, in deed to George S. Maze and Sheila S. Maze, his wife, as community property, recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records, and being the same undivided one-half interest in and to said substances, as reserved by C.L. Crow and Mildred B. Crow, his wife, in the Agreement of Sale dated January 4, 1952, recorded January 17, 1952 in Book 1563, Page 289 as Document No. 1591 of Official Records.

Also Excepting therefrom an undivided one-fourth interest in and to all oil, gas, petroleum, casinghead gas or other hydrocarbon substances together with, minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of Dean A. Pearce and Verda Lee Pearce, his wife, their successors, heirs or assigns, to enter into, upon, about and above, the above described real property, for the purposes of exploring, drilling, mining, storing or removing the same or any part thereof, from the above described real property, all as reserved by Dean A. Pearce and Verda Lee Pearce, in deed recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records.

Also Excepting from the South 30 acres, lying West of the Friant-Kern Canal right of way in said Section 1, all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with, minerals or either or all of them, situated and being or to be found or discovered in, on or under a portion of the above described real property, together with, rights incidental to the development thereof, as reserved by George S. Maze and Sheila S. Maze, his wife, in the instrument entitled Declaration of Trust (deed), recorded March 1, 1957 in Book 1979, Page 720 as Document No. 7226 of Official Records.

Excepting from all of said land, except the South 30 acres thereof, seventy-five percent of the minerals, such minerals to include but not be limited to oil, gas, casinghead gas, associated hydrocarbons, coal, lignite, sulphur, phosphate, lead, zinc, copper, iron ore and other metallic ores, sodium, salt, uranium, thorium, molybdenum, vanadium, geothermal energy, titanium and other fissionable materials, gold, silver (and other precious metals), bauxite, limestone and other stones, gypsum and other minerals (sand, gravel and clay being the only exceptions) now owned or hereafter acquired by party of the first part in, on or under the real property, together with, full rights of ingress and egress and use of the surface to the extent reasonably necessary for the purpose of exploring, drilling, mining (including, to the extent reasonable in the circumstances, open pit and strip mining), developing, producing, storing, removing, treating and transporting said materials, all as reserved by The Travelers Insurance Company, in Quit Claim Deed recorded November 28, 1988 in Book 4774, Page 156, as Document No. 74413 of Official Records.

PART 2:

A strip of land lying adjacent to the Friant-Kern Canal in fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, being a portion of the 44.7 acre parcel of land described in the deed to the United States of America recorded April 12, 1948 in Book 1289, Page 154 of Official Records, said portion being described as Parcel "A" in the deed executed by the United States of America, recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records, described as follows:

Beginning, at a point in the Northwesterly boundary of said 44.7 acre parcel distant South 60° 23' West 45.8 feet from a point in the Easterly boundary of said Section 1, that is distant therealong South 00° 23' West 157.3 feet from the Northeast corner of said Section 1;
thence, from said point of beginning entering said 44.7 acre parcel South 67.1 feet;
thence, South 60° 38' West 746.8 feet;
thence, South 55° 17' West 329.8 feet;
thence, South 46° 00' West 819.8 feet;
thence, North 74° 36' West 69.5 feet;
thence, South 45° 39' West 70.0 feet;
thence, South 15° 24' East 69.5 feet;
thence, South 44° 49' West 342.5 feet;
thence, South 39° 41' West 228.7 feet;
thence, South 33° 41' West 2855.2 feet;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900.0 feet;
thence, North 56° 45' West 35.0 feet to the Northwesterly boundary of said 44.7 acre parcel;
thence, along said Northwesterly boundary as follows:

North 33° 15' East 1400.0 feet;
thence, North 34° 12' East 600.1 feet;

thence, North 32° 32' East 800.0 feet;
thence, North 33° 36' East 1080.3 feet;
thence, North 42° 08' East 235.1 feet;
thence, North 34° 09' East 1053.6 feet;
thence, South 44° 21' East 195.0 feet;
thence, North 45° 39' East 302.7 feet;
thence, North 58° 02' East 906.7 feet;
thence, North 60° 23' East 180.0 feet to the point of beginning,

Excepting therefrom that portion thereof described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;
thence, North 00° 18" East 25 feet;
thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2,457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line 1,542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line South 33° 41' West 1,977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting therefrom seventy-five percent of the minerals, such minerals to include but not be limited to oil, gas, casinghead gas, associated hydrocarbons, coal, lignite, sulphur, phosphate, lead, zinc, copper, iron ore and other metallic ores, sodium, salt, uranium, thorium, molybdenum, vanadium, geothermal energy, titanium and other fissionable materials, gold, silver (and other precious metals), bauxite, limestone and other stones, gypsum and other minerals (sand, gravel and clay being the only exceptions) now owned or hereafter acquired by party of the first part in, on or under the real property, together with, full rights of ingress and egress and use of the surface to the extent reasonably necessary for the purpose of exploring, drilling, mining (including, to the extent reasonable in the circumstances, open pit and strip mining), developing, producing, storing, removing, treating and transporting said materials, all as reserved by The Travelers Insurance Company, in the Quit Claim Deed recorded November 28, 1988 in Book 4774, Page 156 as Document No. 74413 of Official Records.

PART 3:

That portion of the South half of fractional Section 1, Township 23 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, created in the deed recorded February 17, 1972 in Book 3017, Page 342 as Document No. 6826 of Official Records, described as follows:

Beginning at a point in the South line of said Section 1, distant 699.60 feet East of the Southwest corner thereof, said point being the Southwest corner of the parcel of land conveyed to the United States of America, for the Friant-Kern Canal right of way by deed recorded April 12, 1948 in Book 1289, Page 154 of Official Records;

thence, North 00° 18' East 25 feet;
thence, North 88° 36' East 540.9 feet;
thence, North 33° 15' East 183.52 feet to the true point of beginning of the parcel herein to be described;
thence, North 02° 22' East 2457.75 feet to a point in the North line of the South half of said Section 1;
thence, South 89° 31' 30" East, along said last mentioned North line, 1542.83 feet to a point in the Easterly line of Parcel "A" of the land conveyed to George S. Maze and wife, by deed recorded July 9, 1959 in Book 2135, Page 196 as Document No. 22184 of Official Records;
thence, along said Easterly line, South 33° 41' West 1977.96 feet to an angle point therein;
thence, South 26° 44' West 125.9 feet;
thence, South 33° 15' West 900 feet;
thence, North 02° 22' East 68.19 feet to the true point of beginning.

Also Excepting therefrom an undivided one-half interest in and to all oils, gas, petroleum, casinghead gas or other hydrocarbon substances, together with minerals or either or all of them situated and being or to be found or discovered in, on or under or above any portion of the above described real property, together with, the right on behalf of C.L. Crow and Mildred B. Crow, his wife, their successors, heirs or assigns, to enter into, upon, or about and above the above described real property for the purpose of exploring, drilling, mining, storing or removing the same or any part thereof from the above described real property, as reserved by C.L. Crow and Mildred B. Crow, his wife, in deed to George S. Maze and Sheila S. Maze, his wife, as community property, recorded October 3, 1956 in Book 1951, Page 24 as Document No. 30786 of Official Records, and being the same undivided one-half interest in and to said substances, as reserved by C.L. Crow and Mildred B. Crow, his wife, in the Agreement of Sale dated January 4, 1952, recorded January 17, 1952 in Book 1563, Page 289 as Document No. 1591 of Official Records.

Also Excepting therefrom all oil, gas and other hydrocarbon substances and minerals lying in, upon or under, or which may be produced, save or sold from real property, with the right of reasonable ingress and egress and all rights necessary and incidental to drilling for and removing such oil, gas and other hydrocarbon substances and minerals therefrom, and subject to all reservations of oil, gas and other hydrocarbon substances and minerals heretofore made by grantor's predecessors in title, all as reserved by S.A. Camp Ginning Company, a California corporation in the deed recorded January 16, 1970 in Book 2876, Page 391 as Document No. 1730 of Official Records.

**PARCEL 16: APN: 338-080-015**

The Northwest quarter of Section 30, Township 24 South, Range 26 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, to the Official Plat thereof.

Excepting therefrom that portion of the Northwest quarter of said Section 30 described as follows:

Beginning, at the Southwest corner of said Northwest quarter;
thence, East, along the South line of said Northwest quarter, a distance of 2654.66 feet, more or less, to the Southeast corner of said Northwest quarter;
thence, North, along the East line of said Northwest quarter, a distance of 35.0 feet;
thence, Westerly parallel to the South line of the Northwest quarter, a distance of 21.7 feet;
thence, Northerly parallel to the East line of the Northwest quarter, a distance of 4.0 feet;
thence, West 2632.96 feet, more or less, to a point on the West line of said Northwest quarter, said point being 40.0 feet North of the Southwest corner of said Northwest quarter;
thence, South 40.0 feet to the point of beginning.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

**PARCEL 17: APN: 338-080-014**

Lots 6 and 8 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

**PARCEL 18: APN: 338-080-037**

Lots 2 and 4 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County, together with, that portion of the Northwest quarter of Section 30, Township 24 South, Range 26 East, Mount Diablo Base and Meridian, in the County of Tulare, State of California, according to the Official Plat thereof described as follows:

Beginning, at the Southwest corner of said Northwest quarter;
thence, East, along the South line of said Northwest quarter, a distance of 2654.66 feet, more or less, to the Southeast corner of said Northwest quarter;
thence, North, along the East line of said Northwest quarter, a distance of 35.0 feet;
thence, Westerly parallel to the South line of the Northwest quarter, a distance of 21.7 feet;
thence, Northerly parallel to the East line of the Northwest quarter, a distance of 4.0 feet;
thence, West 2632.96 feet, more or less, to a point on the West line of said Northwest quarter, said point being 40.0 feet North of the Southwest corner of said Northwest quarter;
thence, South 40.0 feet to the point of beginning,

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons

in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for

any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

**PARCEL 19: APN: 338-080-038**

Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

Also Excepting therefrom an undivided one-fourth interest of the fifty percent defined therein in all oil, gas, minerals and other hydrocarbon substances in, upon or under Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same together with the night at all times to enter upon said lands for the abovementioned purposes with due regard to the use of the same by the grantees, their heirs, successors or assigns, as reserved by Kosta James Hronis, a married man as his sole and separate property, and Peter John Hronis, a married man as his sole and separate property, formerly as joint tenants now as tenants in common, in Quitclaim Deed recorded November 7, 2016 as Document No. 2016-0070603 of Official Records.

Also Excepting therefrom an undivided one-fourth interest of the fifty percent defined therein in all oil, gas, minerals and other hydrocarbon substances in, upon or under Lots 1 and 3 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, or any portion thereof and the right to prospect for the same and to drill for and to produce and take away the same together with the night at all times to enter upon said lands for the abovementioned purposes with due regard to the use of the same by the grantees, their heirs, successors or assigns, as reserved by Hronis Capital Management, LLC, in Quitclaim Deed recorded November 7, 2016 as Document No. 2016-0070604 of Official Records.

**PARCEL 20: APN: 338-080-039**

Lots 5 and 7 in Section 30, of Railway Realty and Investment Company Subdivision No. 7, in the unincorporated area, County of Tulare, State of California, according to the map thereof recorded June 8, 1914 in Book 15, Page 6 of Maps, in the office of the County Recorder of said County.

Excepting therefrom all of the minerals, metals, metalliferous substances, oil, gas and other hydrocarbons in and under said land, together with, the right at all times to enter upon said lands and to explore, drill, mine, produce, process, store, market and remove such minerals, metals, metalliferous substances, oil, gas and other hydrocarbons, and thereon to conduct all operations and to erect, maintain and remove all structures, fixtures, improvements, pipe lines and other facilities which may be necessary or useful for

any of such purposes, subject to the terms and conditions contained therein, all as conveyed by Di Giorgio Fruit Corporation, a Delaware corporation to Earl Fruit Company, a California corporation, in the Quitclaim Deed recorded April 3, 1962 in Book 2332, Page 377 as Document No. 13047of Official Records.

**PARCEL 21A: INTENTIONALLY DELETED**

**PARCEL 21B: INTENTIONALLY DELETED**

**PARCEL 21C: INTENTIONALLY DELETED**

**PARCEL 22: APN: 339-140-002**

The Northwest quarter of the Northwest quarter of the Northwest quarter of Section 27, and that portion of the North half of Section 27, Township 24 South, Range 27 East, Mount Diablo Base and Meridian, in the unincorporated area, County of Tulare, State of California, according to the Official Plat thereof, described as follows:

Beginning at the Northeast corner of the Northwest quarter of the Northwest quarter of the Northwest quarter of said Section 27; thence, South along the East line of the West half of the West half of the Northwest quarter of said Section 27, 1390.4 feet;
thence, East parallel with the North line of said Section 27, 2978.45 feet;
thence, North 1390.4 feet to the North line of said Section 27;
thence, West along said North line, 990 feet to the Northeast corner of the Northwest quarter of said Section 27;
thence, continuing West along said North line 1988 45 feet to the place of beginning.

Excepting therefrom the West 55 feet of the Northwest quarter of the Northwest quarter of the Northwest quarter, as conveyed to the State of California, in deed recorded April 28, 1945 in Book 1121, Page 248 of Official Records.

Also Excepting therefrom all oil, gas, minerals, geothermal and other hydrocarbon substances in and under said land, as reserved by Treecrop Company, a limited partnership in the deed recorded April 27, 1979 in Book 3647,Page 97 as Document No. 24614 of Official Records.

**PARCEL 23-54: INTENTIONALLY DELETED.**

**TRACT B**

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**PARCEL 1-29: INTENTIONALLY DELETED**

**PARCEL 30: APN: 320-200-074-000:**

PARCEL 1 OF PARCEL MAP NO. PPM 14-050, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA ACCORDING TO RESOLUTION 9058,

RECORDED MAY 5, 2015, AS DOCUMENT NO. 2015-0023758, OF OFFICIAL RECORDS, AND DESCRIBED AS FOLLOWS:

THAT PORTION OF THE SOUTHWEST QUARTER OF FRACTIONAL SECTION 2, TOWNSHIP 23 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING, AT THE SOUTHEAST CORNER OF THE WEST HALF OF THE WEST HALF OF SAID SOUTHWEST QUARTER;
THENCE, NORTH 0°32'10" EAST 1272.30 FEET ALONG THE EAST LINE OF SAID WEST HALF OF THE WEST HALF OF SAID SOUTHWEST QUARTER;
THENCE, SOUTH 89°22'59" EAST 969.20 FEET;
THENCE, SOUTH 00°29'44" WEST 1268.10 FEET TO THE SOUTH LINE OF SAID SOUTHWEST QUARTER;
THENCE, SOUTH 89°37'52" EAST 970.10 FEET TO THE POINT OF BEGINNING.

**PARCEL 31: INTENTIONALLY DELETED**

**PARCEL 32: INTENTIONALLY DELETED**

**TRACT C**

**THE LAND REFERRED TO HEREIN BELOW IS SITUATED UNINCORPORATED AREA OF TULARE, COUNTY OF TULARE, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:**

**PARCEL 1-7: INTENTIONALLY DELETED**

**PARCEL 8: APN: 320-230-033-000:**

PARCEL 1 OF RECORD OF SURVEYS OF LOTS 88 AND 97 OF TERRA BELLA LANDS, SUBDIVISION NO. 5, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED JANUARY 26, 1960, IN BOOK 9, PAGE 55 OF LICENSED SURVEYS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY. SAID TERRA BELLA LANDS, SUBDIVISION NO. 5 RECORDED IN VOLUME 8, PAGE 15 OF MAPS.

**PARCEL 9: APN: 320-230-082-000:**

PARCEL 1 OF LOT LINE ADJUSTMENT MAP NO. PLA 10-015, IN THE UNINCORPORATED AREA OF THE COUNTY OF TULARE, STATE OF CALIFORNIA ACCORDING TO THE INSTRUMENT RECORDED DECEMBER 1, 2011, AS DOCUMENT NO. 2011-0074944, OF OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

PARCEL 2 OF PARCEL MAP NO. 2539 PER MAP RECORDED IN BOOK 26, PAGE 40 OF PARCEL MAPS IN THE OFFICE OF THE COUNTY RECORDER, COUNTY OF TULARE, STATE OF CALIFORNIA AND PARCEL 3 OF RECORD OF SURVEY PER MAP RECORDED IN BOOK 9,

PAGE 55 OF LICENSED SURVEYS IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM, THE SOUTH 167.00 FEET OF SAID PARCEL 3

**PARCEL 10A: APN: 339-110-007 PORTION**

THE SOUTH 40 ACRES OF THE SOUTHWEST QUARTER; AND THE WEST 990 FEET OF THE SOUTH 40 ACRES OF THE SOUTHEAST QUARTER OF SAID SECTION 22, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE WEST 55 FEET THEREOF, AS CONVEYED TO THE STATE OF CALIFORNIA, IN DEED RECORDED APRIL 28, 1945 IN BOOK 1121, PAGE 248 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

**PARCEL 10B: APN: 339-110-007 PORTION**

LOTS 20, 27, 28, AND 37 OF G.A. HART'S SUBDIVISION NO 1, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE MAP THEREOF RECORDED JULY 3, 1912 IN BOOK 12, PAGE 1 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPTING THEREFROM THE WEST 30 FEET OF SAID LOTS 20, 28, AND 37, AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE FINAL ORDER OF CONDEMNATION, RECORDED JUNE 21, 1945 IN BOOK 1128, PAGE 103 OF OFFICIAL RECORDS.

ALSO EXCEPTING THEREFROM ALL OIL, GAS, MINERALS, GEOTHERMAL AND OTHER HYDROCARBON SUBSTANCES IN AND UNDER SAID LAND, AS RESERVED BY TREECROP COMPANY, A LIMITED PARTNERSHIP IN THE DEED RECORDED APRIL 27, 1979 IN BOOK 3647, PAGE 97 AS DOCUMENT NO. 24614 OF OFFICIAL RECORDS.

**PARCEL 10C: APN: 339-110-007 PORTION**

THE NORTHWEST QUARTER OF THE NORTHWEST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 22, TOWNSHIP 24 SOUTH, RANGE 27 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA, COUNTY OF TULARE, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THE WEST 55 FEET THEREOF, AS CONVEYED TO THE STATE OF CALIFORNIA, IN THE FINAL ORDER OF CONDEMNATION, RECORDED JUNE 21, 1945 IN BOOK 1128, PAGE 103 OF OFFICIAL RECORDS.